FILED
2025 OCT 14 PM 12:44
CLERK
U.S. DISTRICT COURT

Tracie Halvorsen
Petitioner Pro *Se*
138 E 12300 S
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com

---

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF UTAH

| | |
|---|---|
| TRACIE HALVORSEN, SOPHIE ANDERSON, NANCY INMAN, STEVEN HUBER, WAYNE WICKIZER, and DANIEL NEWBY<br><br>Plaintiffs,<br><br>v.<br><br>SPENCER COX as an individual and official capacity; DEIDRE HENDERSON as an individual and official capacity; CURTIS BRAMBLE as an individual and in his capacity as Utah State Senator, DANIEL MCCAY as an individual and in his capacity as Utah State Senator; MIKE SCHULZ as an individual and in his capacity as a legislator in the House of Representatives and Speaker of the House; J. STUART ADAMS as an individual and in his official capacity as a legislator in the Senate and President of the Senate; BRIAN MCKENZIE as an individual and county clerk for Davis County; MATTHEW DURRANT as an individual and in his capacity as the Chief Justice of the Utah Supreme Court; ROBERT AXSON, as an individual and state party official; KIM COLEMAN as an individual and state party official; CHRIS NULL as an individual and county party official; STATE OF UTAH, a | **COMPLAINT VIOLATIONS OF FIRST AND FOURTEENTH AMENDMENT**<br><br>**(JURY DEMANDED)**<br><br>Case No.<br><br>Judge:<br>Case: 2:25-cv-00909<br>Assigned To : Bennett, Jared C.<br>Assign. Date : 10/14/2025<br>Description: Halvorsen et al v. Cox et al |

| governmental entity, the state and its political subdivisions, as if a private person, | |
|---|---|
| | |

## I.     Introduction

1.      This action targets a racketeering enterprise within Utah, orchestrated by Defendants, including Gov. Spencer Cox and Lt. Gov. Deidre Henderson, to manipulate Utah's election laws from 2016 to 2024 by unlawfully certifying candidates who sought nomination through signature-gathering under Utah Code § 20A-9-408, despite URP bylaws prohibiting this method and mandating the delegate-driven convention process under § 20A-9-407, as permitted by § 20A-9-403(13)(c)'s "either or both" provision. These certifications violated § 20A-9-401(2), which protects URP's internal procedures, and undermined Utah's republican form of government (U.S. Const. art. IV, § 4) by nullifying the representative delegate process (e.g., Lyman's 67.54% vote for governor and Staggs 69.74% vote for U.S. Senate), causing financial, reputational, and constitutional injuries actionable under18 U.S.C. § 1964 and 42 U.S.C. § § §1983, 1985, and 1986.

2.      The enterprise's scheme centered on the unauthorized certification of candidates, such as Defendant Cox, who sought nomination through signature-gathering under Utah Code § 20A-9-408, despite URP bylaws prohibiting this method and mandating nominations solely through the delegate-driven convention process under § 20A-9-407, as permitted by § 20A-9-403(13)(c)'s "either or both" provision. These certifications violated § 20A-9-401(2), fraudulently misrepresenting candidate eligibility and undermining Utah's republican form of government (U.S. Const. art. IV, § 4) by subverting the representative delegate process, causing injuries actionable under 18 U.S.C. § 1964 and 42 U.S.C. § § §1983, 1985, and 1986.

3.     Through predicate acts of mail fraud (18 U.S.C. § 1341) via ballot mailings and wire fraud (18 U.S.C. § 1343) via deceptive social media and emails, the enterprise nullified the 2024 state convention results for the URP, including Phil Lyman's 67.54% delegate vote for governor, Trent Staggs' 69.74% for U.S. Senate, and Frank Mylar's 59.76% for Attorney General (with Rachel Terry advancing to a final primary ballot), causing financial, reputational, and constitutional injuries to Plaintiffs.

4.     Defendants' actions violated Plaintiffs' First Amendment associational rights, Fourteenth Amendment due process rights, and the Guarantee Clause (U.S. Const. art. IV, § 4) by certifying candidates who pursued signature-gathering under Utah Code § 20A-9-408, despite URP bylaws prohibiting this method and mandating the delegate-driven convention process under § 20A-9-407. Utah Code § 20A-9-403(13)(c) permits QPPs to choose "either or both" nomination methods, and URP's convention-only process, protected by § 20A-9-401(2), represents Utah's republican form of government through elected delegates. Defendants' unlawful certifications nullified the 2024 URP convention results (e.g., Lyman's 67.54% vote and Staggs 69.74 vote), causing financial, reputational, and constitutional injuries actionable under 18 U.S.C. § 1964 and 42 U.S.C. § §1983, 1985, and 1986.

5.     Plaintiffs' seek civil remedies including but not limited to appropriate orders ordering the divesting of Defendants from the enterprise, imposing reasonable restrictions on the future activities, prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in, and the recovery of threefold the damage sustained and cost of the suit.

## II.    Parties and Relevant Non-Parties

### A.  Plaintiffs

#### i.    Class 1 Plaintiffs: Plaintiffs Who Are Delegates of the Utah Republican Party

6.      Plaintiffs Tracie Halvorsen and Sophie Anderson, as URP state delegates, exercised their First and Fourteenth Amendment rights to participate in the April 27, 2024, convention (Exhibit 0046). Defendants' certification of candidates, such as Cox, who pursued signature-gathering under Utah Code § 20A-9-408 (¶¶ 97, 148, Exhibits 0050, 0069), nullified Class 1 Plaintiffs' votes (e.g., 67.54% for Lyman, 69.74% for Staggs) at the 2024 URP convention, violating their First Amendment associational rights (*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)), Fourteenth Amendment due process rights, and the Guarantee Clause (U.S. Const. art. IV, § 4). URP bylaws prohibit signature-gathering, mandating nominations solely under § 20A-9-407, as permitted by § 20A-9-403(13)(c)'s "either or both" provision. Defendants' actions violated § 20A-9-401(2), undermining the representative delegate-driven process that constitutes Utah's republican form of government, causing financial (e.g., convention costs) and reputational (e.g., "extreme right-wing" labels, ¶¶ 96, 145) injuries actionable under 18 U.S.C. § 1964 and 42 U.S.C. § §1983, 1985, and 1986.

### ii.      Class 2 Plaintiffs: Plaintiffs Who Are Utah Republican Party Members

7.      Plaintiffs Tracie Halvorsen, Sophie Anderson, Steven Huber, and Nancy Inman, are citizens of Utah and members of the URP. As active party members, they participated in the caucus held on March 5, 2024, where they and other members elected precinct chairs and delegates to represent them in the state's nominating convention process for qualified political parties. Defendants' certification of candidates who used signature-gathering under Utah Code § 20A-9-408 (¶¶ 97, 148, Exhibits 0050, 0069), despite URP bylaws prohibiting this method and mandating nominations under § 20A-9-407, rendered Class 2 Plaintiffs' March 5, 2024, caucus participation meaningless. Utah Code § 20A-9-403(13)(c) permits QPPs to choose "either or both" methods, and URP's convention-only process, protected by § 20A-9-401(2), reflects

Utah's republican form of government (U.S. Const. art. IV, § 4) through delegate representation. Defendants' actions violated Plaintiffs' First Amendment associational rights (*Tashjian*), Fourteenth Amendment due process/equal protection rights, and the Guarantee Clause, causing injuries actionable under 18 U.S.C. § 1964 and 42 U.S.C. § §1983, 1985, and 1986.

### iii.     Class 3 Plaintiffs: Plaintiffs Who Are Utah Unaffiliated Voters

8.     Plaintiff Wayne Wickizer, a citizen of Utah and the United States and an unaffiliated voter, exercised his First and Fourteenth Amendment rights to vote and express political preferences in the 2024 election. Defendants' certification of candidates, such as Cox, via signature-gathering under Utah Code § 20A-9-408 (¶ 148, Exhibit 0069), despite URP bylaws prohibiting this method and mandating nominations under § 20A-9-407, undermined Plaintiff Wickizer's 2024 associational right to associate with the convention nominee and write-in vote for Lyman, violating his Fourteenth Amendment right to a fair election (*Reynolds v. Sims*, 377 U.S. 533 (1964)) and the Guarantee Clause (U.S. Const. art. IV, § 4). Utah Code § 20A-9-403(13)(c) permits QPPs to choose "either or both" methods, and URP's convention-only process, protected by § 20A-9-401(2), ensures a delegate-driven republican form of government. Defendants' actions caused vote dilution and injuries actionable under under18 U.S.C. § 1964 and 42 U.S.C. § § §1983, 1985, and 1986.

### iv.     Class 4 Plaintiffs: Plaintiffs Who Are Citizens of Utah and the United States

9.     Plaintiff Daniel Newby, a citizen of Utah and the United States who does not participate in voting, exercised his First Amendment right to express political preferences by deliberately refraining from electoral participation as a protest against Utah legislature's policies, including those enabling the certification of disqualified candidates Defendants' certification of candidates via signature-gathering under Utah Code § 20A-9-408 (¶¶ 97, 148, Exhibits 0050,

0069), despite URP bylaws prohibiting this method and mandating nominations under § 20A-9-407, violated Plaintiff Newby's First Amendment right to express political preferences through deliberate non-voting as a protest against Utah's electoral policies (*Wooley v. Maynard*, 430 U.S. 705 (1977)), Fourteenth Amendment right to a fraud-free electoral process (*Reynolds v. Sims*, 377 U.S. 533 (1964)), and the Guarantee Clause (U.S. Const. art. IV, § 4). Utah Code § 20A-9-403(13)(c) permits QPPs to choose "either or both" methods, and URP's convention-only process, protected by § 20A-9-401(2), upholds Utah's republican form of government through delegate representation. Defendants' actions undermined electoral integrity, causing financial harm, emotional distress, and loss of confidence, actionable under 42 U.S.C. §§ 1983, 1985, 1986, 28 U.S.C. § 2201, and 18 U.S.C. § 1964.

### B. Defendants

#### i. Class 1 Defendants: Defendants Who Are State Officers in the Executive Department

10.    Defendant Spencer Cox (Defendant Cox), individually and in his official capacity as Governor is a state officer of the Executive Department of Utah.  Defendant Cox is responsible for supervising the official conduct of all executive and ministerial officers under Utah Code 67-1-1, including the Lieutenant Governor's office and official duties.

11.    Defendant Deidre Henderson (Defendant Henderson), individually and in her official capacity as the Lieutenant Governor, is a state officer within the Executive Department of Utah. She serves as Utah's chief election officer under Utah Code § 67-1a-2(2), who exercises direct authority over the conduct of elections for federal, state, and multicounty officers. Specifically, under Utah Code § 20A-9-407(6)(b), the Lieutenant Governor has the duty to

include the name of each candidates who are nominated and certified[1] by a qualified political

party under Section 20A-9-407 (the state's convention process) in both the general and primary

election ballot certifications. and the primary election ballot certification.[2]

### ii.    Class 2 Defendants: Defendants who are County Clerks

12.    Defendant Brian McKenzie, individually and in his official capacity as a county

clerk, is responsible for providing assistance "as applicable,"[3] under 20A-9-408(9). His role

includes determining whether each signature on a candidate's petition was made by a registered

voter qualified to sign, using the same circulation and verification requirements as those outlined

for statewide initiative petitions in Sections 20A-7-105 and 20A-7-204. This process applies to

petitions for qualified political parties that permit members to seek nomination by collecting

signatures, in accordance with the provisions of Section 20A-9-408.

### iii.    Class 3 Defendants: Defendants Who Are Legislative Actors and Lawmakers in the Legislative Department

13.    Defendant Curtis Bramble (Defendant Bramble), individually and in his official

capacity as a senator in the respective senatorial district 24 in the Legislative Department, which

holds the legislative power and is responsible for establishing laws governing Utah elections.

Additionally, Defendant Bramble's legislative authority includes enacting statutes that set the

---

[1] Utah Code § 20A-9-407(6)(a) A qualified political party that nominates a candidate under this section shall certify the name of the candidate to the lieutenant governor before the deadline described in Subsection 20A-9-202(1)(b).

[2] Utah Code § 20A-9-406(b) The lieutenant governor shall include, in the primary ballot certification or, for a race where a primary is not held because the candidate is unopposed, in the general election ballot certification, the name of each candidate nominated by a qualified political party under this section.

[3] Utah Code § 20A-9-408(9)(c)(iii) with the assistance of the county clerk as applicable, determine whether each signer is a registered voter who is qualified to sign the petition, using the same method, described in Section 20A-1-1002, used to verify a signature on a petition; and

procedures and requirements for conducting elections at all levels of government within Utah according to Utah Constitution Article IV, Section 9.

14.    Defendant Daniel McCay (Defendant McCay), individually and in his official capacity as a senator in the respective senatorial district 18 in the Legislative Department, which holds the legislative power and is responsible for establishing laws governing Utah elections. Additionally, Defendant McCay's legislative authority includes enacting statutes that set the procedures and requirements for conducting elections at all levels of government within Utah according to Utah Constitution Article IV, Section 9.

15.    Defendant Mike Schultz (Defendant Schultz), individually and in official capacity as legislator in the House of Representatives and Speaker of the House in the Legislative Department under Article VI of the Utah Constitution, and is responsible for establishing laws governing Utah elections. It is the legislature's duty, as a check on the Executive Department, to uphold the Utah Constitution's foundational principles, to correct the Executive's actions when it disregards or distorts these laws for its own benefit. All hold roles in the impeachment process under Sections 17 and 18.

16.    Defendant J. Stuart Adams, individually and in official capacity as legislator in the Senate and President of the Senate in the Legislative Department under Article VI of the Utah Constitution, and is responsible for establishing laws governing Utah elections. It is the legislature's duty, as a check on the Executive Department, to uphold the Utah Constitution's foundational principles, to correct the Executive's actions when it disregards or distorts these laws for its own benefit. Also hold roles in the impeachment process under Sections 17 and 18. As President of the Senate, he has the duty to convene the legislature into session in the case of an emergency in the affairs of the State to conduct necessary business, consider urgent

legislation, and take appropriate action to protect the public interests and uphold their
constitutional responsibilities, as required by Article VI § 2(3) of the Utah Constitution.

### iv.   Class 4 Defendants: Defendants Who Are Judicial Officers in the Judicial Department

17.    Defendant Matthew Durrant, individually and in his official capacity as Chief
Justice of the Utah Supreme Court, was appointed as a Supreme Court Justice in 2000 by then-
Governor Mike Leavitt. In accordance with Utah Article VIII, § 2 of the Utah Constitution, he
may render final judgment either *en banc* (all judges hear a case) or in divisions (a smaller panel
of at least 3 hear a case). Durrant has the responsibility to ensure the Utah Supreme court reviews
and rules upon any contests of the election. Pursuant to Utah Code § 20A-4-403(4),[4] the court is
mandated not to reject any petition contesting an election due to procedural deficiencies if the
grounds are sufficiently clear to inform the defendant of the specific cause or issue contested.

### v.   Class 5 Defendants: Defendants Who Are Officers of a State Registered Political Party

18.    Defendants Robert Axson, individually and in his official capacity as the
designated party officer and state party chair. Defendant Axson has the responsibility to act as
liaison with the lieutenant governor's office and each county legislative body for the Utah
Republican Party on all matters relating to state election laws.[5] Chair of the state central

---

[4] Utah Code § 20A-4-403(4) The court may not reject any statement of the grounds of contest or
dismiss the proceedings because of lack of form, if the grounds of the contest are alleged with
sufficient certainty as will advise the defendant of the particular proceeding or cause for which
the election is contested.
[5] Utah Code § 20A-8-402(1)(a) Each state political party shall: (a) designate a party officer to act
as liaison with: (i) the lieutenant governor's office; and (ii) each county legislative body; and"

committee for the qualified political party.[6] An election officer of a registered political party.[7] A "party official" holding a post in the political party.[8] An employee, which includes a volunteer for conducting a registered political party's nominating convention. Utah Code § 63G-7-102(3)(a)(ix). An individual responsible for acting as the liaison between the central committee to certifying the party's candidates under Utah Code § 20A-1-501(2) who are the nominee as the State of Utah designates the state central committee to carry out the primary convention process.[9]

19.    Defendant, Kim Coleman, individually and in her official capacity as a state actor, designated state party officer, as the state party vice chair to assist the Chair in his duties and perform the Chair's duties in the Chair's absence.[10] Individual who serves as vice chair the state central committee.[11] An election officer of a registered political party.[12] A "party official" holding a post in the political party.[13] An employee, which includes a volunteer conducting a registered political party's nominating convention. Utah Code § 63G-7-102(3)(a)(ix). An individual responsible for acting as the liaison between the central committee to certifying the party's candidates who are the nominee under Utah Code § 20A-1-501(2) as the State of Utah designates the state central committee to carry out the primary convention process.[14]

---

[6] Exhibit 3 - Utah Republican Party Const. Article III § B.1.
[7] *Id.* Article III § C.
[8] Utah Code § 76-8-101(1) "Party official" means an individual holding any post in a political party whether by election, appointment, or otherwise.
[9] Exhibit 9 – Utah Republican Party Bylaws, Special Rules, pg. 26.
[10] Exhibit 3 - Utah Republican Party Const. Article III § B.2
[11] *Id.*
[12] *Id.* Article III § C.
[13] Utah Code § 76-8-101(1)
[14] Exhibit 9 – Utah Republican Party Bylaws, Special Rules, pg. 26.

20.     Defendant Chris Null (Defendant Null), an individual, a state actor, designated party officer and county party chair to act as liaison with the lieutenant governor's office and each county legislative body for the Utah Republican Party on all matters relating to state election laws. Utah Code § 20A-8-402. Individual who serves as a voting member of the state central committee.[15] Chair and member of the county central committee.[16] A "party official" holding a post in the political party.[17] An employee, which includes a volunteer conducting a registered political party's nominating convention. Utah Code § 63G-7-102(3)(a)(ix). An individual acting under the color of law as the State of Utah designates the state and county central committee to carry out the state and county primary convention process. Utah Code § 20A-1-501.

### vi.     Class 6 Defendants: Defendants that are a Governmental Entity

21.     The State of Utah, a governmental entity, treated as a private person for liability purposes, is liable under Utah Code §§ 63G-7-102, 63G-7-202(1)(b) for the actions and misconduct of its public officers and public servants—specifically Defendants Cox, Henderson, Bramble, McCay, McKenzie, Adams, Schultz, Durrant, Axson, Coleman, and Null—whose wrongful acts and misconduct advanced a scheme to control Utah elections and political power.

## C.  Non-Party Co-Conspirators

### i.     Class 1 Non-party co-conspirators: Count My Vote Sponsors

22.     Michael O. Leavitt, Gail Miller, Stephen W. Owens, Norma W. Matheson, and Rich McKeown were sponsors of the Count My Vote (CMV) citizens' initiative petition filed in accordance with Utah Code § 20A-7-202, **Exhibit 0001**, CMV Application. The initiative aimed

---

[15] Exhibit 3 – Utah Republican Party Constitution, Article IV § B.
[16] Exhibit 10 – Salt Lake County Republican Party Bylaws Article III § 3
[17] Utah Code § 76-8-101(1)

to replace Utah's traditional caucus-convention system with a state-run, direct primary process for nominating candidates for federal, state, and county offices. It also proposed allowing candidates to qualify for the open primary ballot through signature-gathering efforts.

ii.    **Class 2 Non-party co-conspirators: Political Issue Committees**

23.    Alliance for Good Government, a Political Issues Committee (PIC), was established on November 7, 2011, with the purpose of soliciting or receiving donations and making expenditures to expressly advocate for political causes and to support the ballot proposition, Count My Vote (**Exhibit 0002** – Alliance for Good Government PIC Statement of Org.). Pursuant to Utah Code § 20A-11-801(3), Alliance for Good Government designated LaVarr Webb and Rich McKeown as the two primary officers. Additionally, Taylor D. Morgan and Lindsay Zizumbo, serving as Executive Directors, were listed as additional officers of the PIC, and Maura Carabello was identified as the Chief Financial Officer.

iii.    **Class 3 Non-party co-conspirators: Political Action Committees.**

24.    Count My Vote, a Political Action Committee (PAC), was established January 15, 2016, (**Exhibit 0003** – CMV PAC Statement of Organization) with the primary purpose of soliciting and receiving contributions from individuals or entities and making expenditures to expressly advocate for or against candidates seeking election to municipal or county offices.[18] Val Oveson was listed as Treasurer and Primary Officer 1, Rich McKeown serves as Director and Primary Officer 2, Taylor Morgan was identified as a Director, and David May was listed as an additional PAC officer.

---

[18] Utah Code 20A-11-101(35)(a) "Political action committee" means an entity, or any group of individuals or entities within or outside this state, a major purpose of which is to: (i)solicit or receive contributions from any other person, group, or entity for political purposes; or (ii) make expenditures to expressly advocate for any person to refrain from voting or to vote for or against any candidate or person seeking election to a municipal or county office.

### iv.    Class 4 Non-party co-conspirators: Donors and Supporting Individuals

25.    Class 4 Non Party Co-Conspirators encompasses individuals and entities who provided financial resources, in-kind contributions, or substantial support to the Count My Vote (CMV) initiative and the Alliance for Good Government, influencing Utah's election laws to favor donor-backed candidates. These donors, operating in key economic sectors, have conflicts of interest as their support aligns with pursuing government contracts, subsidies, and regulatory advantages.

26.    Real Estate Interest Donors, including Gail Miller ($170,980.42), Delloy Hansen ($35,000), Kem C. Gardner ($25,000), H. Roger Boyer ($25,000), John Price ($25,000), Maccall Management LLC ($25,000), and Joseph Sorenson ($30,000) own or develop commercial and residential properties across Utah. They seek candidates who will pass policies favorable to public funding, tax incentives, and infrastructure improvements to enhance property values and project profitability. (See, **Exhibit 0004** Alliance for Good Gov Financial Disclosures)

27.    Healthcare Interest Donors, including James Wall ($10,000, Intermountain Healthcare), Huntsman Corporation ($100,000, Huntsman Cancer Institute), Leavitt Partners ($60,000, Mike Leavitt), Rich McKeown ($25,000), Dinesh Patel ($25,000, pharmaceuticals), Gary Crocker ($25,000, biotech), Merit Medical ($25,000, medical devices), and the Eccles Foundation (S.F. Eccles $30,000, Lisa Eccles $5,000, Katherine Eccles $5,000), invest in hospitals, biotech, and healthcare consulting. They pursue policies expanding healthcare funding and reducing operational costs to increase revenues (**Exhibit 0005** – Eccles, "Why my family supports a state-of-the-art hospital in West Valley – and why you should too," University of Utah Health, July 2, 2025, https://uofuhealth.utah.edu/notes/2025/07/why-my-family-supports-state-of-art-hospital-west-valley-and-why-you-should-too).

28.     Business and Advocacy Donors, including Sandy Chamber of Commerce ($49,000), Garff Enterprises ($25,000, automotive), James Swartz ($25,000, venture capital), H. Brent Beesley ($25,000, technology), and Donald Lewon ($25,000, manufacturing), advocate for economic growth, deregulation, and business-friendly policies to support their industries (**Exhibit 0006** – Lobbying Efforts).

29.     Insurance Donors, including Leavitt Group Enterprises ($25,914.30), focus on reforms to streamline insurance processes and enhance profitability in healthcare-related markets (**Exhibit 0007** – Legislation Passed).

**v.      Class 5 – Non-party co-conspirators: Signature Gathering Companies**

30.     On November 19, 2015, Tanner Leatham and Spencer Stokes incorporated Gathering, Inc. (**Exhibit 0008** – Gathering, Inc. Articles of Incorporation). Tanner Leatham is a Utah based entrepreneur and political consultant specializing in signature-gathering who developed his expertise as a door-to-door alarm salesman. In 2012, he was recruited by a friend to join Mitt Romney's presidential campaign advance team, where he handled event logistics (**Exhibit 0009** – As signature gathering begins in Utah, pros are taking to the streets - The Salt Lake Tribune).[19] Spencer Stokes, a seasoned Utah political consultant and lobbyist, co-founded Gathering, Inc., with Leatham, bringing over four decades of experience in GOP strategy, lobbying through his firm Stokes Strategies, and prior roles as Weber County Commissioner and executive director of the Utah Republican Party. It was Spencer Stokes who "suggested Leatham

---

[19] See Exhibit 0016, Robert Gehrke As signature gathering begins in Utah, pros are taking to the streets - The Salt Lake Tribune, January 5, 2016, https://archive.sltrib.com/article.php?id=3378785&itype=CMSID.

get involved in gathering signatures in Utah. Stokes now owns part of the business and consults with Leatham, along with Casey Hill, a lobbyist for Energy Solutions."[20]

### III.    Jurisdiction and Venue

31.    This is a civil action arising under the Constitution (e.g. First and Fourteenth Amendment) and the laws of the United States. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.[21]

32.    Plaintiffs are persons injured in their business and property by reason of violations of 18 U.S.C. § 1962 and is provided civil remedies pursuant to 18 U.S.C. § 1964 where this Court has jurisdiction to prevent and restrain violations of § 1962[22] and recover threefold the damages Plaintiffs have sustained.[23]

33.    Jurisdiction exists under 28 U.S.C. § 1343 as this is a civil action authorized by 42 U.S.C. §§§ 1983, 1985, and 1986 to recover damages or injury of the Plaintiffs' rights and privileges, to recover damages from any person who failed to prevent or to aid in preventing any

---

[20] *Id.* at page 7

[21] 28 U.S.C. § 1331 – Federal question. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

[22] 18 U.S.C. § 1964(a)The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

[23] 18 U.S.C. § 1964 (c)Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

wrongs mentioned in section 1985 of Title 42, to redress the deprivation or their rights and privileges, and to recover damages and other relief under Acts of Congress.

34.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

## IV.     Factual Basis for Claims

### D.  Background

35.     September 18, 2013, Count My Vote (CMV), Class 1 Non-party co-conspirators, led by Michael O. Leavitt, Gail Miller, Stephen W. Owens, Norma Matheson, and Rich McKeown, initiated an effort to replace Utah's traditional convention system by "modernizing" the election process. Advocating for amending Utah election laws to require candidates to be nominated through a "direct vote of the people in a regular primary election" suggesting that the convention system was outdated, exclusionary, and unfair. Claiming Utah's existing system greatly increased the potential for significant election fraud and administration problems. (**Exhibit 0001** - Count My Vote Submitted Initiative Application).

36.     A coalition of actors (Class 2- 4 Non-party  co-conspirators) joined forces to advocate for a direct primary system in Utah, using substantial campaign donations to Alliance for Good Government, a Political Issues Committee created on November 7, 2011, by LaVarr Webb, Rich McKeown, Maura Carabello, Taylor Morgan, and Lindsay Zizumbo, **Exhibit 0002** – Alliance for Good Government 2011 PIC SofO), to compel its implementation for nominating political candidates.

37.     According to Alliance for Good Government financial donations, **Exhibit 0003** –

2012 – 2016 Financial Report for Alliance for Good Government, the following individuals

comprise some of its top donors:

| Name | Amount Donated |
|---|---|
| Gail Miller | $170,980.42 |
| Mike Leavitt, Leavitt Group Enterprise, Leavitt Partners | $110,914.30 |
| Huntsman Corporation | $100,000.00 |
| Hatch Election Committee | $50,000.00 |
| S.F. Eccles, Lisa Eccles, Katherin Eccles | $40,000.00 |
| Sandy Chamber of Commerce | $49,000.00 |
| Dell Loy Hansen | $35,000.00 |
| Joseph Sorenson | $30,000.00 |
| Khosrow B. Semnani | $25,000.00 |
| H. Brent Beesley | $25,000.00 |
| Kem C. and Carolyn Barnes Gardner | $25,000.00 |
| John Price | $25,000.00 |
| Donald and Susan P. Lewon | $25,000.00 |
| Maccall Management LLC | $25,000.00 |
| H. Roger Boyer (Blake Moore's Father in law) | $25,000.00 |
| Merit Medical | $25,000.00 |
| Garff Enterprises Inc. | $25,000.00 |
| Rich McKeown | $25,000.00 |
| Dinesh Patel | $25,000.00 |
| Gary Crocker | $25,000.00 |
| Mark Miller | $25,000.00 |
| Prime Holdings Insurance Services Inc. | $25,000.00 |
| Ian M. Cumming (Gondola) | $25,000.00 |
| Leslie and Alan Layton | $25,000.00 |
| James Swartz | $25,000.00 |
| Jennifer Speers | $25,000.00 |
| Thackery Garn Company | $25,000.00 |
| Steve Creamer | $25,000.00 |
| Labore et Honore LLC | $25,000.00 |

38.     This effort resulted in a compromise with Utah lawmakers in 2014, known as

Senate Bill 54 (SB54), **Exhibit 0010** – SB0054 2014 Election Amendments.

17

39.     Defendants Bramble and McCay (Class 4 Defendants) sponsored SB54, asserting that the State's convention process was preserved under Utah Code § 20A-9-407.

40.     On February 14, 2014, during the Senate Business and Labor Committee (**Exhibit 0011** – Transcription of SB Labor Committee of 02.14.2014), Defendant Henderson, then Senator, voted in favor of SB54 advocating for preserving the caucus and convention process. Stating "…and you take away, this grassroots process, this caucus process, this convention process, this one-on-one process and you strip a whole group of people their ability to compete in this arena."[24]

41.     During that same committee meeting, Defendant Bramble states that SB54 "preserves the caucus and the convention system." Confirming that SB54 doesn't "dictate anything to any political party." That is parties wanted to "maintain the exclusive right of access for their candidate to the ballot based on solely their criteria, they would have that option under this bill. Where under Count My Vote, they would have no such option."[25]

42.     During the Senate Floor Debate, Defendant Henderson, stood again in favor of SB54 because it protected the convention process stating "I don't see how taking that option away from people and mandating that they only have one way, one direct primary way to get on the ballot, which will inject all kinds of big money into our elections, it will cost a lot of money, there won't be a way, it will be prohibitive. There won't be a way for regular folks and regular women to put their names forward. It will be prohibitive."[26]

---

[24] Exhibit 0011 attached herewith, Utah State Legislature, "Senate Business and Labor Committee – February 14, 2024," https://le.utah.gov/av/committeeArchive.jsp?timelineID=63650 – minute marker 47:33.
[25] *Id.* at minute marker 50:15.
[26] Utah State Legislature, "Senate - 2014 General Session – Day 24," https://le.utah.gov/av/floorArchive.jsp?markerID=86066  at minute marker 1:24:21.

43.     On March 3, 2014, during the House Government Operations Committee (**Exhibit 0012** – Transcript of House Gov Ops Committee), Defendant Bramble again states that SB54 "does not prohibit the parties from continuing to maintain their convention system."[27]

44.     On March 5, 2014, during the House Floor Debate, Defendant McCay stated that there were alternatives in SB54, "one is a signature path to a direct primary held only within the parties. The other is an alternative to that path where you can collect some signatures, depending on the varying offices that are offered in this state, to run for your heart's content. And upon arriving at those signatures, you can qualify for the ballot, or you can go through the current historical nominating process of the convention."[28]

45.     SB54 was signed into law on March 10, 2014. The URP responded by filing a Complaint, **Exhibit 0013** URP Complaint 2:14-cv-00876-DN, on December 1, 2014, challenging its constitutionality.

46.     On January 27, 2015, the Constitution Party of Utah filed a Complaint as an intervening Plaintiff, **Exhibit 0014** [27] CPU Complaint.

47.     SB54 mandated that political parties seeking to have their affiliation on the ballot at a general election must designate themselves as either a "Registered Political Party" ("RPP")[29] or a "Qualified Political Party" (QPP).[30]

48.     Under SB54, if a Registered Political Party (RPP) wanted to qualify its candidates for the general ballot without declaring itself as a Qualified Political Party it had to comply with

---

[27] Exhibit 0012 attached herewith Utah State Legislature, "House Government Operations Committee – March 3,2014", https://le.utah.gov/av/committeeArchive.jsp?timelineID=63886 – at minute marker 51:44.
[28] Exhibit 0013 Utah State Legislature, "House - 2014 General Session – March 5, 2014" https://le.utah.gov/av/floorArchive.jsp?markerID=87025 – at minute marker 1:31:00.
[29] See SB54, 2014 General Sess., attached hereto as Exhibit 0010 at 1115-1253, § 20A-9-403.
[30] *Id.* at 1335-1390, § 20A-9-406.

Utah Code Section 20A-9-403, which required a direct primary instead of a convention primary (in-direct primary). This statute mandated that an RPP "either declare [its] intent to participate in the next primary election, or declare that the [RPP] chooses not to have the names of its candidates for elected office featured on the ballot at the next general election."[31] This is done by filing a statement with the Lt. Governor no later than 5 pm on November 15 of the preceding odd-numbered year.[32]

49.     Initially, SB54, stipulated that a participating RPP could "identify one or more registered political parties whose members may vote" for the RPP's candidates and "whether or not persons identified as unaffiliated with a political party may vote" for the RPP's candidates.[33]

50.     During the 2015 General Session, Defendants Curtis and McCay sponsored Senate Bill 207 (**Exhibit 0015** - SB207 (2015)) amending SB54 to clarify that any candidate seeking a Registered Political Party's (RPP) nomination "must be a member of the registered political party to appear as the candidate in the primary election, except to the extent the RPP permits otherwise under the RPP's bylaws." (**Exhibit 0016** - [170] Mem. Decision and Order Denying Preliminary Injunction, ¶ 9, *Utah Republican Party v. Herbert, 133 F. Supp. 3d 1337, D. Utah 2015*)[34]

51.     Originally, SB54 allowed each party participating as a RPP to determine who could vote in its primaries. However, if a party chose to act as a QPP to utilize the State's

---

[31] *Id.* at 1134-1139, § 20A-9-403(2)(a)(i).
[32] *Id.* at 1167-1171, § 20A-9-403(2)(b).
[33] *Id.* at 1140-1143, § 20A-9-403(2)(a)(ii).
[34] See SB 207, 2015 General Sess., attached as Exhibit 0015, at 626-32 ("an individual may not…(iii) file a declaration of candidacy for a [RPP] of which the individual is not a member, except to the extent that the [RPP] permits otherwise…")

convention process under Section 20A-9-407, it was required to permit unaffiliated voters to vote for the party's candidates in the primary election.[35]

52.    This created a "partially closed" or "quasi jungle" primary system where registered political party members could only vote in the own party's primary, while unaffiliated voters had some ballot-choice flexibility—similar to a "jungle" primary where all candidates are listed on a single ballot regardless of party, and voters select which ballot to participate in. Candidates thus could choose whether they would seek the qualified political party's nomination through convention, signature-gathering, or both.

53.    On November 13, 2015, in *Utah Republican Party v. Herbert* (133 F. Supp. 3d 1337, D. Utah 2015), Judge David Nuffer declared that the provision of SB54 requiring unaffiliated voters to participate in primaries (SB54 line number 805-806) —unconstitutional. This decision was based on violation of the URP's First Amendment rights to free association, and affirmed by *California Democratic Party v. Jones*, 530 U.S. 567 (2000) (**Exhibit 0017** – [215] Declaratory Judgment and Injunction).

54.    Relying on the plain language of Utah Code § 20A-9-101(13)(c),[36] the URP restricted its candidate-selection procedures to the convention method. (**Exhibit 0018** – Complaint in *URP v. Herbert* 2:16-cv-00038-DN at ¶¶ 29 and 30).

---

[35] See SB 54 (2014), attached as Exhibit 0004, at line 804-06 ("Qualified political party means a registered political party that…(a) permits voters who are unaffiliated with any political party to vote for the registered political party's candidates in a primary election…"

[36] 20A-9-101(13)(c) permits a member of the registered political party to seek the registered political party's nomination for any elective office by the member choosing to seek the nomination by **either or** both of the following methods: (i) seeking the nomination through the registered political party's convention process, in accordance with the provisions of Section 20A-9-407; or (ii) seeking the nomination by collecting signatures, in accordance with the provisions of Section 20A-9-408 [emphasis on bold].

55.    Cox responded by letter dated November 19, 2015, **Exhibit 0019** – Letter from Lt. Gov. Cox dated Nov. 19, 2015, that he disagreed and stated that the member is the one who chooses how they seek the Party's nomination, and acting under color of law and usurping his authority, he "intended to, allow candidates, in a qualified political party, the opportunity to choose between the convention system, gathering signatures or both. Any objection by a qualified political party to reject candidates who gather signatures [would] be [sic] not be sustained by [his] office."[37]

56.    On November 19, 2015, Tanner Leatham and Spencer Stokes incorporated Gathering, Inc. (**Exhibit 0008** – Gathering, Inc. Articles of Incorporation).

57.    On January 15, 2016, Count My Vote, a Political Action Committee (PAC) was created by Val Oveson, Rich Mckeown, Taylor Morgan, and David May (**Exhibit 0003** – CMV PAC SofO). Being immediately funded in January by Mike Leavitt ($3,000), Rich McKeown ($7,000), and Gail Miller ($20,000) (**Exhibit 0020** – 2015-2025 CMV Financial Disclosures).

58.    In response to Judge Nuffer's ruling, the Utah Legislature passed House Bill 48 (HB48) in 2016, sponsored by Defendants Curtis and McCay (**Exhibit 0021** – HB0048 2016). HB48 repealed the unaffiliated voter provision, reinstating the URP's closed primary system under Utah Code § 20A-9-101, which restricts voting in the party's primary to registered Republicans.[38]

---

[37] See Exhibit 0014, at page 2.
[38] See HB 48 (2016), attached as Exhibit 0017, *at line 347-350*, "the qualified political party shall, no later than 5 p.m. on March 1 of each even-numbered year, certify to the lieutenant governor the identity of one or more registered political parties whose members may vote for the qualified political party's candidates <u>and whether unaffiliated voters may vote for the qualified political party's candidates</u>;"

59. The URP continues to nominate candidates exclusively through the convention process under Utah Code § 20A-9-407 and its Party Constitution (**Exhibit 0022** – Utah Republican Party Constitution at Art. XII § 2(I)). As a result, Utah Code § 20A-9-408's signature-gathering pathway—originally designed to provide an alternative nomination process—is unconstitutional as applied to the URP, as it infringes on the party's right to define its own procedure for selecting party candidates under Utah Code § 20A-8-401(2)(c), violating Utah Code § 20A-9-401(2) and the Supreme Court's decision in *California Democratic Party v. Jones*, 530 U.S. 567 (2000).

60. Ignoring the legislative process, the court ruling declaring certain aspects of SB54 unconstitutional, and the clear legal guidance against enforcing laws that violate constitutional protections, Defendant Spencer Cox, an attorney, has continued to construe and apply election laws—specifically the signature-gathering process—in a manner that best serves his interests and those of the Count My Vote (CMV) initiative, disregarding legal precedent and constitutional principles. This selective interpretation and application of the law undermines the integrity of the electoral process and infringes upon the constitutional rights of Utah citizens, Utah voters, and Utah candidates.

61. Despite co-sponsoring HB48 in 2016, which eliminated the ability to access the URP closed primary ballot through signature-gathering, Defendant Curtis Bramble actively undermined this restriction by accepting $7,500 in donations from the CMV PAC (**Exhibit 0020** – CMV Financial Disclosures at page 3 and 9) and by personally utilizing the signature-gathering process in his 2016 re-election campaign, spending $6,000 (**Exhibit 0023** – Bramble Financial Disclosures at pages 3-4) through in-kind donations to Gathering, Inc. for signature-gathering services. Furthermore, by participating in and publicly legitimizing the signature-gathering

23

process, Bramble implicitly validated Defendant Cox's assertion that signature-gathering was a legitimate means for URP members to access the URP primary ballot, effectively lending credibility to a process that the enterprise was using to subvert the party's nomination procedures and Utah's elections.

62.     On September 27, 2017, Count My Vote, led by Michael O. Leavitt, Norma W. Matheson, Gail Miller, Ben McAdams, and Rich McKeown, submitted a second initiative. This initiative aimed to eliminate the state convention process under 20A-9-407 by repealing the entire section (**Exhibit 0024** – CMV 2.0 Direct Primary).

63.     During the 2018 General Session, Defendant McCay sponsored HB 338 (**Exhibit 0025** – HB338 2018 Election Amendments) to achieve the goals of the Count My Vote movement by effectively eliminating the nomination process through conventions by repealing the state nominating convention under § 20A-9-407,[39] favoring primary elections and signature-based nominations. This bill further protected the signature-gathering process as it included language that a legal action could not prohibit placement of a nominee of the political party who qualified for the ballot by the collection signatures.[40] Although this bill passed the House, it did not pass the Senate.

64.     The second CMV initiative were able to collect more than 132,000 verified signatures to qualify for the ballot but a group called Keep My Voice in opposition to the CMV initiative were able to convince people in two Senate district to withdraw their signatures during

---

[39] See Exhibit 0025 at line 1867.
[40] See Exhibit 0025 at line 1659-1673.

a 30-day review (**Exhibit 0026** - Utah Supreme Court deals a blow to Count My Vote: Election reform initiative won't be on November's ballot).[41]

65.     During the 2021 General Session, Defendant McCay sponsored SB 205 (**Exhibit 0027** – SB 205 2021 Election Process Amendments), which established classifications for political parties: Class A, B, C, and D. Under this bill, a Class A party could permit a member to seek the party's nomination for any elective office exclusively through a party convention. Importantly, the bill raised the threshold to avoid a direct primary from 60% to two-thirds (approximately 66.7%).[42] If a candidate reached this higher percentage at the convention, they would no longer need to participate in the direct primary election. This change effectively altered the unconstitutional application of Cox's forced direct primary, shifting it away from the forced signature-gathering process and favoring a convention-only system. Had it passed, this legislation would have dramatically dominated the candidate selection process including the 2024 election, undermining Cox's unconstitutional application of the 2014 legislative compromise built around a more open signature-based pathway.

66.     On Saturday, February 25, 2021, SB 205 passed a second reading and was scheduled for a 3rd reading on February 26, 2021. On February 26, 2021, SB 205 was circled and reschedule for a third reading (**Exhibit 0028** – SB 205 2021 Status).

67.     On February 27, 2021, just days before the 2021 legislative session concluded on March 5, 2021, an exclusive and private meeting took place at the governor's mansion (**Exhibit 0029** – "Exclusive: Inside the secret meeting at the governor's mansion that saved Utah's

---

[41] Davidson, "Utah Supreme Court deals a blow to Count My Vote: Election reform initiative won't be on November's ballot," The Salt Lake Tribune, August 24, 2018, https://www.sltrib.com/news/politics/2018/08/24/utah-supreme-court-deals/.
[42] See Exhibit xx at line 573-579

signature path for candidates). [43] The meeting was called by Governor Cox and those in attendance were Daniel McCay, Lt. Gov. Deidre Henderson, Senate President Stuart Adams, and House Speaker Brad Wilson. Others included Sen. Curt Bramble, the original architect of the 2014 SB54 compromise; former Governor Mike Leavitt, a key supporter of Count My Vote; then Utah GOP Chairman Derek Brown; and Jon Pierpont, Cox's chief of staff.

68.     According to the Salt Lake Tribune sources, they described the meeting as "collegial and constructive," with "Cox clearly in charge." Wilson made an oblique reference to the meeting during an interview on the "Utah Politics" podcast saying, "We had a meeting on Saturday at the mansion about a somewhat controversial issue, and he stood up with a whiteboard and a marker and took charge of the meeting. It was great." This description underscores Cox's central role and leadership at the gathering, where he "stood up" and "took charge"—a clear indication that Cox was in control of the proceedings.

69.     This clandestine meeting, orchestrated and led by Cox, was instrumental in shaping the outcome and was actively working behind the scenes to kill SB 205. The reliance on the whiteboard and Cox's direct, authoritative speech during the session signified that this was no ordinary political discussion; it was a strategic intervention by Cox to preserve the status quo and block reforms that threatened his control over the elections and his unconstitutional application of the signature-gathering process. His leadership was pivotal, and his influence effectively prevented the legislation from moving forward, reaffirming that Cox was in command during this critical juncture and that his actions were decisive in stopping the bill. As a result, SB 205 was ultimately killed in the session as it never was heard for a 3rd reading after the meeting,

---

[43] Schott, "Exclusive: Inside the secret meeting at the governor's mansion that saved Utah's signature path for candidates," The Salt Lake Tribune, March 10, 2021, https://www.sltrib.com/news/politics/2021/03/10/exclusive-inside-secret/.

reaffirming Cox's command and his role during this critical juncture in keeping the signature-gathering process as the vehicle in controlling the elections and political power.

70.    Defendant Spencer Cox continued to sabotage Utah's elections as lieutenant governor from the time SB54 became effective in 2015 and taught current Lieutenant Governor, Defendant Deidre Henderson, a once advocate for the convention system, to construe the law and unlawfully force a direct primary to give a "second chance" at the URP's nomination to those who paid for signature-gathering in response to unfavorable convention results as a means of effecting industrial and political revolution committing an offense against the administration of government under Utah Code § 76-8-902.

### E.  The 2024 Elections: Defendants' Actions and Violation of Plaintiffs' Rights

71.    The government's Declaration of Candidacy form presents three options for seeking the nomination of a qualified political party: using the convention process as described in Section 20A-9-407, the signature-gathering process described in Section 20A-9-408, or both the convention process and the signature-gathering process (**Exhibit 0030** – 2024 Partisan State Constitutional Office Form). This undermines how the URP chooses its nominee because the party only allows its members to seek its nomination through primary convention under § 20A-9-407.

72.    However, this form is designed to create confusion by implying that the government allows the candidate to choose the method of seeking a party's nomination, misleading individuals into believing that the candidate, rather than the qualified political party, has authority to decide how to secure the nomination—contradicting the requirements set forth under 20A-9-101(13)(c), which stipulate that the qualified political party determines the nomination process.

27

73.    This is consistent with Cox's view, as he stated in his letter dated November 19, 2015 (Exhibit 0019), that he believed he was the one who should allow candidates to choose how they seek the party's nomination, asserting that candidates should have the opportunity to select between the convention system, gathering-signatures, or both, and that objections by parties to signature-gathering would not be sustained by his office.

> (c) permits a member of the registered political party to seek the registered political party's nomination for any elective office by the member choosing to seek the nomination by **either or both** of the following methods:
>> (i)  seeking the nomination through the registered political party's convention process, in accordance with the provisions of Section 20A-9-407; **or**
>> (ii) seeking the nomination by collecting signatures, in accordance with the provisions of Section 20A-9-408; and

Quoting Utah Code 20A-9-101(13)(c). [Emphasis on bold].

74.    An Interlocal Cooperation Agreement was signed by the Davis County Commissioner on July 11, 2023, and by Ryan Cowley, the Director of Elections for the Lieutenant Governor, on March 19, 2024 (**Exhibit 0031** – Interlocal Cooperation Agreement). This agreement centralizes the review of nominating petitions for signature-gathering candidates seeking a party's nomination for a statewide office (e.g. Governor, U.S. Senate, and Utah Attorney General). It effectively circumvents the established legislative safeguards under Utah Code § 20A-9-408(9)(b), designed to prevent fraud and collusion, which requires participation by all 29 county clerks in the signature verification process, by using the same verification process as statewide initiatives under Utah Code § 20A-7-105.

75.    On January 2, 2024, Phil Lyman, declared his candidacy for the office of Governor seeking the nomination of the Utah Republican Party through "both the convention process and the signature-gathering process." Subsequently, Class 1 Defendants, Cox and Henderson declared their candidacy for the office of Governor as the incumbents seeking the

nomination of the Utah Republican Party through "both the convention process and signature-gathering process." Other individuals who declared their candidacy for the office of Governor seeking the Utah Republican Party nomination included: Scott Robbins (via convention and signature-gathering process), T. Carson Jorgansen (via convention only), Sylvia Miera Fisk (via convention and signature-gathering process), **Exhibit 0032** – Declaration of Candidacy for Governor seeking Republican Nomination.

76.     Other individuals who declared candidacy seeking the office of Governor were: Tom Tomeny (Unaffiliated), Tommy Williams Archie (Independent American), and J. Robert Latham (Libertarian), **Exhibit 0033** - Declaration of Other Candidates for Gov.

77.     On January 2, 2024, Trent Staggs declared candidacy as a member of the Utah Republican Party seeking the party's nomination for the office of the United States Senate through only the convention process along with Jeremy Friedbaum and Carolyn Phippen. While John Curtis, Jason Walton, Brad Wilson, Brian Jenkins, Chandler Tanner, Clark White, and Brent Hatch declared candidacy for the Office of the United States Senate seeking the UPR nomination through both the convention and signature-gathering process (**Exhibit 0034** – Declaration of Candidacy US Senator for Republican Nominee).

78.     On or after January 4, 2024, Frank Myler, Rachel Terry, and Trent E. Christensen declared candidacy for the Office of Utah Attorney General seeking the UPR nomination through convention only. While Derek Brown declared candidacy for the office of Utah Attorney General seeking the nomination through both the convention and signature-gathering process (**Exhibit 0035** – Declaration of Candidacy Utah Attorney General).

79.     On January 3, 2024, Molly Hart filed a declaration of candidacy, declaring she was a member of the Republican Party, seeking nomination for the office of State School Board

District 7 using both the convention process and the signature-gathering process while Kris

Kimball declared candidacy on January 8, 2024, as a member of the Utah Republican Party

seeking the party's nomination for the office of State School Board District 7 using only the

convention process (**Exhibit 0036** – Declaration of Candidacy BOE7 for Republican

nomination).

80.     On January 4, 2024, Randy Boothe filed a declaration of can candidacy, declaring

he was a member of the Republican Party, seeking nomination for the office of State School

Board District 13 using both the convention process and the signature-gathering process. While

Alyson Robertson and Carrie Bartholomew declared candidacy on January 8, 2024, as a member

of the Utah Republican Party seeking the party's nomination for the office of State School Board

District 13 using only the convention process (**Exhibit 0037** – Declaration of Candidacy BOE13

for Republican nomination).

81.     Pursuant to the URP Bylaw 9.0, candidates who wish to obtain the nomination of

the Utah Republican Party to run as a Republican must sign and submit a completed Candidate

Certification Form declaring that they will (1) comply with the rules and processes set forth in

the Utah Republican Party Constitution and these Bylaws, and (2) disclose their acceptance of

the State Party platform with itemized exceptions. Each candidate certifies the following

message:

> "I have read the Utah Republican Party Platform, Constitution, and Bylaws. I support that
> Platform, Constitution, and Bylaws except for any provision I explicitly outline below,
> and accept it as the standard by which my performance as a candidate and as an
> officeholder should be evaluated. I certify that I am not a candidate, officer, delegate, or
> position holder in any Party other than the Republican Party."

Quoting **Exhibit 0038** – Utah Republican Party Candidate Filing Form.

82.     On February 20, 2024, Cox utilized X (formerly known as Twitter), to promote his scheme. He announced that "I'm grateful today to announce that Lt. Governor Henderson and I have submitted 28,000 Republican signatures to get on the primary ballot," an overt act intended to influence public perception (**Exhibit 39** – Social Media Post at Image 1). This statement was designed to convince the public that he could bypass the State convention process and secure the URP nominee through signatures alone despite the pure language of Utah Code § 20A-9-101(13)(c) stating that it is the qualified political party that permits its member to seek the nomination "by either or both" of two methods: convention or signature-gathering.

83.     On March 5, 2024, Class 1 and 2 Plaintiffs attended and participated in the caucus convention (neighborhood elections), where they cast votes to elect their precinct party chair, precinct party vice chair, precinct secretary, precinct treasurer, precinct state delegate, and precinct county delegate in accordance with the party's bylaws (**Exhibit 0040** – URP Bylaws).[44] As a result of these elections, Class 1 Plaintiffs were chosen as state delegates to represent their voting precincts in choosing the URP nominee.

84.     On March 26, 2024, Cox again used X and declared "Now that are team has qualified for the 2024 GOP Primary ballot, we're grateful to officially add @DeidreHenderson to the ticket" prior to the URP primary convention (**Exhibit 0039** – Social Media Posts at Image 002). This assertion aimed to convince the public that he had the ability to secure enough signatures and qualify for the ballot regardless of the convention's outcome.

85.     On April 13, 2024, Salt Lake County Delegates participated in the 2024 nominating convention, where they nominated Kris Kimball (65.54%) for the State School Board District 7 seat and Fred Cox (66.67%) for House District 30 (**Exhibit 0041** – 2024 Salt Lake

---

[44] See Exhibit 0040 – Utah Republican Party Bylaws at Section 10.0

County Convention Results). Both Kimball and Fred Cox were to proceed to the general ballot as they were the party nominees and Molly Hart, David Parke, and Cindy Thompson were disqualified at convention (**Exhibit 0042** - SLCO GOP Rules 2024).

86.    At the Utah County GOP nominating convention held on April 20, 2024, Carrie Bartholomew received 51% of the delegate vote (**Exhibit 0043** – 2024 Utah County Party Convention Results). However, following Alyson Robertson subsequent withdrawal (**Exhibit 0044** – Alyson Robertson Withdrawal), Bartholomew was automatically the party nominee and was to proceed to the general ballot. Randy Boothe was eliminated at the party convention.

87.    On April 27, 2024, Class 1 Plaintiffs, and other delegates lawfully convened at the state primary convention,[45] voting to adopt the Party nominating convention rules (**Exhibit 0045**, 2024 State Nominating Convention Rules), as well as electing Phil Lyman (67.54%) as their nominee for Governor. Sylvia Miera Fisk (0.53%), T. Carson Jorgenson (25.80 %), Scott Robins (0.56%) were eliminated during Round 1 of the multiple ballots voting. Defendant Spencer Cox (32.46%) was eliminated in Round 2 of the multiple ballots voting and Phil Lyman was to proceed to the general election (**Exhibit 0046** - Utah State GOP Convention Results).

> H.    In the event that three or more candidates are nominated for the same office, the convention may use multiple ballots or preference voting to choose Party nominees. The State Party Central Committee shall certify the method of election for the State Convention at least 6 months prior to the convention. In the case of multiple ballots, more than one candidate may be eliminated in each round, provided that the sum of the votes received by the candidates to be eliminated does not exceed the number of votes received by the next highest candidate, and that at least two candidates remain on the ballot. The two top candidates shall participate in the final ballot.

> I.    A candidate for an office that receives 60% or more of the votes cast at any point in the ballot process at the state nominating conventions shall proceed to the general election.

---

[45]  Utah Code § 20A-1-102(55) "Primary convention" means the political party conventions held during the year of the regular general election.

Quoting the Utah Republican Party Constitution (Exhibit 0022), Article XII, Section 2.H and 2.I.

88.    At the same state primary convention, Class 1 Plaintiffs and other delegates elected Trent Staggs (69.74%) as the URP nominee for office of U.S. Senate, and he was to proceed to the general election and be included on the general ballot. During the first round Josh Randall (1.49%), Brian Earl Jenkins (0.16%), and Jeremy Lewis Friedbaum (0.13 %) were eliminated. During Round 2 Brent Orrin Hatch (1.74%) and Chandler H. Tanner (2.27%) were eliminated. During Round 3 Jason Walton (3.46 %), Brad Wilson (4.86%), and Carolyn Phippen (9.34%) were eliminated. Finally, during Round 4, John Curtis (30.26%) was eliminated, making Trent Staggs the party nominee.[46]

89.    During the same state primary convention, Class 1 Plaintiffs and other delegates nominated Frank Mylar (59.76%) and Rachel Terry (40.24%)[47] to a final primary ballot to determine the Party's nominee for the office of Attorney General. Trent Christensen (9.00%) and Derek Brown (16.70%) were eliminated during Round 1 and neither Mylar nor Terry reached 60% during Round 2.[48]

**Section 5. Primary Election**
A.    When two candidates are nominated by the state nominating convention for the same office, both candidates shall run in a primary election in accordance with Utah Code.

B.    Only voters who are registered Republicans may vote in a Republican primary election.

Quoting Utah Republican Party Constitution (Exhibit 22), Article XII, Section 5.

90.    Spencer Cox (candidate for Governor), Deidre Henderson (Candidate for Lt. Governor), Sylvia Meira Fisk (candidate for Governor), T Carson Jorgensen (candidate for

---

[46] See Utah State GOP Convention Results, attached hereto as Exhibit 0046.
[47] See *Id*.
[48] See *Id*.

Governor), Scott Robins (candidate for Governor), John Curtis (candidate for US Senate), Brent

Orrin Hatch (candidate for US Senate), Jason J. Walton (candidate for US Senate), Brad Wilson

(candidate for US Senate), Jeremy Friedbaum (candidate for US Senate), Brian Jenkins

(candidate for US Senate), Josh Randall (candidate for US Senate), Carolyn Phippen (candidate

for US Senate), Chandler Tanner (candidate for US Senate), Derek Brown (candidate for Utah

Attorney General), Trent E. Christensen (candidate for Utah Attorney General), Randy Boothe

(Candidate for State School Board 13), and Molly Hart (Candidate for State School Board 7)

were "eliminated" as candidates through multiple-round voting, following the internal

nominating procedures of the URP at the state primary convention.

91.    The URP nominates its candidates for partisan offices using a primary convention

and primary elections.[49] It does not rely on signature-gathering to nominate candidates under §

20A-9-8-408. As a qualified political party, the URP allows its members to seek the nomination

via its nominating convention process, in accordance with the provisions of Section 20A-9-407.

However, it is not required to provide its members with the option to seek the nomination

through both methods as outlined in Utah Code § 20A-9-101(13)(c) referencing the either or

provision.

> (c)    permits a member of the registered political party to seek the registered political
> party's nomination for any elective office by the member choosing to seek the nomination
> by **either or** both of the following methods:
> (i)    seeking the nomination through the registered political party's convention process,
> in accordance with the provisions of Section 20A-9-407; or
> (ii)    seeking the nomination by collecting signatures, in accordance with the
> provisions of Section 20A-9-408; and

Quoting Utah Code § 20A-9-101(13)(c). [Emphasis on bold].

---

[49] *See* URP Constitution, Exhibit 0022 attached hereto, at Article XII, Section 2.A.

92.    The only viable avenue for the eliminated candidates to participate in the general election would be as a write-in candidate under Utah Code § 20A-9-601.

**Section 2. State and County Nominating Conventions**
A.    The Party shall nominate candidates for partisan offices by a nominating convention and primary elections.

Quoting Utah Republican Party Constitution, Article XII, Section 2.

93.    Part 4 of Title 20A of Utah's election code, which governs Primary Elections—including the convention process under § 20A-9-407—treats the convention as an integral part of the primary election. This process functions as an indirect primary, embodying a representative form of government by allowing party members to select their nominees through a democratic republic convention system, rather than a direct primary election by all voters.

94.    After losing the nomination through the primary convention process, Defendant Cox persisted in his efforts to persuade the people that he was a viable candidate by posting on social media stating: "Hey friends, we need your help! It's time to get ready for the primary election," despite the fact the primary had already taken place through the state convention process under Utah Code § 20A-9-407, and he was eliminated as a candidate.[50]

95.    Defendant Henderson also used social media to explicitly attempt to convince the public that the convention was "no longer a family friendly environment," an overt act intended to delegitimize and undermine the integrity of the state's convention process.[51]

96.    On April 29, 2024, Axson claimed to have sent a certification of the URP nominee (**Exhibit 0047** – Convention Results Certification Letter 042924) as required under Utah Code § 20A-9-407(6)(a). However, this certification lacks a date indicating when it was received by the

---

[50] See Social Media Posts, attached hereto as Exhibit 0039 at Image 003.
[51] See *Id.* at Image 004.

Lieutenant Governor's Office. In contrast, the certification of President Trump endorsement by Axson was date-stamped August 13, 2024 (**Exhibit 0048** – Republican Party Letter of Endorsement), revealing a significant discrepancy of how the certification of party candidates are treated.

97.     On April 29, 2024, Cox sent emails to members of the URP labeling Class 1 Plaintiffs, and others, "extreme right-wing delegates" who "[represent] less than 1% of the Republicans," an overt act in furtherance to convince members of the Party that they do not have the right to associate and choose the manner in which they elect their party nominees (**Exhibit 0049** – Extreme Right-Wing Delegates Email). Spreading and teaching the members that delegates "DO NOT get to decide who represents Utah as the GOP nominee," sabotaging the URP nomination process (a pattern of conduct intended to suppress the voices of URP delegates and manipulate the outcome of nominating process).

98.     On May 1, 2024, Henderson, acting under color of law, certified disqualified candidates to a "closed primary" ballot for the URP (**Exhibit 0050 -** 2024 Official Primary Certification). She declared that she, along with Spencer Cox, Derek Brown, John Curtis, Jason Walton, Brad Wilson, Dave Parke, Molly Hart, and Randy Boothe were nominated through the signature-gathering process, granting them a second chance at being nominated to the general ballot as the URP nominee (**Exhibit 0051** – 2024 Candidate Nomination Verification Rates).

99.     Pursuant to Utah Code § 20A-9-407(6), the lieutenant governor's role is solely ministerial. Candidates who received over 60% were nominated under section 20A-9-407 and qualified to be included in the general election ballot certification.[52] As they were unopposed,

---

[52] Utah Code 20A-9-407(6)(b) – The lieutenant governor shall include, in the primary ballot certification or, for a race where a primary is not held because the candidate is unopposed, in the

their inclusion to the general election ballot certification would have complied with the party's

constitution, specifically Article XII, Section 2.I.

     I.     A candidate for an office that receives 60% or more of the votes cast at any point in the balloting process at the state nominating conventions **shall proceed to the general election**.

Quoting Article XII, Section 2.I. of the Utah Republican Party Constitution (Exhibit 22).

100.    Those candidates that did not reach 60%, the top two candidates were nominated

by the state nominating convention and were to participate in a final ballot in accordance with

Article XII, Section 2.H.

> In the event that three or more candidates are nominated for the same office, the convention may use multiple ballots or preference voting to choose Party nominees. The State Party Central Committee shall certify the method of election for the State Convention at least 6 months prior to the convention. In the case of multiple ballots, more than one candidate may be eliminated in each round, provided that the sum of the votes received by the candidates to be eliminated does not exceed the number of votes received by the next highest candidate, and that at least two candidates remain on the ballot. The two top candidates shall participate in the final ballot.

Quoting Article XII, Section 2.H of the Utah Republican Party Constitution, Exhibit 0022.

101.    When two candidates are nominated by the state nominating convention for the

same office, both candidates are to be included in the primary ballot certification in accordance

with Utah Code § 20A-9-407(6)(b) and the Utah Republican Party Constitution Article XII,

Section 5, where only voters who are registered Republican may vote in a Republican primary

election.

> **Section 5. Primary Election**
> A. When two candidates are nominated by the state nominating convention for the same office, both candidates shall run in a primary election in accordance with Utah Code.
> B. Only voters who are registered Republicans may vote in a Republican primary election.

Quoting Article XII, Section 5 of the Utah Republican Party Constitution, **Exhibit 0022**.

---

general election ballot certification, the name of each candidate nominated by a qualified
political party under this section.

102.    On May 1, 2024, Defendant Henderson also publicly announced via X (formerly Twitter) that she certified these candidates, thereby attempting to legitimize their inclusion on the ballot.[53] The public communication was an overt act aimed at reinforcing the perception of the candidates' validity, despite questions regarding the legitimacy of the certification process.

103.    Defendant Henderson's actions constituted the creation of counterfeit ballots under Utah Code § 20A-4-501, an offense involving election returns.[54] Specifically, she held a primary election for candidates seeking the URP nomination in a situation where such an election was not authorized to take place.

104.    Additionally, Henderson willfully counterfeited election returns by replacing the true returns for those primary races with false ones, including candidates who had been eliminated at the convention, thereby manipulating the results. Her conduct facilitated and caused election fraud in violation of Utah law.

**20A-4-501 Election returns -- Forgery.**
(1) It is unlawful for any person to:
    (a) forge or counterfeit any election returns from any election purporting to have been held at any voting precinct where no election was in fact held;
    (b) willfully substitute any forged or counterfeit election returns in the place of the true return for a voting precinct where any election was actually held; or
    (c) commit or cause any fraud in any election in any manner.
(2) A violation of this section is a third degree felony.

Quoting Utah Code § 20A-4-501.

105.    On May 23, 2024, Cox emailed party members announcing the "endorsements" he and the Lieutenant Governor received, further attempting to convince party members that he

---

[53] See Social Media Posts, attached hereto as Exhibit 0039 at Image 005.
[54] 20A-9-102(28) "Election returns" includes: (a) the pollbook, the military and overseas absentee voter registration and voting certificates, one of the tally sheets, any unprocessed ballots, all counted ballots, all excess ballots, all unused ballots, all spoiled ballots, the ballot disposition form, and the total votes cast form; and

is a valid candidate supported by other members of the government (**Exhibit 0052** – 5.23.2024 Gmail – Cox endorsements). He also continued to actively campaign on X to further persuade the public that he was a legitimate candidate.[55]

106.    May 31, 2024, in response to a GRAMA request made by Casey Seely, a URP state delegate, the Lieutenant Governor Offices requests $250.00 be paid in order to release the list of names who signed the nominating packets for Cox, Curtis, and Brown's signature packets (**Exhibit 0053** – 05.31.2024 Gmail – Candidate Signature Lists GRAMA Request). Only to receive 40% of the lists redacted (**Exhibit 0054** – Spencer Cox Signers – 20240605, **Exhibit 0055** — John Curtis Signers – 20240605, and **Exhibit 0056**—Derek Brown Signers—20240605) violating Utah Code § 63G-2-305(74) where the signature on the political petition is the only data protected.

107.    On June 4, 2024, Class 1 Defendants admitted on X that the fraudulent ballots were mailed that day with Cox stating, "we are excited and grateful for your support."[56]

108.    On June 6, 2024, Defendant Henderson used social media and Fox13 to further promote the notion that the mailed ballots were legitimate and valid.[57]

109.    On June 7, 2024, Cox emailed URP members, falsely implying he was a valid candidate by promoting "Green Wave Endorsements," thereby furthering the scheme to convince the public and party members of his legitimacy and to support his candidacy despite being disqualified or uncertified under the lawful nominating processes (**Exhibit 0057** – Email dated June 7 2024_Green wave Endorsements).

---

[55] See Social Media Posts, attached hereto as Exhibit 0039 at Image 006.
[56] See *Id*. at Image 007, 008.
[57] See *Id*. at Image 009.

110.    On June 8, 2024, Michael Mower, a Senior Advisor for Community Outreach and Intergovernmental Affairs in the office of Utah Governor Spencer Cox, posted on X that the "[p]olls show Cox far ahead of Lyman in the Republican Primary," which Henderson retweeted. This was another attempt to persuade the public that a legitimate primary was underway and that Cox would be the winner.[58]

111.    The social media campaign persisted, with Cox thanking his supporters for the "green wave endorsements" and reminding the public to mail in their ballots by at least Monday, June 24, 2024.[59]

112.    On June 21, 2024, Defendant Brian McKenzie, via the Davis County Clerk's Facebook account linked to X, publicly affirmed Cox, Curtis, and Brown's ballot legitimacy amid rising public concern over the integrity of the signature-gathering process and doubts about whether Cox and other disqualified candidates met the qualification requirements. This statement, issued in response to the May 1, 2024, primary certification, appeared to misrepresent the process, seemingly aimed at quelling criticism and supporting enterprise-backed candidates. Jon Cox supported this assertion by sharing it on his X account (@joncoxut43), while Defendant Henderson further amplified it with a retweet.[60]

113.    On June 23, 2024, Henderson posted on X images showing the number of signatures collected, along with the statement, "Clerks stop verifying signatures once the legal threshold to qualify for the ballot has been reached," in an apparent effort to dispel any doubts

---

[58] See *Id*. at Image 010.
[59] See *Id*. at Image 011 and 012.
[60] See *Id*. at Image 013 and 014.

about whether disqualified candidates had obtained enough signatures to qualify for the "second chance" at the Party's nomination.[61]

114.    On June 23, 2024, Defendant McCay posted on X expressing support for the disqualified candidate Cox, thereby reinforcing their perceived legitimacy and undermining the established nominating procedures.[62]

115.    On June 24, 2024, Defendant Cox posted an endorsement from former governor Gary Herbert, constituting another effort to bolster the legitimacy of his candidacy and sway public perception in his favor.[63]

116.    Defendant Henderson used social media to post election updates and information, actively promoting the legitimacy of the election.[64]

117.    On June 25, 2024, at 8:21 p.m., news outlets started reporting Defendant Cox the GOP primary winner and Cox as the party nominee, 21 minutes after polls closed (**Exhibit 0058** – AP calls the race for Gov. Spencer Cox in GOP primary against Phil Lyman – Deseret News).

118.    On June 25, 2024, at 8:54 pm, Senator Mike Lee posted on X congratulating Defendant Cox on becoming the Republican nominee, which Cox then retweeted to further reinforce his claim of being the legitimate nominee and persuade the public of his candidacy's validity.[65]

119.    On June 25, 2024, at 10:58 PM, Cox posted on social media thanking his fellow Republicans for their overwhelming support and declaring himself the nominee.[66]

---

[61] See *Id*. at Image 015.
[62] See *Id*. at Image 016.
[63] See *Id*. at Image 017.
[64] See *Id*. at Image 018.
[65] See *Id*. at Image 019.
[66] See *Id*. at Image 020.

120.     June 26, 2024, J. Stuart Adams posted on X, publicly congratulating the disqualified candidates (Cox, Henderson, Curtis, and Brown), furthering the appearance of legitimacy of the signature gathering process and undermining Utah's election process.[67]

121.     On June 26, 2024, Spencer Cox reposted a post by Decision Desk HQ giving credit that John Curtis won the Republican state primary for US Senate in Utah and made a post thanking the Republican primary voters for their "vote of confidence."[68]

122.     On June 26, 2024, Defendant Henderson reposted a message originally posted by Election Staff member Ryan Cowley on X. Cowley's post stated that he left work at 5:15 p.m. on June 25, 2024, and did not return home until 1:04 a.m. the following day. He mentioned feeling extremely tired but expressed pride in the efforts of his staff and clerks to ensure the election was conducted smoothly. Additionally, Henderson reposted a message from Defendant Cox, thanking the team. These actions are coordinated attempts to create a false impression of the events.[69]

123.     On June 28, 2024, Vote Utah launched an initiative to address any questions about the canvassing process on the platform "Your Voice, Your Vote" by posting a video on X featuring Defendant Henderson explaining the process. Henderson then reposted the video to further amplify the message that Utah elections can be trusted.[70]

124.     On June 30, 2024, Defendant Henderson posted a picture of a house with a "Congratulations" sign, claiming it was her neighbors celebrating her nomination by the direct primary. This act was intended to further convince the public that the primary election was legitimate.[71]

---

[67] See *Id*. at Image 021.
[68] See *Id*. at Images 022 – 023.
[69] See *Id*. at Images 024 – 025.
[70] See *Id*. at Image 026.
[71] See *Id*. at Image 027.

125.    On July 2, 2024, Defendant Henderson continued her efforts to persuade the public that the elections were secure by announcing that eleven counties were conducting post-election audits and inviting citizens to observe the process firsthand.[72]

126.    On July 3, 2024, Henderson issued through email and social media a statement to county clerks, instructing them to restrict access to election records, claiming that "[by] restricting access to the records, the Election Code preserves the integrity of both elections and election contests."[73] This action, however, directly contradicts her public efforts to assure the public that the elections are secure and transparent, effectively undermining the very trust she seeks to build by limiting access to crucial information.

127.    On July 22, 2024, acting under color of law, Henderson certified candidates that were disqualified under the state primary convention process (Utah Code § 20A-9-407) as the URP nominees on the 2024 general election ballot (**Exhibit 0059**, 2024 Primary Elections Certification). She then posted on X stating "Today, I officially certified the 2024 Statewide and Multicounty Primary Election Canvass" falsely asserting her authority to veto the delegate's nominees.[74] Additionally, she posted a picture of what was an unlawful canvass of the Republican state primary, further misleading the public about her authoritative role in the election process.[75]

128.    The public grew restless regarding the signature-gathering process and application. In response, on July 26, 2024, Defendant McCay took to social media to defend the process, asserting that it was too late to challenge it and claiming that no court would overturn

---

[72] See *Id*. at Image 028.
[73] See *Id*. at Image 029-30.
[74] See *Id*. at Image 031.
[75] See *Id*. at Image 032.

the vote. An effort to persuade the public that the suspect election was valid and to encourage people to accept the results and move on.[76]

129.    On August 1, 2024, Plaintiff Lyman filed a Petition for Extraordinary Writ of Declaratory and Injunctive Relief (**Exhibit 0060** – Lyman Petition for Extraordinary Writ) contesting the primary election under Utah Code § 20A-4-403 and the unconstitutional application of the Utah election law, specifically Utah Code § 20A-9-408 (nomination by signature-gathering) being forced upon the URP.

130.    On August 2, 2024, Cox's campaign issued a press release—posted on X— "inviting" Lyman to "accept the election results," while simultaneously accusing him of misleading citizens. This coordinated act was designed to confusion the public and reinforce the false narrative that Cox was a valid and legitimate nominee of the party, further undermining the integrity of the election process.[77]

131.    According to the Utah Supreme Court docket an "Attorney Called" on August 6, 2024.[78]

132.    On August 12, 2024, Lyman filed a Motion to Expedite (**Exhibit 0061** – Motion to Expedite).

133.    On August 13, 2024, acting under color of law, Defendant Durrant issued an order (**Exhibit 0062** – Extraordinary Writ denied) denying Lyman's petition without holding a hearing or receiving a response from the Defendants, in violation of Utah Code § 20A-4-403(4).[79]

---

[76] See *Id*. at Image 033.
[77] See *Id*. at Images 034-035.
[78] See *Id*. at Images 036.
[79] 20A-4-403(4) The court **may not** reject any statement of the grounds of contest or dismiss the proceedings because of lack of form, if the grounds of the contest are alleged with sufficient certainty as will advise the defendant of the particular proceeding or cause for which the election is contested. [Emphasis on bold].

134.    Defendant Durrant, as Chief Justice, violated Utah Code § 76-8-201 by knowingly issuing an unauthorized order dismissing Phil Lyman's election contest under Utah Code § 20A-4-403, despite the Utah Supreme Court's original jurisdiction to hear extraordinary writs under Utah Const. art. VIII, § 3, and the mandate of § 20A-4-403(4) to review contests based on substance, not form. Lyman's petition alleged that Defendants' certifications of candidates via signature-gathering under § 20A-9-408 violated URP bylaws prohibiting signatures, mandating nominations solely under § 20A-9-407, as permitted by § 20A-9-403(13)(c), and protected by § 20A-9-401(2). The dismissal, without merits review, violated *Marbury v. Madison's* mandate for judicial review of constitutional claims (5 U.S. 137 (1803)), including First Amendment, Fourteenth Amendment, and Guarantee Clause (U.S. Const. art. IV, § 4) violations, as it undermined Utah's republican form of government through the delegate-driven process, furthering the Defendants' fraudulent scheme.

135.    In doing so, Durrant applied Utah election code that does not pertain to qualified political parties, in an apparent effort to falsely convey that the unlawful primary was valid and to protect the enterprise-backed candidates.[80]

136.    Defendant DURRANT's order asserted that Lyman had failed to establish a legal basis for invalidating the 2024 Republican primary election, referencing Section 20A-9-403(1)(a), which is explicitly excluded under Utah Code 20A-9-406(2) and does not apply to nominations for a qualified political party. Section 20A-9-403(1)(a) specifies that candidates for offices to be filled at the next regular general election must be nominated in a regular primary election through direct voting by the people, as prescribed by Utah law. Lyman, was seeking nomination from a qualified political party, which was utilizing the primary convention to elect

---

[80] See Exhibit 0039 at Image 037.

its nominees. This action is classified as an offense under Utah Code 76-8-504, which pertains to making a written false statement.

137.    On August 13, 2024, to further the scheme that the Supreme Court ruling was valid, Defendant Cox took to social media posting that the Utah Supreme Court "rightly struck down former Republican gubernatorial candidate Phil Lyman's frivolous lawsuit."[81]

138.    Defendant Henderson used social media to promote the scheme, claiming that the "Court has made it abundantly clear that there is no legal basis to challenge the results of this election—for any race." She condemned Lyman for challenging the election results, falsely asserting that he had "actively tried to steal an election by demanding the Utah Supreme Court crown him the victor of a race he soundly lost,"[82] thereby misleading the public and undermining legitimate electoral process.

139.    Defendant McCay also used social media to sow doubt about Lyman's supporters, labeling them as RINOs (Republicans in Name Only) and accusing them of assisting Democrat candidate Brian King, in an apparent effort to further the scheme and undermine Lyman's legitimacy.[83]

140.    Additionally, other Utah legislators, such as Senator Todd Weiler, publicly confirmed that Lyman's petition was denied without further briefing or oral argument by posting about it on social media.[84]

141.    On August 14, 2024, Defendant Cox continued the scheme by sending an email to member of the Utah Republican Party, claiming that he was the "official Utah GOP," despite

---

[81] See *Id.* at Image 038.
[82] See *Id.* at Images 039-041.
[83] See *Id.* at Image 042.
[84] See *Id.* at Image 043.

having been eliminated through the state convention (**Exhibit 0063** – Gmail Our State's Future – Let's Keep Utah from Becoming Blue).

142.    On August 15, 2024, Defendants Rob Axson and Mike Schultz posted on X falsely representing Spencer Cox as the legitimate URP nominee for governor, while criticizing Plaintiff Lyman, who secured 67.54% of the delegate votes as the duly nominated candidate. They claimed that Lyman's appearance in a campaign advertisement alongside Democratic candidate Brian King was disloyalty to the URP. Transmitted via interstate servers, this false portrayal of Lyman's bipartisan outreach aimed to sow voter confusion and damage his reputation, effectively undermining his candidacy.[85]

143.    On August 18, 2024, in an apparent attempt bolster Defendant Cox's image amid dissenters, Defendant McCay posted on X that Cox was a "follower of Christ that is trying to lead the state in difficult times," thereby deflecting attention from reality that the nomination was unlawfully taken from the rightful nominee.[86]

144.    On August 18, 2024, Lyman was forced to declare a "write-in" candidacy after the party nomination was stolen, where he received 200,551 signatures, the most write-in votes ever for a non-presidential campaign in U.S. history (**Exhibit 0064** – Lyman-Clawson Write-In).

145.    On August 20, 2024, in an effort to quell rumors that the Defendants failed to gather the required number of signatures to unlawfully secure a second chance at the URP nomination, Defendant McKenzie posted on social media stating that he welcomed an audit. He asserted that the signature verification process was properly followed, aiming to further the scheme and protect the enterprise-backed candidates.[87]

---

[85] See *Id.* at Images 044-045.
[86] See *Id.* at Image 046.
[87] See *Id.* at Image 047.

146.     On August 21, 2024, Plaintiff Halvorsen sent a Notice of Intent (NOI) to the URP State Central Committee (SCC) chair. The following day, August 22, 2024, she sent a text blast to SCC members linking the NOI, requesting the enforcement of Lyman's nomination, which he had earned through the state primary convention process. The NOI explained that the signature-gathering process under Utah Code § 20A-9-408 did not apply to the URP, and that the SCC had both the authority and duty to uphold and enforce Lyman's duly earned nomination. (**Exhibit 0065** – Notice of Intent – UTGOP)

147.     On August 31, 2024, Robert Axson, acting under color of law as a party official and as indicated by his inclusion on the email (**Exhibit 0066** – Aug 32 2024 Axson response email) alongside other Utah GOP officials (Brad Bonham, Kim Coleman, Stafford Sievert, and McKay Newell), sent an email to Central Committee Members dismissing concerns about election fraud raised by Plaintiff Halvorsen. He characterized these concerns as "meritless threats" and obstructed any potential investigations. Axson's actions were intended to further the scheme, protect the enterprise's preferred candidates, and quell internal party dissent regarding the questionable primary election results. The email's reassurance of legal defense for committee members threatened with lawsuits further reveals an effort to stifle challenges and maintain the status quo, thus protecting the interests of the enterprise.

148.     On September 3, 2024, an individual named Richard Lyman and his mother Carol Lyman declared a write-in candidacy (**Exhibit 0067** – Richard Lyman Declaration of Write-in Candidacy).

149.     On September 3, 2024, the Office of the State Auditor issued a letter explaining that state auditor, John Dougal, provided a limited review and of the 373 samples reviewed, 4 of them were not valid, concluding that "statistically, it is possible that each candidate might have

fallen short of the statutory requirement in the validated population of signatures based on our projected number of possible exceptions" (**Exhibit 0068** – Dougal Letter dated 09.03.2024). However, concluded that each candidate had ample time to gather more signatures if they would have known they were short, again protecting the enterprise backed candidates, and the scheme that the signature-gathering process was a valid avenue to seek the URP nomination when it is not.

150.    On September 3, 2024, Defendant Henderson, acting under color of law, certified the names of disqualified candidates including herself, Cox, Curtis, Brown, Hart, and Boothe to the 2024 General Election, effectively disenfranchising the delegate vote (**Exhibit 0069** – 2024 General Election Certification).

151.    On September 4, 2024, Defendant Cox posted on X wishing Defendant Henderson a happy birthday and praising her as an "amazing leader," seemingly in an attempt to bolster her public image amid the growing doubts and controversies surrounding the elections.[88]

152.    On September 7, 2024, Plaintiff Halvorsen attended the State Central Committee meeting by invitation to address the Committee regarding a Notice of Intent and potential actions to ensure the proper nomination of candidates through the state convention.

153.    Defendant Axson demanded Plaintiff Halvorsen leave the meeting, and Defendant Coleman subsequently contacted the West Valley City Police Department and filed a false police report (**Exhibit 0070** – West Valley Police Report and URP Bylaws), falsely claiming Halvorsen was a trespasser in a public meeting. This conduct constituted an unlawful trespass, as Halvorsen had a right to attend the meeting and participate under Utah Republican Party Bylaws 3.0(E)13[89]

---

[88] See *Id.* at Image 048.
[89] URP Bylaw 3.0 E. **Meetings Held Electronically**. 13. Public Access: The state party shall not provide electronic access or allow electronic participation for non-SCC members.

and Robert's Rules,[90] which confirm that members—including observers—are entitled to attend and observe meetings unless expressly restricted by law or bylaws.  It is also well established that the central committees are not inherently private and should be open and transparent, especially given their governmental role in candidate certification under Utah Code § 20A-1-501.

154.    The central committees are public bodies with statutory responsibilities, and their meetings must follow principles of transparency to ensure fair and lawful processes. Attempts to block or silence individuals seeking to observe or discuss election procedures undermine these principles and threaten the integrity of the electoral system. The trespass was an improper attempt to remove Halvorsen from the meeting in response to her concerns about election laws and her intention to address them. This action improperly influenced the Committee's deliberations on Plaintiff Halvorsen's Notice of Intent, illegally prevented her from participating in a discussion about unlawful primary ballot certification, and furthered the scheme to protect the enterprise's preferred candidates.

155.    On September 7, 2024, Defendant Null actively assisted Defendant Coleman and the West Valley City Police in removing Halvorsen from the State Central Committee meeting, knowing that doing so would prevent her from informing the governing body of the political party about serious election offenses.

156.    On September 9, 2024, Phil Lyman announced on social media that on Tuesday, September 3, 2024, he was contacted by two individuals who provided information that Richard

---

[90] URP Bylaw **12.0 Robert's Rules of Order**. The rules contained in the current edition of Robert's Rules of Order shall govern all meetings of the Party, except to the extent they are inconsistent with the Constitution and Bylaws and any special rules of order the Party may adopt.

Lyman was recruited and offered $1,000 and a steak dinner by the Cox campaign to put his name on the ballot as a write-in for governor (**Exhibit 0071** – Text messages of James Newson).[91]

157.    On October 3, 2024, Defendant Henderson spoke to a room full of students, reporters, government officials, and staff with the University of Utah's Hinckley Institute of Politics with the message to "doubt the doubters." (**Exhibit 0072** – Dunphey, Criticizing her own party, Utah's Lt. Gov. warns of threats and claims of fraud as election nears." Utah News Dispatch, October 3, 2024).

158.    On October 4, 2024, Defendant Deidre Henderson certified Richard Lyman and Carol Lyman as write-in candidates for governor and lieutenant governor, respectively, alongside Phil Lyman, the legitimate URP nominee with 67.54% of delegate votes, in the write-in candidate certification for the 2024 general election (**Exhibit 0073,** 2024 Write-In Certification). By including Richard and Carol Lyman, who shared Phil Lyman's surname to create voter confusion, Henderson further undermined Lyman's write-in campaign and misled voters about his status as the rightful URP nominee, violating Utah Code §§ 20A-9-407 and 20A-9-401(2).

159.    During the week of October 14, 2024, ballots containing false statements and misrepresented candidates who had been disqualified at the URP convention (e.g., through the state convention process) were distributed using the U.S. Postal Service. These ballots unlawfully included candidates from an illegitimate direct primary, constituting an act of mail fraud crossing state lines into Nevada similar to the primary ballots containing false statements

---

[91] See *Id.* at Image 048.

and reported to have arrived in Nevada. (**Exhibit 0074** – Schott, "9,800 Southern Utah ballots in limbo amid mail-in ballot dispute in Iron County, The Salt Lake Tribune, July 8, 2024).[92]

160.    On October 15, 2024, the Utah Office of the Legislative Auditor General issued a report (**Exhibit 0075** – Legislative Audit Report) regarding signature verification for candidate nominating petitions. While the Audit identified errors in the process for candidates Spencer Cox, John Curtis, and Derek Brown, the Audit explicitly stated that candidates fulfilled existing requirements and had opportunities to validate additional signatures, ignoring the fact that the URP does not select its nominees through the signature-gathering process.

161.    On October 24, 2024, Richard Lyman and Carol Lyman, who declared write-in candidacy, withdrew from the campaign (**Exhibit 0076** – Richard Lyman Withdrawal Form) pursuant to a Court order. This action caused widespread confusion, exacerbated by KSL's social media post and article stating, "Two write-in candidates for governor have dropped out of the race after another candidate with the same last name filed legal proceedings against them," which prominently featured a photo of Phil Lyman.[93] This misleading presentation created the false impression that Phil Lyman himself had withdrawn  his write-in candidacy, further muddying the waters and impacting voter perception.

162.    The scheme to defraud Utah voters continued, with the intent to deceive the public into believing that the Defendants and other disqualified candidates were valid contenders. This deception was furthered through social media posts thanking individuals for endorsements, including Defendant Bramble, and reminding voters to cast their ballots.[94]

---

[92] Schott, "9,800 Southern Utah ballots in limbo amid mail-in ballot dispute in Iron County, The Salt Lake Tribune, July 8, 2024, https://www.sltrib.com/news/politics/2024/07/08/9800-southern-utah-ballots-limbo/.
[93] See Exhibit 0031 at Image 050.
[94] See *Id.* at Images at 051 – 053.

163.    On November 4, 2024, in a further attempt to dispel growing concerns and questions regarding the election, Defendant Henderson posted on X an op-ed co-authored with Georgia's Secretary of State. The op-ed aimed to discredit "election deniers," a move designed to preemptively undermine any challenges to the election results and maintain the false appearance of legitimacy.[95]

164.    On November 5, 2024, Defendant Cox posted on X at 7:06 AM, proclaiming "Election Day is here!" and encouraging people to believe their voice is heard through voting. Then, at 10:56 PM, despite the ongoing questions surrounding the legitimacy of his nomination, he declared himself the winner, thanking Utah for their "trust" – furthering the false narrative that his election was lawful when it was not.[96]

165.    On November 25, 2024, candidates that were disqualified under the Utah state and county primary convention process were certified to their perspective offices. (**Exhibit 0077** - 2024 General Elections).

166.    On January 6, 2025, Defendant Durrant, acting under color of law, administered the oath of office to Cox, Henderson, and Brown—all illegitimate candidates—in a "private ceremony." This action furthered the scheme, with Cox and Henderson posting pictures of the unlawful ceremony on X, thereby lending a false veneer of legitimacy to their positions.[97]

167.    On January 9, 2025, Defendant Cox held an inaugural address, posting about it on X. Defendant McCay reposted it, highlighting themes of "faith, family, community," in an

---

[95] See *Id.* at Image at 054.
[96] See *Id.* at Images at 055 – 056.
[97] See *Id.* at Images at 057 – 059.

apparent attempt to portray them as pious and virtuous leaders, despite their involvement in carrying out an unlawful election scheme.[98]

### F. Impact on Nomination Process: Financial Influence and Vulnerability to Fraud

168.    The unconstitutional application of Utah's election laws facilitated signature-gathering companies and campaign firms in profiting from an unauthorized signature-gathering process for candidates seeking the URP nomination.

169.    Specifically, Gathering Inc., received $294,000 for signature-gathering services for Spencer Cox prior to the URP convention held on April 27, 2024. Following Cox's loss at convention, Gathering Inc. received an additional $151,155 for "grassroots" services totaling $445,155.00, according to Spencer Cox Campaign Financial Disclosures (**Exhibit 0078** - Spencer Cox Financial Disclosures). These disclosures verify that Cox's campaign funds were used to support the signature-gathering efforts, which are part of the broader scheme to unlawfully influence the electoral process and benefit certain candidates and CMV interests.

170.    Moreover, following the 2024 election, authorities charged 11 individuals with forgery and other related crimes in connection to the signature-gathering process. Five of these individuals were signature-gatherers for Gathering Inc., according to Kyle Dunphey report, "Eleven people charged with forging signatures to help Candidates qualify for 2024 primary election," Utah News Dispatch, March 11, 2025, included as **Exhibit 0079**. As a result of these vulnerabilities exposed during this scheme, the Utah legislature has left Utah with nothing but an electoral system that is highly susceptible to fraud.

171.    The existing system creates a situation where those with connections or influence may perceive that their preferred candidates or political allies will shield them from prosecution,

---

[98] See *Id.* at Images at 060.

even if they engage in questionable or illegal activities. This perception is exacerbated by cases like the one described in **Exhibit 0080,** where individuals like Rocko John Huntsman receive a plea in abeyance for serious election-related offenses and the unlawful dismissal of Lyman's Petition challenging the primary results.

172.    Election Hive, founded in 2018, specializes in political campaign consulting, including messaging, and other campaign services. The business was essentially created in response to the "second chance" process—an unconstitutional interpretation and application of Utah election laws—that allowed disqualified candidates to gain a foothold in elections contrary to statutory intent.

173.    Election Hive is owned by partners Matt Lusty, Casey Hill, Dan Hemmert, and Jon Cox. Its activities and profits are directly tied to this scheme, as they facilitate and support candidates seeking to exploit the flawed "second chance" process for their clients. As evidenced by Spencer Cox's Financial Disclosures, **Exhibit 0078**, paying Election Hive a total of $264,755.96 before the URP primary convention, and following Cox's loss at the convention, the firm received an additional $792,937.32.

174.    As lobbyists and political consultants, Election Hive profits not only from advancing their candidates' electoral success but also from helping those candidates pass policies and legislation favorable to them and their clients. For example, Matt Lusty incorporated Utah Workforce Housing Authority (UWHA) November 20, 2023, listing Heather Groom, Steve Waldrip, and Derek Brown (disqualified Attorney General candidate) as the directors (**Exhibit 0081** – UWHA Articles of Incorporation).

175.    In 2025, $2 million dollars was requested by Defendant McCay and awarded to UWHA for the Demand More Supply campaign and recommendations aimed addressing Utah's

lack of housing, particularly housing people can afford (**Exhibit 0082** – How Utah is spending $2 million to tell you there's a housing shortage).[99] Thus capitalizing on the manipulated electoral system and influencing policy outcomes that benefit their economic and political interest.

176.    Derek Brown, paid $259,000 for signature gathering and $107,680.40 to Election Hive to spread their propaganda of which candidate to vote for. Brown also received $2,500 on July 25, 2024, from Count My Vote PAC (**Exhibit 0083** – Brown Financial Disclosures). Furthermore, Defendant Cox donated $50,000 on May 20, 2024, to the disqualified candidate Derek Brown while Defendant Henderson served as his campaign fundraiser (**Exhibit 0084** – Lt. governor's campaign role called 'inappropriate' by two candidates for attorney general).[100]

177.    Donors to the Alliance for Good Government and Count My Vote (CMV), including prominent individuals and entities from real estate, healthcare, business, and insurance sectors, derive significant financial and political benefits from the passage of legislation such as Senate Bill 54 (SB54) and the unconstitutional application of Utah election laws. These legislative measures, which altered Utah's election processes by introducing and sustaining a signature-gathering pathway to create confusion, created a system that favored candidates backed by substantial financial resources, thereby amplifying the influence of these donors. By enabling a "second chance" for candidates disqualified at party conventions, this legislation ensured that donor-backed candidates could bypass the URP grassroots nominating process through the state

---

[99] Carlisle, "How Utah is spending $2 million to tell you there's a housing shortage," Fox 13, July 29, 2025, https://www.fox13now.com/news/fox-13-investigates/how-utah-is-spending-2-million-to-tell-you-theres-a-housing-shortage.

[100] Mullahy, "Lt. governor's campaign role called inappropriate by two candidates for attorney general," KUTV, April 4, 2024, https://kutv.com/news/politics/lt-gov-deidre-henderson-campaign-role-called-inappropriate-by-two-candidates-for-attorney-general.

convention process, securing their placement on primary and general election ballots. This manipulation of the electoral process directly served the economic and political interests of these donors, who leveraged their financial contributions to shape policy outcomes and secure favorable governmental actions.

178.    Real estate donors, such as Gail Miller, Delloy Hansen, Kem C. Gardner, H. Roger Boyer, John Price, Maccall Management LLC, and Joseph Sorenson, benefit from the misapplication of the signature-gathering process by supporting candidates who advocate for policies that enhance property development and increase land values.

179.    For instance, Gail Miller's substantial contributions to the initiative of CMV (approximately $170,980.42, **Exhibit 0004**) helped secure the passage of SB54, which facilitated misapplication of signature-gathering and the election of candidates like Defendant Spencer Cox. Miller also contributed to Cox's campaign in the amount of $75,000 just for the year 2024.[101] Cox's administration, in turn, supported initiatives like HB562 (passed February 28, 2024), which allocated $900 million in public funding for the Power District stadium project, directly benefiting Miller's real estate and entertainment interests (**Exhibit 0092** – HB0562 2024). Similarly, other real estate donors gain from infrastructure improvements, tax incentives, and zoning changes driven by candidates they support, who are more likely to reach the ballot through the signature-gathering process that unconstitutional application of SB54 enabled. These policies enhance the profitability of commercial and residential developments, directly aligning with the donors' economic objectives.

180.    Healthcare donors, including James Wall, Huntsman Corporation, Leavitt Partners, Rich McKeown, Dinesh Patel, Gary Crocker, Merit Medical, and the Eccles

---

[101] See Exhibit 0078 – Cox Campaign Financial Disclosure 2024

Foundation, reap significant rewards from the electoral influence facilitated by SB54's signature gathering process and related legislation. By funding CMV and the Alliance for Good Government, these donors ensured the election of candidates who prioritize healthcare policies that expand funding, reduce regulatory burdens, and lower operational costs for hospitals, biotech firms, and healthcare consulting businesses. For example, policies favorable to healthcare expansion are passed such as increased funding for medical facilities like the Eccles West Valley hospital.[102] These legislative outcomes directly increase revenues for healthcare donors by creating a favorable environment for their businesses, ensuring long-term profitability and market dominance.

181.    The unconstitutional application of Utah election laws creates a feedback loop that perpetuates the donors' influence. By enabling signature-gathering firms like Gathering, Inc. and campaign consulting firms like Election Hive to profit from the "second chance" process, donors indirectly fund a system that prioritizes wealth-driven candidates. This system ensures that candidates reliant on donor funding, such as Cox, Curtis, and Brown, remain beholden to these financial backers once elected.

## V.    Political and Financial Benefits for Defendants

182.    The unconstitutional application of Utah election laws creates a self-perpetuating cycle that enables incumbents to retain office by systematically undermining fair electoral processes. By rigging candidate qualification procedures, disqualifying legitimate challengers, and manipulating primary and general election outcomes through false certifications and fraudulent ballots, the unconstitutional application of these laws diminish genuine competition and erode electoral legitimacy.

---

[102] See Exhibit 0031 at Image 061.

183.    Additionally, incumbents leverage taxpayer-funded perks, such as costly public relations campaigns—exemplified by House Republicans' $144,000 investment in taxpayer-funded PR videos in 2024 and nearly $140,000 in 2025 (**Exhibit 0085** – Northbound Strategy),[103] to bolster their visibility and reputation. This not only perpetuates their hold on power but also consolidates influence among entrenched political and financial interests, further marginalizing true democratic competition and accountability.

184.    These lucrative salaries and benefits serve as strong incentives for incumbents and officials to remain in their positions, regardless of their performance or the integrity of the electoral process. Matthew Durrant, for example, receives $226,482.69 in wages complemented by $139,856.89 in benefits, while Spencer Cox's compensation includes $183,237.85 in wages and $62,765.06 in benefits. Deidre Henderson is paid $164,800.25 in wages with benefits totaling $69,810.39, and Brian McKenzie earns $143,260.97 in wages with $74,007.55 in benefits.[104] These substantial financial incentives create a powerful motivation to maintain the status quo, discouraging accountability and reinforcing their hold on power despite the ongoing manipulation of elections and public trust.

185.    Specifically, Defendant Cox's family business, CentraCom, benefits from government contracts. A sizable share of government funding goes to CentraCom from the University of Utah. In 2023, the University of Utah paid $266 million to CentraCom and its subsidiaries 2.66 million. Payments from the school to CentraCom companies total more than

---

[103] Office of the State Auditor, Transparent Utah, https://transparent.utah.gov/.
[104] *Id.*

$21 million over the past decade (**Exhibit 0086** - Why Utah Gov. Spencer Cox's family business, CentraCom, has thrived with his political rise).[105]

186.    Defendants who are part of the legislative department receive wages and benefits anywhere from $30,000 to $40,000. This may not be a lot of money in comparison; however, they can pass legislation that benefits their businesses and their families. For example, Defendant Adams influenced legislation that helped his 18-year-old relative who was charged with child rape receive a more lenient sentence (**Exhibit 0087** - Utah Senate president who intervened in child rape case must resign, Democratic senator says).[106]

187.    Defendants Schultz, McCay, and Adams, real estate developers, protect a fraudulent election system to retain power and pass laws benefiting their businesses. Bills like the First-time Homebuyer Assistance Program (S.B. 240, 2023), First Home Investment Zone Act (S.B. 268, 2024), Housing Affordability Modifications (S.B. 262, 2024), Utah Housing Amendments (H.B. 37, 2025), Housing Affordability Amendments (S.B. 181, 2025), and Housing and Transit Reinvestment Zone Amendments (S.B. 26, 2025) provide developers with tax incentives, reduced regulations, and infrastructure funding, boosting profitability. By rigging elections, they secure legislative influence to enact such laws, entrenching their financial and political control while stifling democratic competition.

188.    Defendant Bramble, leveraging his position, indulged in an extravagant lifestyle, spending over $300,000 on travel as disclosed in his financial records (**Exhibit 0088** – Bramble

---

[105] Schott and Semerad, "Here's why Utah Gov. Spencer Cox's family business has become an internet powerhouse," the Salt Lake Tribune, January 18, 2024, https://www.sltrib.com/news/2024/01/18/why-utah-gov-spencer-coxs-family/.

[106] Gehrke, "Do the right thing: Utah Senate president who intervened in child rape case must resign, Democrat senator says" The Salt Lake Tribune, August 8, 2025, https://www.sltrib.com/news/politics/2025/08/08/utah-senate-president-who/.

Financial Disclosures). This lavish expenditure coincided with a clear pattern of advancing his donors' interests, evidenced by his sponsorship and passage of S.B. 54 and other legislation (**Exhibit 0089** – Bramble Needs to Resign). By prioritizing donor-driven policies, such as S.B. 54's changes to Utah's election system favoring entrenched interests, Bramble enriched himself and secured political influence, undermining electoral integrity to maintain his power and financial benefits.[107]

189.    Kim Coleman, director of the Utah Children First Education Fund (**Exhibit 0090** – Utah First Education Fund), and Robert Axston a lobbyists for The Other Side Academy and Piper Hill Consulting (**Exhibit 0091** – Axson Lobbyists), protect Utah's fraudulent election process to sustain a Republican legislature that funds their organizations. The Children First Fund, receiving $3,692,141.01 in FY 2025 and $14,144.75 in FY 2023, and The Other Side Academy, with $4,547,354.62 in FY 2025 and over $10 million since 2018, rely on state contracts and scholarships tied to legislative support. As Utah GOP Chairman, Robert Axson reinforces party control, while Chris Null, a compliant Salt Lake County GOP figure, follows suit. They preserve rigged elections to secure financial benefits and influence, sidelining electoral integrity.

190.    Additionally, Kim Coleman is a co-founder of Monticello Academy, an institution that receives significant funding from the State of Utah. This financial relationship further underscores the extent to which key figures involved in defending Utah's fraudulent election process have vested interests tied to state-funded organizations, thereby compromising electoral integrity and perpetuating a system that benefits their organizational and political agendas.

---

[107] Opinion, "Bramble needs to resign," Deseret News, March 24, 2004, https://www.deseret.com/2004/3/24/19819078/bramble-needs-to-resign/.

191.    To execute this election scheme and maintain control, a complicit executive department must be willing to break the law by overseeing fraudulent processes, while actors engage in a signature-gathering scheme to manipulate candidate qualifications. A judicial department unlawfully denies challenges to preserve the facade, supported by a political party chairs and vice chairs who cancels dissenters to stifle opposition. The legislative department remains inert, avoiding accountability, and a state Attorney General either refrains from charging election fraud or imposes lenient penalties, ensuring the system remains unchecked.

192.    This cycle of financial influence and legislative favoritism undermines Utah's republican form of government, as guaranteed by Article IV, § 4 of the U.S. Constitution, while delivering tangible economic and political advantages to the donors of Alliance for a Better Utah and Count My Vote.

### VI.    Grounds for Claim

### A.  First, Fourteenth Amendment and Article IV, Section 4 Violations

193.    **Class 1 Plaintiff Violations: Plaintiffs Who Are Delegates of the URP.**
Plaintiffs Tracie Halvorsen and Sophie Anderson, as Utah Republican Party (URP) delegates, experienced violations of their First Amendment rights to associate and participate in the party's nominating process, Fourteenth Amendment equal protection rights, and their right to a republican form of government under Article IV, Section 4. Defendants' unlawful certification of disqualified candidates (¶ 98, Exhibit 0050) invalidated their convention votes on April 27, 2024 (e.g., 67.54% for a candidate, Exhibit 0046), undermining their role in selecting URP nominees (*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)). This certification subverted the delegate-driven nominating process, denying Plaintiffs their constitutional entitlement to a fair and representative electoral system as guaranteed by Article IV, Section 4 and provided through

the State's primary convention (Utah Code § 20A-9-407). Defendants' defamatory statements labeling them "extreme right-wing delegates" (Exhibits 0049; Axson's email Exhibit 0066) and financial losses, including the economic value of time spent preparing for, traveling to, and participating in the convention, further injured them. These actions are remediable under 42 U.S.C. §§ 1983, 1985, 1986, and 18 U.S.C. § 1964.

194.    **Class 2 Plaintiff Violations: Plaintiffs Who Are Utah Republican Party Members.** Plaintiffs Tracie Halvorsen, Sophie Anderson, Steven Huber, and Nancy Inman, as URP members and Utah citizens, suffered violations of their First Amendment rights to associate and participate in the party's caucus and convention processes, Fourteenth Amendment equal protection rights, and their right to a republican form of government under Article IV, Section 4. Their participation in the "state convention"[108] on March 5, 2024, to elect delegates was rendered meaningless by Defendants' certification of disqualified candidates (Exhibit 0050), denying their voice in nominating candidates under Utah Code § 20A-9-401(2). This certification undermined Utah's republican form of government by nullifying the representative caucus convention and primary convention system under Utah Code § 20A-9-407, violating Article IV, Section 4. Defendants' actions, including defamatory statements labeling participants "extreme right-wing" (Exhibit 0049), caused financial losses (e.g., time, campaign donations, and expenses for convention participation), reputational harm, and constitutional injuries, remediable under 42 U.S.C. §§ 1983, 1985, 1986, and 18 U.S.C. § 1964.

195.    **Class 3 Plaintiffs: Plaintiffs Who Are Utah Unaffiliated Voters.** Plaintiff Wayne Wickizer, as an unaffiliated voter, suffered violations of his First Amendment rights to

---

[108] Utah Code § 20A-101(14) "Convention" means the political party convention at which party officers and delegates are selected.

vote and express political preferences, Fourteenth Amendment due process and equal protection rights, and his right to a republican form of government under Article IV, Section 4. Wickizer voted for Phil Lyman in his write-in campaign after counterfeit ballots listed disqualified candidates (Exhibit 0069), but the write-in's slim chance of success—exacerbated by the URP's dominance in Utah and Lyman's name not being on the ballot—undermined his vote's efficacy, violating his right to a fair election (*Reynolds v. Sims*, 377 U.S. 533 (1964)). By certifying disqualified candidates (Exhibit 0069) and enabling fraudulent practices (e.g., forgery Exhibit 0079), Defendants subverted the integrity of Utah's republican electoral system, denying Wickizer a meaningful opportunity to participate in a representative government as guaranteed by Article IV, Section 4. This caused financial losses (e.g., campaign donations to Lyman, advocacy), confusion, and emotional distress (**Exhibit 0092** – Lyman Financial Disclosures), remediable under 42 U.S.C. §§ 1983, 1985, 1986, and 18 U.S.C. § 1964, to restore electoral integrity.

196.    **Class 4 Plaintiffs: Plaintiffs Who Are Citizens of Utah and the United States.**
Plaintiff Daniel Newby, as a non-voting citizen of Utah and the United States, suffered violations of his First Amendment right to express political preferences through non-participation, Fourteenth Amendment due process rights, and his right to a republican form of government under Article IV, Section 4. Newby deliberately refrained from participating in the electoral process as a protest against Utah legislature's policies, including those enabling the certification of disqualified candidates (Exhibit 0077), exercising his First Amendment right to express dissent (*Wooley v. Maynard*, 430 U.S. 705 (1977)). As a citizen, Newby retained the right to a fraud-free electoral process, which was denied by Defendants' certification of disqualified candidates and related fraudulent practices (e.g., 2025 forgery case, Exhibit 0079). These actions

violated his Fourteenth Amendment due process rights by undermining the fairness of Utah's electoral system (*Reynolds v. Sims*, 377 U.S. 533 (1964)) and subverted the guarantee of a republican form of government under Article IV, Section 4, by compromising the integrity of the process that governs representation for all citizens. These violations caused Newby emotional distress and a loss of confidence in the electoral system, remediable under 42 U.S.C. §§ 1983, 1985, 1986, and 18 U.S.C. § 1964, to restore electoral integrity.

### B. Violation of 18 U.S.C. 1962 – Prohibited Activities

197.    Plaintiffs assert that Defendants violated 18 U.S.C. § 1962(b), which prohibits any person from acquiring or maintaining, directly or indirectly, an interest in or control of an enterprise affecting interstate or foreign commerce through a pattern of racketeering activity. Defendants, through fraudulent certifications and related acts, controlled the Utah Republican Party (URP) nominating process, an enterprise affecting interstate commerce, injuring Plaintiffs' business and property interests, remediable under 18 U.S.C. § 1964.

198.    Plaintiffs assert that Defendants violated 18 U.S.C. § 1962(c), which prohibits any person employed by or associated with an enterprise affecting interstate or foreign commerce from conducting or participating in the enterprise's affairs through a pattern of racketeering activity. Defendants, including Cox, Henderson, Bramble, McCay, Adams, Schultz, Durrant, Axson, Coleman, and Null, conducted the state's nominating process through fraudulent acts, undermining Utah's republican form of government under Utah Code § 20A-9-407 as guaranteed by Article IV, Section 4, and injuring Plaintiffs' constitutional and property interests.

199.    Plaintiffs assert that Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(b) and (c). Defendants agreed to engage in a pattern of racketeering activity to control the URP nominating process, as evidenced by coordinated actions, including a secret

meeting on February 27, 2021, at the governor's mansion (Exhibit 0029), and fraudulent certifications (Exhibits 0050 and 0069), causing harm to Plaintiffs. Under *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768 (9th Cir. 2002), liability for a civil RICO conspiracy under § 1962(d) requires only an agreement to violate RICO, which can be inferred from the Defendants' coordinated actions and interdependence, without needing explicit confirmation or an overt act.

200.    The Defendants, with non-party co-conspirators including Michael O. Leavitt and Count My Vote (CMV) donors (e.g., Gail Miller, $170,980.42, Exhibit 0004), formed a racketeering enterprise to manipulate Utah's election laws and favor donor-backed candidates over delegate-selected nominees, violating Utah Code § 20A-9-401(2) and Article IV, Section 4. The enterprise, centered on the URP and state election system, operated through private coordination and financial transfers, affecting interstate commerce.

201.    The enterprise was initiated by Leavitt's CMV initiative to replace the primary convention system with a direct primary (Exhibit 0001), enabling signature-gathering candidates to bypass delegate votes in violation of Utah Code § 20A-9-401(2) (*California Democratic Party v. Jones*, 530 U.S. 567 (2000)).

202.    Defendant Cox, as Lieutenant Governor from 2015 to 2020, orchestrated the enterprise by declaring signature-gathering candidates could bypass the convention process (¶ 57, Exhibit 0019), and as Governor, directed opposition to SB205 in 2021, which would have restored convention-only nominations (Exhibit 0027), through a secret meeting with Henderson, Bramble, McCay, Adams, and Leavitt (Exhibit 29).

203.    Defendant Henderson, as Lieutenant Governor, certified disqualified candidates (Exhibits 00050 and 0069), adopting Cox's 2015 policy (Exhibit 0019), and Defendants

Bramble, McCay, and Adams, as legislators, shielded the signature-gathering process by defeating SB205 (Exhibit 0028), enabling fraudulent certifications.

204.     Defendant Schultz failed to investigate fraud despite a Notice of Intent (Exhibit 0065), facilitating the enterprise's control.

205.     Defendant Durrant, as Chief Justice, denied a petition without a hearing (Exhibit 0060), obstructing fraud investigations (Exhibit 0062).

206.     Defendants Axson, Coleman, and Null, as URP leaders, suppressed dissent by dismissing fraud claims (Exhibit 0066) and intimidating delegate Halvorsen at a September 7, 2024, meeting (Exhibit 0070), violating her rights under URP Bylaw 3.0(E)13 and Utah Code § 20A-1-501.

207.     The enterprise engaged in a pattern of racketeering activity through mail fraud (18 U.S.C. § 1341), distributing counterfeit ballots listing disqualified candidates (Exhibit 0050 and 0069) via U.S. mail crossing state lines into Nevada, misleading voters and delegates (Exhibit 0074).

208.     The enterprise further engaged in wire fraud (18 U.S.C. § 1343) by transmitting deceptive communications via interstate servers, including Cox's 2015 letter (Exhibit 0019), Cox's emails (Exhibits 0049, 0057, 0063), Cox and Henderson's 2024 social media posts affirming false ballot legitimacy (Exhibit 0039), and Axson's August 31, 2024, email dismissing fraud claims (Exhibit 0066).

209.     The pattern of racketeering activity, spanning 2015 to 2025, shows open-ended continuity, with ongoing fraudulent certifications (Exhibits 0050 and 0069) and donor influence (Exhibit 0078), nullifying delegate votes (Exhibit 0046) and convention participation.

210.    The enterprise's activities affected interstate commerce by influencing Utah's elections, which determine federal and state representation (*United States v. Robertson*, 514 U.S. 669 (1995)). Fraudulent ballots and communications crossed state lines, impacting national political processes.

211.    Defendants' violations of 18 U.S.C. § 1962(b), (c), and (d) caused Plaintiffs' injuries, including financial losses from delegate time (Class 1), convention participation (Class 1 and 2), campaign donations (Class 1-3), and time spent battling legislative policies via initiatives and a blog (Class 1- 4), plus reputational and constitutional harms (Classes 1–4), including rights to a fair election (Classes 1-4) and a fraud-free process protested by non-voting (Class 4 *Wooley v. Maynard*, 430 U.S. 705 (1977)). These injuries violate Article IV, Section 4 and are remediable under 42 U.S.C. §§ 1983, 1985, 1986, and 18 U.S.C. § 1964.

## VII.    Immunity expressly waived

212.    Federal legislation, such as 18 U.S.C. § 1964, part of the Racketeer Influenced and Corrupt Organizations Act (RICO), can abrogate a state's Eleventh Amendment immunity when Congress acts pursuant to its constitutional authority, including the Commerce Clause or Section 5 of the Fourteenth Amendment. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State" (U.S. CONST. amend. XI), but this immunity is not absolute. Under 18 U.S.C. § 1964(c), RICO provides a private right of action against "any person" for injuries from racketeering, and courts have interpreted this to include states or officials when Congress's intent is clear and tied to interstate commerce or constitutional enforcement (e.g., *United States v. Angelilli*, 660 F.2d 23 (2d Cir. 1981)). In this case,

Defendants' predicate acts—mail fraud via counterfeit ballots (Exhibits 00050 and 0069) and wire fraud through deceptive social media (Exhibit 0039)—substantially affect interstate commerce, supporting abrogation.

213.    Additionally, where these acts violate Plaintiffs' First and Fourteenth Amendment rights (e.g., fair elections, equal protection), Section 5 of the Fourteenth Amendment empowers Congress to override immunity to enforce constitutional protections, as seen in analogous contexts under 42 U.S.C. § 1983 (*Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989)).

214.    This federal abrogation is further reinforced by the Supreme Court's recent decision in *USDA Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 64 (2024), which clarified that federal statutes can abrogate state sovereign immunity when they unambiguously authorize suits against states as "persons" and are enacted under a valid constitutional power. In *Kirtz*, the Court held that the Fair Credit Reporting Act (FCRA) abrogated immunity for a federal agency (and by extension, state analogs) because its text and purpose—protecting consumers from credit reporting abuses—impliedly included governmental entities, aligning with Congress's Commerce Clause authority. Similarly, RICO's broad language targeting "any person" involved in racketeering, coupled with its aim to combat organized crime affecting interstate commerce (e.g., fraudulent election schemes), supports abrogation. The *Kirtz* ruling underscores that where a statute's remedial scheme (e.g., RICO's treble damages under § 1964(c)) is designed to address widespread harm, including by public actors, immunity yields to federal enforcement, directly applicable here given the alleged enterprise's interstate impact.

215.    This federal framework is complemented by Utah's express waiver of sovereign immunity under the Utah Governmental Immunity Act (UGIA). As established in *Port Authority Trans-Hudson Corp. v. Feeney* (495 U.S. 299, 305–06 (1990)), a state may waive immunity

through clear statutory language, and UGIA explicitly waives immunity for injuries caused by "willful misconduct" during employee duties. Here, Defendants—entrenched in the Utah Republican Party and government—engaged in willful misconduct by fabricating false narratives about the nomination process, misrepresenting Utah law to certify disqualified candidates, and ignoring Plaintiff Halvorsen's notice of this misapplication (Exhibit 0065).

216.    The Utah Supreme Court's ruling in *Utah Republican Party v. Cox* (2016 UT 17) clarified that a qualified political party may choose either the convention process (Utah Code § 20A-9-407) or signature-gathering (Utah Code § 20A-9-408), yet Defendants falsely claimed the latter was mandatory, an intentional act known to injure Plaintiffs' rights. This meets UGIA's definition of willful misconduct—intentional wrongful action likely to cause harm—triggering Utah's unequivocal waiver.

217.    The combined effect of federal abrogation and state waiver establishes jurisdiction. *Kirtz* affirms that RICO's inclusion of "any person" and its commerce-based purpose allow suits against state actors in a racketeering context, while UGIA's waiver covers Defendants' willful misconduct in executing the scheme. The Supreme Court has reaffirmed that explicit waivers, whether by Congress or state law, permit federal jurisdiction (*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996)), especially where officials act under color of law to violate constitutional rights (e.g., *Ex parte Young* for prospective relief). Thus, the Eleventh Amendment does not bar this court from hearing the case. Utah's waiver, bolstered by RICO's abrogation as validated by Kirtz, mandates judicial oversight to provide Plaintiffs relief—treble damages, injunctive relief, and restoration of electoral integrity—against Defendants' unlawful actions.

218.    **WHEREFORE**, Plaintiffs seek civil remedies including, but not limited to, treble damages, divestiture of Defendants from the Enterprise, restrictions on future activities, and injunctive relief to prohibit the Defendants from engaging in the same type of endeavor as the Enterprise, and cost of the suit.

## VIII.    Statement of Claims

### A.  Count I: Declaration Claim Under 28 U.S.C. § 2201 (Creation of Remedy)

219.    **Introduction and Allegations.** Plaintiffs reassert all prior paragraphs in this complaint and incorporates them here by reference.

220.    **Practical interest in the declaration**. A practical interest in a declaratory judgment has a real, substantial, and immediate need for the court to clarify the legal rights in this current situation. The court's decision will have a tangible impact on the actions and future conduct. Declaratory relief will finally stop the harm that has been imposed by Defendants for the past ten years and impact Utah's elections.

221.    Declaratory relief will provide the ability to restore confidence in the justice and the election system that so many Utahns have lost faith in.

222.    **Declaratory relief is appropriate and effective in resolving the controversy.** Declaratory relief will resolve the present dispute between Plaintiff and Defendants and enable the governmental entity to correct the errors of the 2024 election.

223.    **Nature of Action.** This cause of action seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, to resolve legal uncertainties regarding the rights and obligations of the parties involved in the electoral processes, including the Utah Republican Party, following the actions taken by Defendants.

224.    Defendants claim that Utah election laws allow the Government to give a candidate a "second chance" if the candidate seeks the nomination of a party using the signature-gathering process. Plaintiffs disagree; however, even if the law did state the Government could force a second chance primary, Plaintiffs contend it would be "repugnant to the Constitution" and is "void." In the landmark U.S. Supreme Court case *Marbury v. Madison*, 5 U.S. 137, 177 (1803), it has been already established that "a legislative act contrary to the Constitution is not law." Declaratory relief is sought to resolve this controversy and restore Utah's electoral integrity.

225.    Defendants claim authority to centralize the signature-gathering process via an Interlocal Cooperation Agreement (Exhibit 0031), violating Utah Code § 20A-9-408(9)(b), which requires all 29 county clerks to verify signatures to prevent fraud. Plaintiffs contend the URP nominates candidates solely through conventions under Utah Code § 20A-9-407, rendering signature-gathering inapplicable; however, even if unapplicable, Defendants' centralization facilitated fraudulent certifications (Exhibits 0050 and 0069), nullifying Class 1's votes (Exhibit 0046), Class 1 and 2's convention efforts (Utah Code 20A-9-407), Class 3's vote (Exhibit 0069 and 0077), and Class 4's fraud-free process, causing financial and constitutional injuries (First Amendment, Fourteenth Amendment, Article IV, § 4). Declaratory relief is sought to resolve this controversy and restore Utah's electoral integrity.

226.    Defendants claim signature-gathering petition records are private, redacting 40% of lists requested by Casey Seely, and others, (Exhibits 0054–0056) and restricting access to election records, asserting voter privacy. Plaintiffs contend Utah Code § 63G-2-305(74) protects only the signature itself, not entire records, and Defendants' withholding violates transparency, enabling fraudulent certifications. This obstructed verification of signatures, nullifying Class 1's

convention votes, Class 1 and 2's convention efforts (Utah Code 20A-9-407), Class 3's vote
(Exhibit 0069 and 0077), and Class 4's fraud-free process, causing financial losses (delegate
time, caucus expenses, donations, activism time) and constitutional injuries (First Amendment,
Fourteenth Amendment, Article IV, § 4). Declaratory relief is sought to resolve this controversy
and ensure electoral transparency.

227.    Relief for this cause of action is found below under the heading "PRAYER FOR
RELIEF."

**B. Count II: Civil Claim Under 18 U.S.C. § 1964 (Civil RICO)**

228.    Plaintiffs reassert all prior paragraphs in this complaint and incorporates them
here by reference.

229.    This claim arises under 18 U.S.C. § 1964, which provides a civil remedy for
injuries to business or property caused by a violation of 18 U.S.C. § 1962. Defendants, including
Spencer Cox, Deidre Henderson, Curtis Bramble, Daniel McCay, J. Stuart Adams, Mike Schultz,
Brian McKenzie, Matthew Durrant, Robert Axson, Kim Coleman, Chris Null, and the State of
Utah, along with non-party co-conspirators (e.g., Count My Vote sponsors), have engaged in a
racketeering enterprise since 2016 to manipulate Utah's election laws. This enterprise, operating
through predicate acts of mail fraud (18 U.S.C. § 1341) via counterfeit ballots (Exhibits 0050 and
0069) and wire fraud (18 U.S.C. § 1343) via deceptive social media and emails (Exhibits 0039,
0049, 0063, 0066) tied to financial influence from Count My Vote and others), nullified the Utah
Republican Party's (URP) 2024 convention results, including Phil Lyman's 67.54% delegate win
(Exhibit 0041). Defendants' willful misconduct, including unauthorized candidate certifications
(Exhibits 0050 and 0069), false legal misrepresentations, and ignored notices of misapplication
(Exhibit 0065), constitutes a pattern of racketeering activity under 18 U.S.C. § 1961(5).

230.    This enterprise caused Plaintiffs financial losses, reputational harm from defamatory labels, and constitutional injuries to their First and Fourteenth Amendment rights, violating Utah's republican form of government (Article IV, § 4) and Utah law.

231.    Relief for this cause of action is found below under the heading "PRAYER FOR RELIEF."

## C. Count III. – Civil action under 42 U.S.C. § 1983

232.    Plaintiffs reassert all prior paragraphs in this complaint and incorporates them here by reference.

233.    Plaintiffs assert that Defendants, acting under color of state law, violated 42 U.S.C. § 1983 by depriving Plaintiffs of rights secured by the First Amendment, Fourteenth Amendment, and Article IV, Section 4 of the U.S. Constitution, causing financial and constitutional injuries, remediable under 42 U.S.C. § 1983.

234.    Defendants, including Cox (Governor), Henderson (Lieutenant Governor), Bramble, McCay, and Adams (legislators), Schultz (state official), and Durrant (Chief Justice), acted under color of state law by leveraging their official positions, or failing to act when required, to manipulate Utah's election process. Their actions and inaction included certifying disqualified candidates (Exhibits 0050 and 0069), defeating legislation to restore convention-only nominations (Exhibit 0029), failing to investigate fraud despite a Notice of Intent (Exhibit 0065), and obstructing judicial review (Exhibit 0062).

235.    Defendants Axson, Coleman, and Null, as URP leaders, acted under color of state law by coordinating with state officials to suppress delegate rights (Exhibits 0066 and 0070), constituting state action (*West v. Atkins*, 487 U.S. 42 (1988)).211.

236.    **Class 1 Plaintiffs**: Defendants deprived Class 1 Plaintiffs of their First Amendment right to associate and participate in the URP nominating process (*Tashjian v. Republican Party of Conn.,* 479 U.S. 208 (1986)) by certifying disqualified candidates (Exhibits 0050 and 0069), nullifying their April 27, 2024, convention votes (Exhibit 0046), and issuing defamatory statements labeling them "extreme right-wing" (Exhibit 0049). Defendants violated their Fourteenth Amendment equal protection rights by favoring signature-gathering candidates over delegate-selected nominees, undermining Utah's republican form of government under Utah Code § 20A-9-407 guaranteed by Article IV, Section 4. These actions caused financial losses, including delegate time spent preparing for, traveling to, and attending the convention, and reputational harm.

237.    **Class 2 Plaintiffs**: Defendants deprived Class 2 Plaintiffs of their First Amendment right to associate through caucus participation (Exhibit 0046) by certifying disqualified candidates (Exhibits 0050 and 0060), rendering their March 5, 2024, caucus efforts meaningless in violation of Utah Code § 20A-9-401(2). This violated their Fourteenth Amendment equal protection rights and Article IV, Section 4 right to a republican form of government. Defendants' defamatory statements (¶ 86, ¶ 96, Exhibit 0041) caused financial losses (e.g., convention participation expenses) and reputational harm.

238.    **Class 3 Plaintiffs:** Defendants deprived Plaintiff Wickizer, an unaffiliated voter, of his First Amendment right to vote and express political preferences (*Reynolds v. Sims*, 377 U.S. 533 (1964)) by distributing counterfeit ballots listing disqualified candidates (Exhibit 0066), undermining his vote's efficacy in the 2024 election, particularly as the candidate he supported was no longer listed on the ballot. This also violated his Fourteenth Amendment due process and equal protection rights and Article IV, Section 4 right to a republican electoral system.

Defendants' actions caused financial losses from campaign donations and emotional distress from the confusion from misleading election information.

239.    **Class 4 Plaintiffs:** Defendants deprived Plaintiff Newby, a non-voting citizen, of his First Amendment right to express political preferences through non-participation (*Wooley v. Maynard*, 430 U.S. 705 (1977)) by enabling fraudulent certifications (Exhibits 0050 and 0069), denying his right to a fraud-free electoral process under the Fourteenth Amendment due process clause and Article IV, Section 4. These actions caused financial losses from time spent battling legislative policies via initiatives and a blogs and emotional distress from loss of confidence in elections.

240.    Defendants' coordinated actions and failures to act, including a secret meeting to defeat SB205 (Exhibit 0029), fraudulent certifications (Exhibit 0077), failure to investigate fraud (Exhibit 0065), and obstruction of investigations (Exhibits 0070), directly caused these deprivations, as Defendants acted with intent to favor donor-backed candidates over delegate-selected nominees, violating Utah Code § 20A-9-401(2) (*California Democratic Party v. Jones*, 530 U.S. 567 (2000)).

241.    The injuries to the Plaintiffs, including financial losses (delegate time, caucus expenses, donations, activism time), reputational harm, and constitutional deprivations, are remediable under 42 U.S.C. § 1983, as Defendants' actions and inaction under color of state law directly caused these harms (*Carey v. Piphus*, 435 U.S. 247 (1978)).

242.    Relief for this cause of action is found below under the heading "PRAYER FOR RELIEF."

**D.  Count IV – Civil Action under 42 U.S.C. § 1985**

243.     Plaintiffs reassert all prior paragraphs in this complaint and incorporates them here by reference.

244.     Plaintiffs assert that Defendants violated 42 U.S.C. § 1985(3) by conspiring to deprive Utah citizens of equal protection and privileges and immunities under the First Amendment, Fourteenth Amendment, and Article IV, Section 4 of the U.S. Constitution, motivated by invidious animus against citizens exercising their right to participate in a representative electoral process, believing themselves to be better deciders than the citizenry and rejecting Utah's republican form of government, causing financial and constitutional injuries, remediable under 42 U.S.C. § 1985.

245.     Defendants Cox, Henderson, Bramble, McCay, Adams, Schultz, Durrant, Axson, Coleman, and Null, with non-party co-conspirators (e.g., Michael O. Leavitt, Count My Vote donors, Exhibit 0004), conspired to manipulate Utah's election process by certifying disqualified candidates (Exhibits 0050 and 0069), defeating legislation to restore convention-only nominations (Exhibit 0027), and suppressing dissent (Exhibits 0062, 0066, and 0070). Their conspiracy, coordinated through a secret meeting on February 27, 2021, at the governor's mansion (Exhibit 0029), aimed to favor donor-backed candidates over citizen-selected nominees, violating Utah Code § 20A-9-401(2) (*California Democratic Party v. Jones*, 530 U.S. 567 (2000)).

246.     The conspiracy was motivated by animus against Utah citizens, including Classes 1 (delegates), 2 (URP members), 3 (voters), and 4 (citizens), for exercising their First Amendment right to associate and participate in a representative electoral process (*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)). Defendants, believing themselves better suited to control electoral outcomes, undermined Utah's republican form of government under Utah

77

Code § 20A-9-407 guaranteed by Article IV, Section 4, as evidenced by defamatory statements labeling delegates "extreme right-wing" (Exhibit 0049) and intimidating delegate Halvorsen (Exhibit 0070).

247.    **Class 1 Plaintiffs** (Delegates): The conspiracy deprived Class 1 Plaintiffs of their First Amendment right to associate by nullifying their April 27, 2024, convention votes (¶ 88, Exhibit 0038) through fraudulent certifications (Exhibit 0046). This violated their Fourteenth Amendment equal protection rights by favoring signature-gathering candidates and subverted Utah's republican government (Utah Code § 20A-9-407), causing financial losses from delegate time and reputational harm.

248.    **Class 2 Plaintiffs (URP Members)**: (Halvorsen, Anderson, Huber, Inman): The conspiracy deprived Class 2 Plaintiffs of their First Amendment right to associate through caucus convention participation, rendered meaningless by Defendants' fraudulent certifications (Exhibits 0050 and 0069), violating Utah Code § 20A-9-401(2). This breached their Fourteenth Amendment equal protection rights, causing financial losses from caucus expenses and reputational harm.

249.    **Class 3 (Unaffiliated Voter)**: The conspiracy deprived Plaintiff Wickizer of his First Amendment right to vote and express political preferences (*Reynolds v. Sims*, 377 U.S. 533 (1964)) through counterfeit ballots listing disqualified candidates (Exhibits 0069), undermining his vote's efficacy in the 2024 election. This violated his Fourteenth Amendment due process and equal protection rights, causing financial losses from campaign donations and emotional distress.

250.    **Class 4 (Utah and American citizens)**: The conspiracy deprived Plaintiff Newby of his First Amendment right to express political preferences through non-participation (*Wooley v. Maynard*, 430 U.S. 705 (1977)) by enabling fraudulent certifications (Exhibit 0077), denying

his right to a fraud-free electoral process under the Fourteenth Amendment. This caused financial losses from time spent battling legislative policies via initiatives and a blog and emotional distress.

251.    The conspiracy's actions, including fraudulent certifications (Exhibits 0050 and 0069), legislative inaction (Exhibit 0029), and suppression of dissent (Exhibits 0062, 0066, and 0070), directly caused these deprivations, motivated by Defendants' animus against Utah citizens' electoral participation, resulting in injuries remediable under 42 U.S.C. § 1985 (*Griffin v. Breckenridge*, 403 U.S. 88 (1971)).

252.    Relief for this cause of action is found below under the heading "PRAYER FOR RELIEF."

**E.  Count IV - Violation of 42 U.S.C. § 1986 – Neglect to Prevent Conspiracy**

253.    Plaintiffs reassert all prior paragraphs in this complaint and incorporates them here by reference.

254.    Plaintiffs assert that Defendants violated 42 U.S.C. § 1986 by having knowledge of the § 1985(3) conspiracy described in paragraphs 243–251, possessing the power to prevent or aid in preventing its wrongful acts, and neglecting or refusing to act, causing financial and constitutional injuries, remediable under 42 U.S.C. § 1986.

255.    Defendants Schultz and Durrant, as state officials, had actual knowledge of the conspiracy to manipulate Utah's election process and undermine its republican form of government by favoring donor-backed candidates over citizen participation, as evidenced by a Notice of Intent served on Schultz (Exhibit 0065) and a petition filed with Durrant (Exhibit 0060), detailing fraudulent certifications (Exhibits 0050 and 0069) and legislative inaction (Exhibit 0029).

256.    Defendant Schultz, with authority to investigate electoral fraud, neglected to act on the Notice of Intent, failing to address the conspiracy's actions, which nullified Plaintiffs' votes (Exhibit 0077) and convention participation (Exhibit 0046).

257.    Defendant Durrant, as Chief Justice, had the power to grant a hearing on a petition challenging fraudulent certifications (Exhibit 0060) but neglected to do so, obstructing fraud investigations (Exhibit 0062), allowing the conspiracy to harm Utah citizens' electoral rights.

258.    Defendants Cox, Henderson, Bramble, McCay, Adams, Axson, Coleman, and Null, despite knowledge of the conspiracy through their participation (Exhibits 0029 and 0065), failed to take corrective actions within their roles, enabling the conspiracy to deprive Plaintiffs of their rights to a representative government.

259.    The Defendants' neglect directly caused injuries to Classes 1–4, including financial losses from delegate time, caucus expenses, campaign donations, and activism time, as well as reputational and constitutional harms, including First Amendment and Fourteenth Amendment, remediable under 42 U.S.C. § 1986 (*Park v. City of Atlanta* 120 F.3d 1157 (11th Cir. 1997)).

260.    Relief for this cause of action is found below under the heading "PRAYER FOR RELIEF."

## IX.    PRAYER FOR RELIEF

261.    Pursuant to 18 U.S.C. § 1964(a) and (c), 42 U.S.C. §§ 1983, 1985, 1986, and 28 U.S.C. § 2201, Plaintiffs request the following relief to remedy the injuries caused by Defendants' violations of 18 U.S.C. § 1962 as well as 42 U.S.C. §§ 1983, 1985, and 1986, which deprived Plaintiffs of their First and Fourteenth Amendment rights, as detailed in Counts I through IV, and caused financial, reputational, and constitutional harms.

A.    **Declaratory relief under 28 U.S.C. § 2201**

262.    **Declare Unlawful the Forced "Second Chance" Primary Unconstitutional:**
Declare that Defendants' claim to allow a "second chance" primary for candidates seeking the
URP nomination through signature-gathering under Utah Code § 20A-9-408 is unconstitutional
and void, as it violates the URP's First Amendment right to select nominees exclusively through
its convention process under Utah Code § 20A-9-407 and Utah Code § 20A-9-101(13)(c)
(*California Democratic Party v. Jones*, 530 U.S. 567 (2000); *Marbury v. Madison*, 5 U.S. 137
(1803)), nullifying Class 1's convention votes, Class 2's caucus convention efforts, Class 3's vote
efficacy, and Class 4's fraud-free electoral process, causing financial and constitutional injuries
(First Amendment, Fourteenth Amendment, Article IV, § 4).

263.    **Declare the 2024 Election Certifications Null and Void.** Declare the 2024
election certifications (Exhibits 0050, 0069, and 0073) null and void due to violations of Utah
Code §§ 20A-9-407 and 20A-9-401(2). These certifications are based on counterfeit election
returns in violation of Utah Code § 20A-4-501, compromising the integrity of the 2024 election
process.

264.    **Declare Utah Governor and Lieutenant Governor's Offices Vacant:** Declare
the offices of Governor and Lieutenant Governor vacant due to the unlawful certifications, and
order that an election should be held at the next regular general election in 2026 for both
positions, in accordance with Article VII, Section 2, of the Utah Constitution. These elections
will serve to fill the unexpired terms of the offices in accordance with Article VII, Section 11(4)
of the Utah Constitution.[109]

---

[109] Utah Constitution Article VII, Section 11. (4)   If a vacancy in the office of Governor occurs
during the first year of the term of office, an election shall be held at the next regular general

265.    **Declare Utah Attorney General Office Vacant:** Declare the office of Utah Attorney General vacant due to the unlawful certifications, and order that an election should be held at the next regular general election in 2026 for both this office, in accordance with Article VII, Section 9, of the Utah Constitution and Utah Code § 20A-1-504.

266.    **Declare one Utah Senate Seat Office Vacant:** Declare the office of one Utah Senate seat, specifically the seat for which John Curtis was unlawfully certified, vacant due to the unlawful certification. Order that the vacancy be filled in accordance with the Seventeenth Amendment of the United States Constitution and Utah Code § 20A-1-502.

267.    **Declare one Utah State Board of Education District 13 Vacant:** Declare the office of one Utah State Board of Education District 13 vacant due to the unlawful certification. Order that the vacancy be filled in accordance with Article X, Section 3 of the Utah Constitution and Utah Code § 20A-1-504.

268.    **Declare one Utah State Board of Education District 7 Filled:** Declare the office of one Utah State Board of Education District 7 filled as it was already declared vacant and filled in accordance Article X, Section 3 of the Utah Constitution and Utah Code § 20A-1-504.

269.    **Declare Unlawful the Centralization of Signature Verification:** Declare that Defendants' centralization of the signature-gathering process via the Interlocal Cooperation Agreement violates Utah Code § 20A-9-408(9)(b), which requires all 29 county clerks to verify signatures to prevent fraud, and is inapplicable to the URP, which nominates solely through conventions under Utah Code § 20A-9-407. This centralization facilitated fraudulent

---

election after the vacancy occurs to elect a Governor and Lieutenant Governor, as provided in Article VII, Section 2, to serve the remainder of the unexpired term.

certifications, injuring Class 1's votes, Class 2's caucus convention participation, Class 3's vote efficacy, and Class 4's fraud-free process, violating First Amendment, Fourteenth Amendment, and Article IV, Section 4 rights.

270. **Declare Unlawful the Withholding of Election Records:** Declare that Defendants' redaction of 40% of signature-gathering petition records requested by Casey Seely and others and restriction of access to election records violate Utah Code § 63G-2-305(74), which protects only the signature itself, not entire records. This withholding obstructed transparency, enabled fraudulent certifications, and harmed Class 1's votes, Class 2's caucus efforts, Class 3's vote efficacy, and Class 4's fraud-free process, violating First Amendment, Fourteenth Amendment, and Article IV, Section 4 rights.

271. **Enjoin Future Violations:** Issue an injunction prohibiting Defendants from enforcing a "second chance" primary, centralizing signature verification, or withholding non-signature election records, to prevent further violations of Utah Code § 20A-9-407, Utah Code § 20A-9-408(9)(b), and Utah Code § 63G-2-305(74), ensuring compliance with the URP convention-only nomination process through Utah Code § 20A-9-407 and restoring electoral transparency.

272. **Order Corrective Actions:** Order Defendants to:

a.    Publicly acknowledge the URP's exclusive right to nominate candidates through its convention process under Utah Code § 20A-9-407 and its bylaws.

b.    Implement decentralized signature verification involving all 29 county clerks, as required by Utah Code § 20A-9-408(9)(b), for any applicable process.

c.    Release unredacted election records (excluding signatures) to comply with Utah Code § 63G-2-305(74) and ensure transparency.

273.   **Award Costs and Fees:** Award Plaintiffs reasonable legal fees, costs, and expenses incurred in bringing this action, as authorized under 28 U.S.C. § 2202 and 42 U.S.C. § 1988, due to the willful misconduct of Defendants in violating Plaintiffs' constitutional and statutory rights.

274.   Grant such other and further relief as the Court deems just and proper to restore confidence in Utah's electoral system, remedy the financial losses, reputational harm, and constitutional injuries (First Amendment, Fourteenth Amendment, Article IV, § 4) suffered by Classes 1–4, and ensure a fair and representative electoral process.

**B.     Relief under 18 U.S.C. § 1964 (Civil RICO)**

275.   **Award Treble Damages:** Award Plaintiffs treble damages for injuries to their business and property caused by Defendants' violations of 18 U.S.C. § 1962(b), (c), and (d), including financial losses from delegate time for Class 1, caucus convention participation expenses for Class 2, campaign donations for Class 3, and activism time for Class 4, as well as reputational harm from defamatory statements labeling delegates "extreme right-wing", resulting from the racketeering enterprise's fraudulent certifications and predicate acts of mail fraud and wire fraud.

276.   **Divest Defendants from the Enterprise:** Order the divestiture of Defendants Spencer Cox, Deidre Henderson, Curtis Bramble, Daniel McCay, J. Stuart Adams, Mike Schultz, Matthew Durrant, Robert Axson, Kim Coleman, Chris Null, and the State of Utah from the racketeering enterprise, which manipulated Utah's election laws through the Count My Vote initiative and coordinated actions, to prevent further control over the Utah Republican Party (URP) nominating process and restore its autonomy under Utah Code § 20A-9-407 and Utah Code § 20A-9-101(13)(c) (*California Democratic Party v. Jones*, 530 U.S. 567 (2000)).

277.    **Impose Restrictions on Future Activities**: Issue an injunction imposing reasonable restrictions on Defendants' future activities, prohibiting them from engaging in or facilitating any enterprise that manipulates Utah's election processes, including unauthorized candidate certifications, fraudulent ballot distribution, or deceptive communications via interstate servers, to protect Plaintiffs' First Amendment right to associate (*Tashjian v. Republican Party of Conn.*) and Fourteenth Amendment equal protection and due process rights (*Reynolds v. Sims*).

278.    **Prohibit Similar Endeavors:** Enjoin Defendants from engaging in any endeavor similar to the racketeering enterprise described in paragraphs 195–209, including schemes to favor donor-backed candidates over delegate-selected nominees through signature-gathering processes , to prevent further nullification of Class 1's convention votes, Class 2's caucus efforts, Class 3's vote efficacy, and Class 4's fraud-free electoral process, and to ensure compliance with Utah Code § 20A-9-401(2).

279.    **Order Disgorgement of Illicit Gains**: Order Defendants to disgorge all illicit gains derived from the racketeering enterprise, including funds received by signature-gathering firms like Gathering, Inc. and campaign consulting firms like Election Hive, as well as donations from Count My Vote and Alliance for Good Government donors, which fueled the scheme to manipulate Utah's elections and caused Plaintiffs' financial and constitutional injuries.

280.    **Award Costs and Legal Fees**: Award Plaintiffs reasonable legal fees, costs, and expenses incurred in bringing this action, as authorized under 18 U.S.C. § 1964(c) and 42 U.S.C. § 1988, due to Defendants' willful misconduct in conducting the racketeering enterprise, which violated Plaintiffs' constitutional rights and caused financial losses.

281.    **Grant Further Relief:** Grant such other and further relief as the Court deems just and proper to remedy the injuries to Classes 1–4, including financial losses (delegate time,

caucus expenses, donations, activism time), reputational harm. and constitutional deprivations (First Amendment, Fourteenth Amendment, Article IV, § 4), and to restore confidence in Utah's electoral system by dismantling the enterprise and preventing future racketeering activities that undermine the URP's nominating process and Utah's republican form of government.

### C. Relief under 42 U.S.C. 1983

282.    Award Compensatory Damages: Award Plaintiffs compensatory damages for injuries caused by Defendants' actions under color of state law, including financial losses from delegate time, caucus participation expenses, campaign donations, and activism time for, as well as reputational harm from defamatory statements labeling delegates "extreme right-wing". These injuries stem from Defendants' fraudulent certifications of disqualified candidates, which violated Plaintiffs' First Amendment right to associate (*Tashjian v. Republican Party of Conn.*) and Fourteenth Amendment equal protection and due process rights (*Reynolds v. Sims*).

283.    Award Nominal Damages for Constitutional Violations: Award nominal damages to Classes 1–4 for the deprivation of their constitutional rights under the First Amendment, Fourteenth Amendment, and Article IV, Section 4, caused by Defendants' actions, including nullifying Class 1's convention votes, Class 2's caucus convention efforts, Class 3's vote efficacy, and Class 4's fraud-free electoral process, even where specific financial losses are not quantified (*Carey v. Piphus*, 435 U.S. 247 (1978)).

284.    Issue Injunctive Relief: Enjoin Defendants Spencer Cox, Deidre Henderson, Curtis Bramble, Daniel McCay, J. Stuart Adams, Mike Schultz, Matthew Durrant, Robert Axson, Kim Coleman, Chris Null, and the State of Utah from further actions under color of state law that violate Plaintiffs' rights, including certifying disqualified candidates, defeating legislation to restore convention-only nominations, obstructing judicial review, and suppressing delegate

dissent, to protect the URP's nominating process under Utah Code § 20A-9-407 and Utah Code § 20A-9-101(13)(c) (*California Democratic Party v. Jones*, 530 U.S. 567 (2000)).

285.    **Order Corrective Actions:** Order Defendants to:

a.    Publicly acknowledge that the URP nominates candidates exclusively through its convention process under Utah Code § 20A-9-407 and its bylaws, and that certifications of disqualified candidates were unlawful.

b.    Implement procedures to ensure compliance with Utah Code § 20A-9-401(2), preventing unauthorized certifications and restoring the delegate-driven nominating process.

c.    Cease defamatory statements against delegates and intimidation of dissenters, to protect Plaintiffs' First Amendment rights.

286.    **Award Punitive Damages:** Award punitive damages against Defendants for their willful and malicious misconduct under color of state law, including orchestrating a secret meeting to defeat SB205, certifying disqualified candidates, and obstructing fraud investigations, which intentionally deprived Plaintiffs of their constitutional rights with reckless disregard for the harm caused (*Smith v. Wade*, 461 U.S. 30 (1983)).

287.    **Award Costs and Attorneys' Fees:** Award Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in bringing this action, as authorized under 42 U.S.C. § 1988, due to Defendants' willful misconduct in violating Plaintiffs' constitutional rights under color of state law, causing financial and reputational injuries.

288.    **Grant Further Relief:** Grant such other and further relief as the Court deems just and proper to remedy the injuries to Classes 1–4, including financial losses (delegate time, caucus expenses, donations, activism time), reputational harm, and constitutional deprivations

(First Amendment, Fourteenth Amendment, Article IV, § 4), and to restore confidence in Utah's electoral system by ensuring compliance with constitutional and statutory protections and preventing future violations under color of state law.

### D.    Relief under 42 U.S.C. 1985 and 1986

289.    **Award Compensatory Damages:** Award Plaintiffs compensatory damages for injuries caused by Defendants' conspiracy under 42 U.S.C. § 1985(3) to deprive Classes 1–4 of their First Amendment right to associate (*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)), Fourteenth Amendment equal protection and due process rights (*Reynolds v. Sims*, 377 U.S. 533 (1964)), and Article IV, Section 4 right to a republican form of government, and by Defendants' knowing neglect to prevent said conspiracy under 42 U.S.C. § 1986, despite all Defendants having knowledge of the conspiracy. These injuries include financial losses from delegate time, caucus participation expenses, campaign donations for, and activism time for, plus reputational harm from defamatory statements labeling delegates "extreme right-wing", stemming from fraudulent certifications, legislative inaction, and suppression of dissent.

290.    **Award Nominal Damages for Constitutional Violations:** Award nominal damages to Classes 1–4 for the deprivation of their constitutional rights under the First Amendment, Fourteenth Amendment, and Article IV, Section 4, caused by Defendants' conspiracy and knowing failure to prevent it, including nullified convention, caucus convention efforts, vote efficacy, and fraud-free electoral process, even where specific financial losses are not quantified (*Carey v. Piphus*, 435 U.S. 247 (1978)).

291.    **Issue Injunctive Relief:** Enjoin Defendants Spencer Cox, Deidre Henderson, Curtis Bramble, Daniel McCay, J. Stuart Adams, Mike Schultz, Matthew Durrant, Robert Axson, Kim Coleman, Chris Null, and the State of Utah, all of whom had knowledge of the conspiracy,

from further conspiring to deprive Plaintiffs of their constitutional rights or neglecting to prevent such conspiracies. This includes prohibiting certifying disqualified candidates, defeating legislation to restore convention-only nominations, obstructing judicial review, and suppressing delegate dissent, to protect the URP nominating process under Utah Code § 20A-9-407 and Utah Code § 20A-9-101(13)(c) (*California Democratic Party v. Jones*, 530 U.S. 567 (2000))

292. **Order Corrective Actions:** Order Defendants to:

a.     Publicly acknowledge that their conspiracy, coordinated through actions like the secret meeting on February 27, 2021, and knowing failure to act on notices of fraud, violated Plaintiffs' rights and the URP's exclusive right to nominate candidates through its convention process under Utah Code § 20A-9-407.

b.     Implement procedures to ensure compliance with Utah Code § 20A-9-401(2), preventing unauthorized certifications and restoring the delegate-driven nominating process.

c.     Cease defamatory statements against delegates and intimidation of dissenters, to protect Plaintiffs' First Amendment rights and prevent further conspiratorial acts or neglect.

293. **Award Punitive Damages:** Award punitive damages against Defendants for their willful and malicious conspiracy under 42 U.S.C. § 1985(3), motivated by animus against citizens exercising their electoral rights, and for their knowing neglect to prevent such wrongs under 42 U.S.C. § 1986, despite all Defendants' awareness of the conspiracy. This includes orchestrating fraudulent certifications, ignoring notices of fraud, and intimidating delegates, which intentionally deprived Plaintiffs of their constitutional rights with reckless disregard for the harm caused (*Smith v. Wade*, 461 U.S. 30 (1983)).

294.    **Award Costs and Fees:** Award Plaintiffs reasonable fees, costs, and expenses incurred in bringing this action, as authorized under 42 U.S.C. § 1988, due to Defendants' willful misconduct in conspiring to violate and knowingly neglecting to prevent violations of Plaintiffs' constitutional rights, causing financial and reputational injuries.

295.    **Grant Further Relief:** Grant such other and further relief as the Court deems just and proper to remedy the injuries to Classes 1–4, including financial losses (delegate time, caucus expenses, donations, activism time), reputational harm, and constitutional deprivations (First Amendment, Fourteenth Amendment, Article IV, § 4), and to restore confidence in Utah's electoral system by dismantling the conspiracy, preventing future violations or neglect, and ensuring compliance with constitutional and statutory protections.

## X.    Additional Equitable Relief:

The Court should order:

296.    Plaintiffs seek equitable relief by requesting the Court to order that the upcoming 2026 general election serve as an extension of the 2024 election, up to the point at which the wrongful certifications were enacted. Specifically, the Court should declare that the candidates who should have been properly and lawfully certified to appear on the ballots during the 2024 election are the ones who should be certified in the 2026 election. These individuals would then carry out the remainder of their terms, as that is what should have happened in the first place. The conduct surrounding the original election, including the wrongful certifications, violated constitutional requirements and fundamental principles of fair and lawful voting processes. Because the original election was based on an improperly certified ballot scheme and deprived voters of their rights, it did not constitute a true or valid expression of the will of the people. To preserve the integrity of the electoral process and ensure compliance with constitutional

standards, the Court should vacate the results of the 2024 primary and general elections and order that the 2026 election be conducted with the 2024 candidates properly and lawfully certified, allowing them to fulfill the remainder of their lawful terms.

297.    The appointment of a special monitor to oversee Utah's election processes to ensure compliance with state and federal law, preventing further violations by the enterprise.

298.    **Scope of Relief:** The requested relief is necessary to prevent and restrain ongoing and future violations of 18 U.S.C. § 1962, restore Plaintiffs' constitutional rights, and protect Utah's republican form of government as guaranteed by Article IV, § 4 of the U.S. Constitution. The enterprise's actions, affecting interstate commerce through ballot mailings, wire communications, and economic impacts of legislation like HB562, justify the Court's jurisdiction to grant these remedies under 18 U.S.C. § 1964(a) and (c).

## XI.    REPRESENTATIONS TO THE COURT (Rule 11)

WE HEREBY CERTIFY that, under Federal Rule of Civil Procedure 11 and applicable local rules, the foregoing Complaint is presented in good faith, for proper purposes, and based on existing law and factual support, and that to the best of our knowledge, information, and belief, formed after reasonable inquiry, the statements contained herein are true and correct.

Dated: October 13, 2025

Submitted by:

/s/ Tracie Halvorsen                          /s/ Sophie Anderson

TRACIE HALVORSEN                       SOPHIE ANDERSON
138 East 12300 South                        138 East 12300 South
C275                                                C275
Draper, Utah 84020                            Draper, Utah 84020
801-688-3594                                    801-953-2841
traciehalvorsen@outlook.com            jessandsophie03@yahoo.com
Plaintiff Pro Se                                 Plaintiff Pro Se

/s/ NANCY INMAN

NANCY INMAN
138 East 12300 South
C275
Draper, Utah 84020
916-396-4395
Nancyjinman@gmail.com
Plaintiff Pro Se

/s/ WAYNE WICKIZER

WAYNE WICKIZER
138 East 12300 South
C275
Draper, Utah 84020
385-239-8326
justice@utahwtp.com
Plaintiff Pro Se

/s/ STEVEN HUBER

STEVEN HUBER
138 East 12300 South
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com
Plaintiff Pro Se

/s/ DANIEL NEWBY

DANIEL NEWBY
138 East 12300 South
C275
Draper, Utah 84020
801-949-3360
danieltrouble@protonmail.com
Plaintiff Pro Se