# Exhibit 0016

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH REPUBLICAN PARTY,<br><br>     Plaintiff,<br><br>CONSTITUTION PARTY OF UTAH, a<br>registered political party of Utah,<br><br>     Plaintiff and Intervenor,<br><br>v.<br><br>GARY R. HERBERT, in his Official Capacity<br>as Governor of Utah, and SPENCER J. COX,<br>in his Official Capacity as Lieutenant Governor<br>of Utah,<br><br>     Defendants. | **MEMORANDUM DECISION AND<br>ORDER DENYING PRELIMINARY<br>INJUNCTION**<br><br>Case No. 2:14-cv-00876-DN-DBP<br><br>District Judge David Nuffer<br>Magistrate Judge Dustin B. Pead |

Utah Republican Party's ("Party") amended motion for preliminary injunction

("Motion")[1] is DENIED in this order  The Party seeks to stay the enforcement and

implementation of Utah Senate Bill 54 ("SB54") before trial.  The Party has challenged SB54 as

a violation of its First Amendment rights of association and free speech and for other reasons.

The parties thoroughly briefed the issues;[2] and the court heard oral argument and ruled from the

bench on April 10, 2015.[3] The Constitution Party of Utah ("Constitution Party"), Plaintiff and

---

[1] Plaintiff's Amended Motion for a Preliminary Injunction ("Motion"), docket no. 13, filed January 5, 2015.

[2] Motion; Plaintiff's Supplemental Brief in Support of Its Motion for a Preliminary Injunction, docket no. 65, filed March 23, 2015; Defendant's Brief in Opposition to Plaintiff's Amended Motion for Preliminary Injunction, docket no. 68, filed March 31, 2015; Plaintiff's Reply in Further Support Its [sic] Amended Motion for a Preliminary Injunction, docket no. 79, filed April 7, 2015.

[3] Minute Entry, docket no. 107, entered April 10, 2015.

Intervenor in this case, did not join in the Motion. The Constitution Party chose to participate in the Motion on only a limited basis. After a thorough review and consideration of the pleadings, motion papers, evidence, memoranda and argument and the draft order submitted by the defendants and objections from the Utah Republican Party and Constitution Party,[4] this order is entered to reflect that the Motion is DENIED.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ 2

FACTUAL RECORD ................................................................................................................... 3

    A. The Statutes at Issue ............................................................................................................ 3

        SB54 ....................................................................................................................................... 3

        Registered Political Parties ................................................................................................. 4

        Qualified Political Parties ................................................................................................... 6

        Primary Elections – RPP Compared to QPP ...................................................................... 7

        Senate Bill 207 .................................................................................................................... 7

        Statutory Provisions Regarding Displaying Party Affiliation on The Ballot ...................... 8

    B. Facts Related to the Party's Constitutional Claims ............................................................. 9

CONCLUSIONS OF LAW ......................................................................................................... 11

    A. The Party Has Not Presented A Facial Challenge To SB54 And Such A Challenge Is Not Likely To Succeed. .................................................................................................................... 12

    B. The Party's As-Applied Challenge to SB54 Is Not Supported by Evidence. ..................... 14

    C. The Party is Not Likely to Succeed on the Merits ............................................................. 15

---

[4] Counsel for Defendants was directed to submit a proposed draft of this order by July 10, 2015. *See* Docket Text Order ("140 DTO"), docket no. 140, entered June 18, 2015. Defendants complied with this directive. *See* Notice of Filing, docket no. 144, filed July 9, 2015. Counsel for Utah Republican Party and counsel for Constitution Party of Utah were allowed to submit objections to the proposed draft on or before July 17, 2015. *See* 140 DTO. Counsel for Constitution Party complied with this instruction, *see* Objection to Defendants' Proposed Memorandum Decision and Order, docket no. 145, filed July 17, 2015, and the Constitution Party's objections have been considered. The Utah Republican Party, however, submitted objections five days late without leave of court. *See* Plaintiff's Objections to Defendants' Proposed Memorandum Decision and Order Denying Preliminary Injunction, docket no. 147, filed July 22, 2015. Although the Party's counsel indicated the "objections are being filed concurrently with a motion to accept late brief," *id.* at 1, no such motion was filed. This is one of many deadlines the Republican Party's counsel has missed in this litigation Nevertheless, the proposed draft was reviewed extensively, in light of the objections filed, and necessary changes have been made to accurately reflect the ruling made in court April 10, 2015.

Requiring Primary Election ........................................................................................ 15

Use of Party's Symbol on the General Election Ballot............................................. 17

Interference with Internal Structure of Party ......................................................... 17

Plurality..................................................................................................................... 20

Subsection 12(a)—QPP Required to Allow Unaffiliated Voters in Primary ......... 20

ORDER ................................................................................................................................ 32

# FACTUAL RECORD[5]

### A. The Statutes at Issue

*SB54*

1.      SB54, enacted by the Utah State Legislature in the 2014 General Session,

modified the Utah Election Code as it relates to the nomination of candidates, primary and

general elections, and ballots.[6] The sections of the Utah Code that are affected by SB54 include:

20A-1-102, 20A-1-501, 20A-5-101, 20A-6-301 through 305, 20A-9-101, 20A-9-202, 20A-9-

403, and 20A-9-701. SB54 also enacts new sections 20A-1-103 and 20A-9-405 through 410.

2.      The provisions of SB54 retained Utah's caucus and convention system and

supplemented the process for selecting candidates by allowing candidates to be nominated to the

primary ballot when they meet threshold requirements for voter support as evidenced by a

candidate gathering the requisite number of signatures.[7]

---

[5] The Factual Record is drawn from largely undisputed facts presented in the materials considered, and apply as of the date of the preliminary injunction hearing, April. 10, 2015. The record is preliminary and subject to revision in other later proceedings, including trial.

[6] See S.B. 54, 2014 Gen. Sess., attached as Exhibit 1 to Motion, docket no. 13-1, filed January 5, 2015 (amending portions of Utah Code tit. 20A, chs., 1, 5, 6, 9, and enacting portions of Utah Code tit. 20A chs. 1, 9.).

[7] Utah Code Ann. §§ 20A-9-405, 408.

3.      SB54 allows political parties to choose to become a "Registered Political Party" ("RPP")[8] or a "Qualified Political Party" ("QPP").[9]

*Registered Political Parties*

4.      Pursuant to Utah Code title 20A, chapter 8, an RPP is an organization of voters that: participated in the last regular general election and in at least one of the last two regular general elections, polled a total vote for any of its candidates for any office equal to 2% or more of the total votes cast for all candidates for the United States House of Representatives in the same regular general election; or has complied with the petition and organizing procedures of Utah Code title 20A, chapter 8.[10]

5.      Under SB54, to qualify to nominate candidates for an upcoming election, an RPP must comply with Utah Code Section 20-9-403. Section 20-9-403 requires an RPP to "either declare [its] intent to participate in the next primary election, or declare that the [RPP] chooses not to have the names of its candidates for elected office featured on the ballot at the next general election."[11] This is done by filing a statement with the Lt. Governor no later than 5pm on November 15 of the preceding odd-numbered year.[12]

6.      If an RPP chooses to participate in the election nomination process, it must also "identify one or more registered political parties whose members may vote" for the RPP's candidates and "whether or not persons identified as unaffiliated with a political party may vote"

---

[8] *Id.* § 20A-9-403.

[9] *Id.* § 20A-9-406.

[10] *Id.* § 20A-8-101(4).

[11] *Id.* § 20A-9-403(2)(a)(i).

[12] *Id.* § 20A-9-403(2)(b).

for the RPP's candidates.[13] An individual may not file a declaration of candidacy for a RPP of which the individual is not a member.[14]

7.     Under SB54, a candidate for elective office seeking the nomination of an RPP may gain access to that party's primary ballot by demonstrating they have a reasonable amount of party voters' support by completing a nomination petition process and obtaining certification.[15]

8.     The Office of the Lieutenant Governor has stated that candidates for a RPP "may only collect signatures from voters who are registered with the same political party and who reside in the district or area of the office the candidate seeks. Signatures will not be counted from voters who are unaffiliated, who affiliate with other parties, living outside of the district or area, or those who are not registered.[16]

9.     Earlier this year, SB54 was amended by the Utah State Legislature to clarify that any candidate seeking an RPP's nomination must be a member of the registered political party to appear as the candidate in the primary election, except to the extent the RPP permits otherwise under the RPP's bylaws.[17]

---

[13] *Id.* § 20A-9-403(2)(a)(ii).

[14] S.B. 207, 2015 Gen. Sess., Enrolled Copy at 23:618-632, Exhibit 7 to Defendant's Index of Exhibits Supporting Memorandum in Opposition to Plaintiff's Amended Motion for Preliminary Injunction, docket no. 69-7, filed April 1, 2015.

[15] Utah Code Ann. § 20A-9-403(3)(b)-(4)(a)(i); *Id.* § 20A-9-405.

[16] Office of the Lieutenant Governor, Senate Bill 54 (2014): Frequently Asked Questions ("SB54 FAQ") at 6, ¶ 2.8, Defendant's Exhibit 5, docket no. 69-5, filed April 1, 2015.

[17] S.B. 207 at 23:618-632 (amending, among other sections, Utah Code Ann. § 20A-9-201).

*Qualified Political Parties*

10.     A QPP is a registered political party that: a) allows voters who have not registered with a political party ("unaffiliated voters") to vote for their party's candidates in a primary election; b) permits a delegate of its party to vote on a candidate's nomination in the party's convention remotely, or provides a procedure for designating an alternative delegate; c) does not hold the party's convention before April 1 of an even year; and d) permits members of its own party to seek nomination by either or both of the following methods: 1) seeking nomination through the party's convention process or 2) collecting signatures.[18]

11.     Under the QPP provisions, there are two tracks for a person to become a candidate for placement on the primary ballot: 1) the convention nomination track; and 2) the signature gathering nomination track. Under both of those tracks the statute limits candidates to members of the party.[19]

12.     On the convention nomination track, Utah Code Ann. § 20A-9-407 sets forth the "requirements for a member of a qualified political party who is seeking the nomination of a qualified political party."[20] The remaining provisions of that section refer specifically to "a member of a qualified political party."

13.     On the signature gathering track, Utah Code Ann. § 20A-9-408 sets forth "the requirements for a member of a qualified political party who is seeking nomination of the

---

[18] Utah Code Ann. § 20A-9-101(12)(a)-(d).

[19] *Id.* §§ 20A-9-201(1), 407(1), -408(1); *see also* S.B. 207 at 23:618-632.

[20] Utah Code Ann. § 20A-9-407.

qualified political party."[21] The statute restricts candidate eligibility to those who are "a member of a qualified political party."[22]

*Primary Elections – RPP Compared to QPP*

14.     Regarding primary elections, SB54 provides that a participating RPP determines who may vote "for the registered political party's candidates."[23]  If, however, a party chooses to designate itself as a QPP, it must "permit[] voters who are unaffiliated with any political party to vote" for the party's candidates in the primary election.[24]

*Senate Bill 207*

15.     Senate Bill 207 ("SB 207") was signed into law on March 27, 2015. SB 207 further clarifies Utah's Election Code.

16.     Among other things, SB 207 clarified that "[b]efore filing a declaration of candidacy for election to any office, a person shall state:

(i)      the registered political party of which that person is a member;

(ii)     or that the person is not a member of a registered political party."[25]

17.     SB 207 further provides that "an individual may not:

(iii) file a declaration of candidacy for a registered political party of which the

individual is not a member, except to the extent that the registered political party

permits otherwise in the registered political party's bylaws."[26]

---

[21] *Id.* § 20A-9-408(1); *see also* S.B. 207 at 23:621-632.

[22] Utah Code Ann. § 20A-9-48(1); *see also* SB54 FAQ at 9, ¶ 3.6.

[23] Utah Code Ann. § 20A-9-403(2)(a)(ii).

[24] *Id.* § 20A-9-101(12).

[25] S.B. 207 at 23:618-625.

[26] Utah Code Ann. § 20A-9-403(8); S.B. 207 at 23:626-632.

18.     Accordingly, Utah's Election Code allows political parties to decide whether a candidate seeking the party's nomination must be a member of the party.

*Statutory Provisions Regarding Displaying Party Affiliation on The Ballot*

19.     The Utah Election Code allows an RPP or QPP to have the names of its candidates for elective office featured with party affiliation on the ballot at a regular general election.[27]

20.     If an RPP or QPP chooses to have the State feature the names of its candidates for elective office with the party's affiliation on the ballot at a regular general election, then the RPP or QPP must comply with the requirements of section 20A-9-403 of the Utah Election Code and "nominate its candidates for elective office in the manner prescribed in [that] section."[28]

21.     The statute provides, in pertinent part, that "candidates . . . receiving the highest number of votes cast for each office at the regular primary election are nominated by their registered political party for that office."[29]

22.     The candidate who receives the most votes in the party's primary election is listed on the general election ballot as the party's candidate:  "Each election officer shall ensure that: (a) each person nominated by any registered political party under Subsection 20A-9-202(4) or Subsection 20A-9-403(5), and no other person, is placed on the ballot: (i) under the registered political party's name and emblem, if any; or (ii) under the title of the registered political party as designated by them in their certificates of nomination or petition, or, if none is designated, then

---

[27] Utah Code Ann. § 20A-9-403(1)(b) (emphasis added); *see also id.* § 20A-9-406(5).

[28] *Id.* § 20A-9-403(1)(b).

[29] *Id.* § 20A-9-403(5)(a).

under some suitable title; (b) the names of all unaffiliated candidates that qualify as required in Title 20A, Chapter 9, Part 5, Candidates not Affiliated with a Party, are placed on the ballot"[30]

### B. Facts Related to the Party's Constitutional Claims

23. The Utah Republican Party is an unincorporated association registered under Title 20A, chapter 8 of the Utah Code.

24. James Evans currently serves as the Republican Party Chairman.

25. Anyone who registers to vote and declares an affiliation with the Republican Party is a member of the Party, and is entitled to vote and participate in Republican Party elections and meetings.[31]

26. There is no "litmus test or required belief" in order to be a "Republican."[32]

27. The Party's bylaws require that neighborhood caucus meetings begin with a prayer, the recitation of the pledge of allegiance, and the reading of the Party's platform.[33]

28. Candidates seeking the Party's nomination to elected office are required to sign a disclosure statement, pledging their willingness to adhere to the Party's platform.

29. The penalty for not filling out the candidate disclosure statement regarding fidelity to the platform is that the delegates who attend the Party's convention are informed that the candidate did not sign the disclosure statement, but such a deficit does not exclude a "Republican" from being a candidate.[34]

---

[30] *Id.* § 20A-6-301(2).

[31] Deposition of James Evans ("Evans Dep.") at 32:2-5, Defendant's Exhibit 4, docket no. 69-4, filed April 1, 2015.

[32] Evans Dep. at 37:23-39:11.

[33] *Id.* at 151:8-15.

[34] *Id.* at 53:22-54:5; 100:13-18.

30.     The Party is a registered political party, as defined by Utah law predating the passage of SB54.

31.     The Party has not made any certification to indicate its intent to participate in the 2016 election as a registered political party, or a qualified political party.

32.     The Party's annual convention is scheduled for August 15, 2015 at which time the Party may decide whether the Party will certify as a QPP or RPP under the statute.[35]

33.     Mr. Evans has stated that it would be an expensive and laborious task to amend the Party's internal bylaws and constitution to comply with the provisions of SB54.[36]

34.     To date, the Party's governing body has not approved the changes to the Party's bylaws and constitution necessary to comply with SB54, instead opting to challenge the constitutionality of the statute.

35.     The Party has moved for a preliminary injunction seeking to stay the enforcement and implementation of SB54.[37]

36.     The Party claims SB54 violates its first amendment rights of association and free speech.

37.     The Party's Motion raised several issues with the QPP and RPP procedures as they apply to the Party under SB54, including 1) the claimed burden of requiring a QPP to allow unaffiliated voters to violate in the Party's primary; 2) the possibility that the Party's candidate

---

[35] *Id.* at 144:19-146:3.

[36] Declaration of James Evans ("Evans Decl.") ¶¶ 79-84, attached as Exhibit C to Motion, docket no. 13-3, filed January 5, 2015.

[37] Motion at 25.

could be elected by a plurality as opposed to a majority of voters; and 3) the State substituting its judgment for the Party's with respect to the Party's internal procedures and governance.

## CONCLUSIONS OF LAW

To obtain a preliminary injunction, the movant must show "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest."[38] Where the moving party can show that the second, third, and fourth factors "tip strongly in [its] favor," the first factor is satisfied "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."[39]

Here, the second and fourth factors weigh in favor of the Party. Violation of core constitutional rights is almost always an irreparable harm.[40] And the public has a strong interest in seeing that elections are not subject to any post-election challenges. However, the third factor does not tip in either party's favor. The State faces the harm of having its law invalidated, which would place the election system in Utah in jeopardy. Therefore, while the Party has shown that two of the factors tip in its favor, it has not shown that all three tip "strongly" in its favor. Accordingly, the Party fails to meet the necessary requirements to relax the "likelihood of success" factor, and will be required to show likelihood of success on the merits in order to

---

[38] *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013).

[39] *Id.*

[40] *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hould that no further showing of irreparable injury is necessary.").

obtain a preliminary injunction. As discussed below, the Party cannot make this showing at this preliminary stage.

At the outset, it is important to note that the court's ruling is preliminary. "[A] preliminary injunction is an extraordinary remedy; it is the exception rather than the rule."[41] First, the Party's facial challenge will be discussed, even though the Party has not made such a challenge. Then, the Party's as-applied challenge will be discussed. Finally, the Party's failure to show likelihood of success on the merits on the current state of the record will be discussed.

### A. The Party Has Not Presented A Facial Challenge To SB54 And Such A Challenge Is Not Likely To Succeed.

The Party has not pleaded that the statute is facially unconstitutional, having instead chosen to bring its claims exclusively as an "as-applied" challenge.[42]  Nevertheless, had the Party chosen to challenge the statute facially, that claim would have failed.

"Facial challenges are strong medicine. Article III of the Constitution ensures that federal courts are not roving commissions assigned to pass judgment on the validity of the nation's laws, but instead address only specific 'cases' and 'controversies.'"[43]  As the Supreme Court has observed, "facial challenges are best when infrequent. . . . Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks."[44] "Because facial challenges push the judiciary towards the edge of its traditional purview and expertise, courts

---

[42] Compl. ¶ 110, docket no. 2, filed December 1, 2014.

[42] Compl. ¶ 110, docket no. 2, filed December 1, 2014.

[43] *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005) (quotation marks and citation omitted).

[44] *Sabri v. United States*, 541 U.S. 600, 608-09 (2004) (internal citations omitted).

must be vigilant in applying the most exacting analysis to such claims."[45]  The Supreme Court

has explained that in the area of election law:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity
> often rest on speculation. As a consequence, they raise the risk of "premature
> interpretation of statutes on the basis of factually barebones records." Facial
> challenges also run contrary to the fundamental principle of judicial restraint that
> courts should neither "'anticipate a question of constitutional law in advance of
> the necessity of deciding it'" nor "'formulate a rule of constitutional law broader
> than is required by the precise facts to which it is to be applied.'" Finally facial
> challenges threaten to short circuit the democratic process by preventing laws
> embodying the will of the people from being implemented in a manner consistent
> with the Constitution.   We must keep in mind that "'[a] ruling of
> unconstitutionality frustrates the intent of elected representatives of people.'"[46]

The Supreme Court has been clear that to succeed in a facial attack "the challenger must

establish that no set of circumstances exists under which the Act would be valid"— an onerous

burden, making it "the most difficult challenge to mount successfully."[47] On the record presented

by the Party's Motion, "it cannot be said that no set of circumstances would result in a

constitutional outcome under this statute [SB54]."[48]

The Party cannot show a likelihood of success on the merits of a facial challenge because

there are constitutional outcomes under SB54.[49]  If the Party chooses to become an RPP: 1) Only

members of the Party can declare candidacy, unless the RPP permits otherwise;[50] 2) on petitions

for candidates to gain access to the ballot, only signatures from members of the Party will be

---

[45] *Ward*, 398 F.3d at 1247 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973)).

[46] *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008) (citations omitted).

[47] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[48] Transcript of Proceedings ("Tr.") April 10, 2015 at 122:15-19, docket no. 117, filed April 24, 2015.

[49] Tr. at 57:4-5; 57:23-25; 122:16-24; 127:1-2.

[50] S.B. 207 at 23:626-32 ("an individual may not . . . (iii) file a declaration of candidacy for a [RPP] of which the individual is not a member, except to the extent that the [RPP] permits otherwise . . . .").

counted by the Lieutenant Governor's Office;[51] 3) the Party can control who votes in its primary and close its primary to whomever it chooses not to associate with;[52] 4) only candidates that prevail in the Party's primary are entitled to have the Party symbol next to their names on the general election ballot;[53] 5) the Party remains free to hold a convention and have its delegates identify its candidate of choice; and 6) the Party is free to endorse, campaign, fundraise, lobby and advertise on behalf of its chosen candidates.

Thus, the RPP path to the general election ballot imposes no unconstitutional burden on the Party's rights of association or free speech. Because the RPP path to the ballot does not severely burden the Party's constitutional rights, a facial challenge to the statute would likely fail.

### B. The Party's As-Applied Challenge to SB54 Is Not Supported by Evidence.

While "[a] facial challenge considers the restriction's application to all conceivable parties, . . . an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case."[54] In *Washington State Grange*, the Supreme Court noted that had the plaintiff brought an as-applied challenge, the plaintiff would have to develop an "evidentiary record against which to assess their assertions . . . ."[55] Thus, the Party bears the burden of

---

[51] SB54 FAQ at 6, ¶ 2.8.

[52] Utah Code Ann. § 20A-9-403(2)(a)(ii) (requiring RPP that intends to participate in an upcoming primary election to file a statement with the Lieutenant Governor's Office "identify[ing] one or more registered political parties whose members may vote for the [RPP]'s candidates and whether or not persons identified as unaffiliated with a political party may vote for the [RPP]'s candidates . . . .").

[53] *Id.* § 20A-6-301(1)(a)(ii) (ensuring that general election ballots do not contain symbols or other markings of a political party, "except for a RPP that has chosen to nominate its candidates in accordance with Section 20A-9-403").

[54] *Colo. Right To Life Comm. v. Coffman*, 498 F.3d 1137, 1146 (10th Cir. 2007).

[55] 552 U.S. at 455 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 375-76 (1997)).

producing evidence in support of its claims.   The Party has not met this burden because, as of the date of the hearing, the Party had not chosen whether it would be a QPP or an RPP. Without designating itself as directly in a path—particularly the QPP path—the as-applied challenge is not ripe.[56]

### C.  The Party is Not Likely to Succeed on the Merits

"To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments."[57] "Election regulations that impose a severe burden on associational rights are subject to strict scrutiny, and [they are upheld] only if they are 'narrowly tailored to serve a compelling state interest.'"[58] The Party argues that SB54 contains several regulations that impose a "severe burden" on the Party's associational rights, but none of the asserted burdens are severe except one, which is not ripe for review since the evidence now presented by the Party cannot sustain an as-applied challenge to the QPP path of SB54. Each of the Party's arguments will be addressed below.

*Requiring Primary Election*

The Party contends that the State cannot require it to select its candidates through a primary election.  However, the Party's contention that it has a constitutional right to select its candidates through the caucus and convention system is not correct.   For more than forty years the United States Supreme Court has recognized that it is "too plain for argument" that "a State may require parties to use the primary format for selecting their nominees, in order to assure that

---

[56] Tr. 53:6-9; Tr. 122:22-25 ("[B]ecause the [P]arty has not elected the QPP route, which in my view is the only possible unconstitutional burden and outcome, we're not ripe for an as applied challenge.").

[57] *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 222 (1989).

[58] *Washington State Grange*, 552 U.S. at 451.

intraparty competition is resolved in a democratic fashion."[59] Accordingly, the State may require political parties to use the primary format for selecting their nominees.[60]

It is true that "[a] political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform."[61] As the Supreme Court has noted, however, "[t]hese rights are circumscribed . . . when the State gives the party a role in the election process," such as "by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot."[62] Where, as here, the State assumes this role, "the State acquires a legitimate governmental interest in assuring the fairness of the party's nominating process, enabling it to prescribe what that process must be."[63] In one case, it was held that a state has a "compelling" state interest in "eliminating the fraud and corruption that frequently accompanied party-run nominating conventions."[64]

The State administers the Party's primary election and allows the Party's symbol to appear on the general election ballot. The State pays for and administers the Party's primary as well as general elections[65] to ensure that candidates are selected through an open and democratic

---

[59] *New York State Bd. of Elections v. Lopez Torres,* 552 U.S. 196, 203 (2008) (quoting with approval *American Party of Tex. v. White*, 415 U.S. 767, 781 (1974)); *see also California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) (same); *Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (concluding that "it is beyond question 'that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'") (quoting with approval *Timmons*, 520 U.S. at 358).

[60] Tr. 123:5-6.

[61] *Lopez Torres,* 552 U.S. at 202.

[62] *Id.* at 203.

[63] *Id.*

[64] *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1180 (9th Cir. 2008).

[65] The State pays approximately $3 million for each statewide election. *See* Mark Thomas Deposition 177:1-3, Defendant's Exhibit 3, docket no. 69-3, filed April 1, 2015.

process.  Accordingly, the State can constitutionally require the Party to select its candidates through a primary election and the State can lawfully certify the Party's candidates who receive the most votes in the primary election as the candidates to appear on the general election ballot.

*Use of Party's Symbol on the General Election Ballot*

The Party also contends that placing the Party's symbol on the general election ballot to designate the Party's candidates violates its rights of free speech.  The Party argues that the Party, not the State, has the exclusive right to use the Party's symbol to endorse its candidates.  However, there is no protected free speech right to communicate the Party's endorsement on the general election ballot.  Ballots serve primarily to elect candidates, not as forums for political expression.[66]  The Supreme "Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message."[67]

Moreover, the Party has not shown it is likely that SB54 "severely burdens" the Party's free speech rights.  The Party may still hold a convention, campaign for candidates, fundraise, and endorse any candidate the Party chooses to support.  Simply put, the "Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office and to spread its message to all who will listen."[68]

*Interference with Internal Structure of Party*

The Party further contends that the provisions of SB54 unconstitutionally interfere with the Party's ability to control its internal structure.  Specifically, the Party claims SB54's process

---

[66] *Washington State Grange*, 552 U.S. at 453 n. 7 (citing *Timmons*, 520 U.S. at 363).

[67] *Nevada Com'n on Ethics v. Carigan*, 131 S.Ct. 2343, 2351 (2011) (quoting *Timmons*, 520 U.S. at 362-63; *Burdick v. Takushi*, 504 U.S. 428, 438 (1991)).

[68] *Timmons*, 520 U.S. at 361.

interferes with the Party's desire to begin neighborhood caucus meetings with a prayer, a

recitation of the pledge of allegiance and the reading of the Party's platform.  The Party's stated

purpose in beginning its meetings with prayer, pledge and platform is to remind those in

attendance of the principles the Party stands for and lessen the possibility that the Party's

nominee may not be a Party member or fully committed to the Party's ideology.

Contrary to the Party's contention, however, SB54 does not prevent the Party from

holding neighborhood caucus meetings and conducting those meetings as the Party chooses.

Moreover, not all regulation of a party's internal processes is prohibited or constitutionally

questionable.  Today, "[n]early every State in the Nation now mandates that political parties

select their candidates for national or statewide office by means of primary elections."[69]  As the

Supreme Court in *Clingman* stated:

> To deem ordinary and widespread burdens like these severe would subject
> virtually every electoral regulation to strict scrutiny, hamper the ability of States
> to run efficient and equitable elections, and compel … courts to rewrite state
> electoral codes.[70]

The Party's reliance on *Eu*[71] is also misplaced.  In *Eu*, the Court considered the

constitutionality of a California state law that banned political parties from "endors[ing],

support[ing], or oppos[ing], any candidate for nomination by that party for partisan office in the

direct primary election."[72]  In addition to restricting the primary activities of the official

governing bodies of political parties, the California statute also regulated the political parties'

---

[69] *Clingman*, 544 U.S. at 599 (O'Connor, J., concurring).

[70] *Id.*, 544 U.S. at 593.  *See also Burdick*, 504 U.S. at 433 (asserting that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.").

[71] *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989).

[72] *Id.* at 217.

"internal affairs."[73] "Separate statutory provisions dictate[d] the size and composition of the state central committees; set forth rules governing the selection and removal of committee members; fix[ed] the maximum term of office for the chair of the state central committee; require[d] that the chair rotate between residents of northern and southern California; specif[ied] the time and place of committee meetings; and limit[ed] the dues parties may impose on members. Violations of these provisions [were] criminal offenses punishable by fine and imprisonment."[74] The U.S. Supreme Court struck down the law as an unconstitutional burden on the California political parties' First Amendment rights, such as the right to control its own internal affairs.[75]

In contrast to *Eu*, SB54 does not restrict the ability of political parties to endorse the candidates of their choice nor does the law directly regulate the internal affairs of the Party. Significantly, under SB54, the State does not dictate who is allowed to be a member of a political party. Instead, state law allows all political parties to define membership in accordance with party rules. A "State political party" is defined as " . . . all of the persons in Utah who, under definitions established by the state political party, are members of the registered political party."[76] The Utah Republican Party has chosen to define its membership as being "open to any resident of the state of Utah who registers to vote as a Republican."[77] Accordingly, it is the Party's inclusive definition of membership, as opposed to the provisions contained in SB54, that creates the possibility that the Party's nominee may not fully adhere to the Party's ideology as expressed in its platform.

---

[73] *Id.* at 218.

[74] *Id.* at 218-219.

[75] *Id.* at 227, 233.

[76] Utah Code Ann. § 20A-8-101(5).

[77] Utah Republican Party Const., Art. I C, Defendant's Exhibit 2, docket no. 69-2, filed April 1, 2015.

Moreover, SB207 eliminates the Party's concern that its nominees may not be members of the Republican Party. SB207 provides that a candidate may not file a declaration of candidacy for a political party of which the candidate is not a member, except to the extent that the political party permits otherwise in the political party's bylaws.[78] Each candidate is required to identify, in a sworn statement, the registered political party of which the candidate is a member, or state the candidate is not a member of a political party. Thus, the Party's concern that its nominees will not be members of the Party is unfounded.[79]

*Plurality*

The Party accurately identifies the possibility that, under the provisions of SB54, its nominee may be elected by a plurality, as opposed to a majority, of its members. However, the Party presented no legal authority indicating that there is any constitutional deficiency in a party's candidate gaining access to the general election ballot based on a plurality vote from a primary election.[80]

*Subsection 12(a)—QPP Required to Allow Unaffiliated Voters in Primary*

The Party further contends that it is a severe burden on its associational rights to require the Party to allow unaffiliated voters to vote in its primary elections.[81] The Party is correct. As set forth above, political parties do not have unfettered freedom to decide every aspect of the election of the process. But a state may go too far when it *forces* political parties to associate

---

[78] S.B. 207 at 23:626-32 ("an individual may not . . . (iii) file a declaration of candidacy for a [RPP] of which the individual is not a member, except to the extent that the [RPP] permits otherwise . . . .").

[79] Moreover, the Party may file objections to a candidate's declaration of candidacy if the Party believes a candidate seeking the Party's nomination is not a member of the Party. *See* Utah Code. Ann. § 20A-9-202(5).

[80] Tr. at 124:25-125:3.

[81] *See* Utah Code Ann. § 20A-9-101(12)(a).

with others involuntarily.  "[F]reedom to associate for the common advancement of political beliefs necessarily presupposes the freedom to identify the people who constitute the association."[82]  And "[i]n no area is the political association's right to exclude more important than in its candidate-selection process," as that process "often determines the party's positions on significant public policy issues, and it is the nominee who is the party's ambassador charged with winning the general electorate over to its views."[83]

In 1981, the U.S. Supreme Court decided *Democratic Party of the United States v. Wisconsin ex rel. La Follette*.[84] In that case, the State of Wisconsin passed an election law that provided for an open primary, which would "allow non-Democrats—including members of other parties and independents—to vote in the Democratic primary without regard to party affiliation and without requiring a public declaration of party preference."[85] "The voters in Wisconsin's 'open' primary express their choice among Presidential candidates for the Democratic Party's nomination; they do not vote for delegates to the National Convention."[86] The delegates, however, "under Wisconsin law, are bound to vote at the National Convention in accord with the results of the open primary election."[87] In other words, the Wisconsin law forced the Democratic Party's delegates to vote at the National Convention according to the results of the open primary in which non-Democratic Party members cast a ballot. The Supreme Court explained that

---

[82] *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981).

[83] *Jones*, 530 U.S. at 568. *See also Tashjian v. Republican Party*, 479 U.S. 208, 216 (1986) (holding that the selection of a nominee is "the crucial juncture at which the appeal to common principles may be translated into concerted action and hence to political power in the community").

[84] *La Follette*, 450 U.S. 107.

[85] *Id.* at 110-111.

[86] *Id.* at 111-12.

[87] *Id.* at 112.

[o]n several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves from intrusion by those with adverse political principles.[88]

The *La Follette* Court went on to hold that "a State, or a court, may not constitutionally substitute its own judgment for that of the Party"[89] and said that "the interests advanced by the State [preserving integrity of electoral process, providing secrecy of the ballot, increasing voter participation, and preventing harassment of voters] do not justify its substantial intrusion into the associational freedom of members of the National Party."[90] The Supreme Court ultimately struck down the Wisconsin law as unconstitutional.

Five years later, in *Tashjian v. Republican Party of Connecticut*,[91] the Supreme Court addressed the constitutionality of a different state law which required a *closed* primary. The Connecticut law "require[ed] voters in any party primary to be registered members of that party."[92] Under the Connecticut law, the Republican Party could not, for example, allow registered independents to vote in the Republican Party's primary election—even if the Republican Party *wanted* Independents to vote in the primary. The state law simply would not allow non-registered voters to vote in the primary.

In striking the Connecticut law down as unconstitutional, the Court wrote that the Republican "Party's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association. As we have

---

[88] *Id.* (internal quotation marks omitted).

[89] *Id.* at 124-25.

[90] *Id.* at 125-26.

[91] *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986).

[92] *Id.* at 210-211.

said, the freedom to join together in furtherance of common political beliefs 'necessarily presupposes the freedom to identify the people who constitute the association.'"[93] The Supreme Court concluded that "the State's enforcement, under these circumstances, of its closed primary system burdens the First Amendment rights of the Party. The interests which the [State] adduces in support of the statute are insubstantial . . . ."[94]

After *La Follette* and *Tashjian*, it appeared that a political party's First Amendment rights were strong, and the State had little ability to intrude into a political party's ability to associate with those whom the party desired to associate.

Over a decade later, in 1997, the Supreme Court again took up the issue of political parties' First Amendment rights of association in *Timmons v. Twin Cities Area New Party*.[95] In that case, Minnesota passed a law prohibiting candidates from appearing on the ballot as a candidate for more than one political party (the prohibition is known as a "fusion ban").[96] A Minnesota State Representative, Andy Dawkins, was nominated to represent the Minnesota Democratic-Farmer-Labor Party in the upcoming election.[97] A separate political party—the "New Party"—selected Dawkins as their candidate for the same office for the same election."[98] "Neither Dawkins nor the DFL objected, and Dawkins signed the required affidavit of candidacy for the New Party."[99] However, due to the fusion ban, Minnesota election officials refused to

---

[93] *Id.* at 214 (quoting *La Follette*, 450 U.S. at 122).

[94] *Tashjian*, 479 U.S. at 225.

[95] *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).

[96] *Id.* at 353-54.

[97] *Id.* at 354.

[98] *Id.*

[99] *Id.*

accept the New Party's nominating petition, so the New Party filed suit "contending that Minnesota's anti-fusion laws violated the party's associational rights under the First and Fourteenth Amendments."[100]

The *Timmons* Court first explained that "[t]he First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas."[101] "On the other hand," the Court explained, "it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."[102] The Court explained the test in determining constitutionality of a state law that burdens a party's associational rights:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiff's rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.[103]

The Court in *Timmons* reasoned that the New Party had a right to select its own candidate, but it was not "absolutely entitled" to have Dawkins appear on the ballot as the New Party's nominee. In other words, "[t]hat a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights."[104] Therefore, because Minnesota's fusion ban did not involve "regulation of political parties'

---

[100] *Id.* at 354-55.

[101] *Id.* at 357.

[102] *Id.* at 358.

[103] *Id.* (internal quotation marks and citations omitted).

[104] *Id.* at 359.

internal affairs and core associational activities," it was unlike *Tashjian* and other prior cases.[105]

The Court concluded that

> Minnesota's laws do not restrict the ability of the New Party and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the party's access to the ballot. They are silent on parties' internal structure, governance, and policymaking. Instead, these provisions reduce the universe of potential candidates who may appear on the ballot as the party's nominee only by ruling out those few individuals who both have already agreed to be another party's candidate and also, if forced to choose, themselves prefer that other party. They also limit, slightly, the party's ability to send a message to the voters and to its preferred candidates. We conclude that the burdens Minnesota imposes on the party's First and Fourteenth Amendment associational rights—though not trivial—are not severe.[106]

Weighing the burden of Minnesota's law against the State interests, the Court found that the State interests were sufficient to uphold the law. The Court held that "[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."[107] The Court further held that "[s]tates also have a strong interest in the stability of their political systems."[108] Because the burdens imposed by Minnesota's law were not severe, the State was not required to "narrowly tailor the means it chooses to promote ballot integrity."[109] The law was upheld as constitutional.[110]

The Supreme Court's next encounter with political parties' associational rights came in 2000, in *California Democratic Party v. Jones*.[111] In *Jones*, California voters had passed an

---

[105] *Id.* at 360.

[106] *Id.* at 363.

[107] *Id.* at 364.

[108] *Id.* at 366.

[109] *Id.* at 365.

[110] *Id.* at 370.

[111] *California Democratic Party v. Jones*, 530 U.S. 567 (2000).

initiative called Proposition 198 that allowed a "blanket primary," in which each voter's ballot in the primary election would list every candidate running for a political office regardless of party affiliation and the voter would be allowed to choose freely among them.[112] Four political parties (the California Democratic Party, the California Republican Party, the Libertarian Party of California, and the Peace and Freedom Party) brought suit, arguing that Proposition 198 violated their First Amendment rights of association.[113]

The *Jones* Court recognized that "States have a major role to play in structuring and monitoring the election process, including primaries[,]" and "may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion."[114] The Court also recognized that "a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot."[115] The Court further recognized that "a State may require party registration a reasonable period of time before a primary election."[116] But the Court also said this:

> What we have not held, however, is that the processes by which political parties select their nominees are . . . wholly public affairs that States may regulate freely. To the contrary, we have continually stressed that when States regulate parties' internal processes they must act within limits imposed by the Constitution.[117]

Citing to *Tashjian* and *La Follette*, respectively, the *Jones* Court went on to explain that "the First Amendment protects 'the freedom to join together in furtherance of common political

---

[112] *Id.* at 569-70

[113] *Id.* at 571.

[114] *Id.* at 572.

[115] *Id.*

[116] *Id.*

[117] *Id.* at 572-73.

beliefs,' which 'necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.'"[118] The Court expounded on this idea by noting that

> That is to say, *a corollary of the right to associate is the right not to associate*. Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.
> . . .
> In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views."[119]

The *Jones* Court reiterated that prior "cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party select[s] a standard bearer who best represents the party's ideologies and preferences."[120] "The moment of choosing the party's nominee, we have said, is the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community."[121]

With these principles in mind, the *Jones* Court struck down California's blanket primary, holding that it violated the political parties' associational rights because it "*forces political parties to associate with*—to have their nominees, and hence their positions, determined by— those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated

---

[118] *Id.* at 574.

[119] *Id.* at 574-75 (emphasis added).

[120] *Id.* at 575 (alteration in original) (internal quotation marks omitted).

[121] *Id.*

with a rival."[122] "In this respect, it is qualitatively different from a closed primary" because "[u]nder that system, even when it is made quite easy for a voter to change his party affiliation the day of the primary, and thus, in some sense, to 'cross over,' at least he must formally *become a member of the party;* and once he does so, he is limited to voting for candidates of that party."[123]

Under California's blanket primary system, however, "the prospect of having a party's nominee determined by adherents of an opposing party [was] far from remote—indeed, it [was] a clear and present danger."[124] Because of this, the Court found the burden to be "severe" and not narrowly tailored to serve a compelling state interest.[125]

California argued that even under the blanket primary system, political parties were "free to endorse and financially support the candidate of their choice in the primary."[126] But the Court rejected this argument, making clear that "[t]he ability of the party leadership to endorse a candidate is simply no substitute for the party members' ability to choose their own nominee."[127] In the end, the California blanket primary was held unconstitutional because it "*forc[ed]* political parties to associate with those who do not share their beliefs."[128]

---

[122] *Id.* at 577 (emphasis added).

[123] *Id.* (emphasis in original).

[124] *Id.* at 578.

[125] *Id.* at 581-82; *id.* at 585-86.

[126] *Id.* at 580.

[127] *Id.*

[128] *Id.* at 586 (emphasis added).

In 2005, the Supreme Court again faced the question of political parties' rights of association in *Clingman v. Beaver*.[129] There, the State of Oklahoma enacted a law providing for a "semiclosed" primary, "in which a political party may invite only its own party members and voters registered as Independents to vote in the party's primary."[130] The Libertarian Party of Oklahoma ("LPO"), along with several Republican and Democratic voters,[131] sued, arguing that the law violated its right to freely associate under the First Amendment.[132] The Court disagreed with the LPO and upheld the Oklahoma law because, unlike some of the prior cases such as *La Follette*, *Tashjian*, and *Jones*, the Oklahoma law did *not* "compel the LPO's association with unwanted members or voters[.]"[133] Further, "[a]s in *Timmons*, Oklahoma's law [did] not regulate the LPO's internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public."[134] Therefore, the law was *not* a "severe" burden on the political party because, rather than *force association* with unwanted members or voters, the law *disallowed association* with a "boundless" pool of voters.[135] The law was upheld as constitutional.[136]

The concept that emerges from these cases is that, while a State has the authority to regulate elections and even require that political parties hold a primary election, *it may not force a political party to allow unaffiliated voters in its primary election*. Such a requirement is a

---

[129] *Clingman v. Beaver*, 544 U.S. 581 (2005).

[130] *Id.* at 584.

[131] *Id.* at 585.

[132] *Id.* at 584.

[133] *Id.* at 587.

[134] *Id.* at 590.

[135] *Id.* at 589.

[136] *Id.* at 598.

"severe" burden on the political party's First Amendment rights, and will only be upheld if it is
narrowly tailored to a compelling state interest.

   Here, subsection 20A-9-101(12)(a) provides that in order to become a QPP, a political
party must "permit[] voters who are unaffiliated with any political party to vote for the registered
political party's candidates in a primary election."[137] This provision falls squarely in line with
the cases above that held forced association provisions in other state laws unconstitutional as
severe burdens on political parties. The Party, if it chooses to be a QPP, will then be required to
allow voters who are unaffiliated with any political party to vote in the Party's primary election.
Therefore, unlike *Clingman*, which prohibited political parties from allowing too many voters in
its voting pool, subsection 12(a) affirmatively requires the Party to accept votes from those with
whom the Party may choose not to associate. This mandate of association is in direct contrast to
the provisions for an RPP under SB54, which allow the Party to identify "one or more registered
political parties whose members may vote for the registered political party's candidates *and
whether or not persons identified as unaffiliated with a political party may vote for the registered
political party's candidates . . . .*"[138] Thus, under SB54, a political party that chooses to be an
RPP has the ability to keep unaffiliated voters out of its primary election, while a political party
that chooses to be a QPP may not. This is a "severe" burden on the Party.

   The State contends that any burden imposed by allowing unaffiliated voters to vote in the
Party's primary is outweighed by the governmental interests that attach to 1) increasing voter
participation; 2) increasing candidates' access to the ballot; and 3) fostering a more open and

---

[137] Utah Code Ann. § 20A-9-101(12)(a).

[138] Utah Code Ann. § 20A-9-403(2)(a)(ii).

honest democratic system of electing people to public office. However, interests such as these have been advanced as "compelling" and rejected by the Supreme Court in the cases reviewed above.[139] Thus, if an as-applied challenge were brought, subsection 12(a) would likely be struck down as an unconstitutional burden on the Party's associational rights, which is not outweighed by any "compelling" interest of the State.

The State contends that the Party is not forced to be a QPP and, thus, SB54 does not force the party to associate with unaffiliated voters. The State is incorrect. In essence, the State's argument is that the Party has a "choice" to be an RPP which can disallow unaffiliated voters in its primary election, or be a QPP and give up its "corollary" First Amendment right not to associate with unaffiliated voters.[140] The State has not shown it is likely to succeed in this argument if an as-applied challenge were brought against subsection 12(a).

At this stage, however, the Party's "as-applied" challenge is not ripe. The Party has not yet decided whether it will become a QPP and, thereby, be required to allow unaffiliated voters to participate in its primary.  No elections have been conducted under the new law and, thus, no evidence was presented as to what impact, if any, SB54 will have on the Party.  And because an alternative path exists that is constitutional, a facial challenge to SB54, even if pled, cannot succeed. While there may be further development of the record, the Party has not presented evidence to demonstrate its constitutional rights of association are severely burdened and, thus, has not demonstrated it is likely to prevail on the merits.  Accordingly, at this stage, no injunction will issue against the State prohibiting its implementation and enforcement of SB54.

---

[139] *See, e.g., Jones*, 530 U.S. at 582-86 (rejecting state's asserted "compelling" interests).

[140] *See id.* at 574 ("[A] corollary of the right to associate is the right not to associate.").

# ORDER

Based upon the Party's Amended Motion for Preliminary Injunction, the argument and evidence received at the April 10, 2015 hearing, the pleadings and papers on file with the Court, and for good cause shown, IT IS HEREBY ORDERED that the Party's Amended Motion for Preliminary Injunction[141] is DENIED.

Dated September 23, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[141] Plaintiff's Amended Motion for a Preliminary Injunction, docket no. 13, filed January 5, 2015.