FILED
2025 DEC 22 AM 11:32
CLERK
U.S. DISTRICT COURT

Tracie Halvorsen
Petitioner Pro Se
138 E 12300 S
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF UTAH

| | |
|---|---|
| TRACIE HALVORSEN, et. al., <br><br> Plaintiffs, <br><br> v. <br><br> SPENCER COX, et. al, <br><br> Defendants | **PLAINTIFFS' REPLY IN OPPOSITION TO [83] LEGISLATIVE DEFENDANTS' MOTION TO DISMISS** <br> **(Bramble, McCay, Schultz, Adams)** <br><br> Case No. 2:25-cv-00909-HCN-JCB <br><br> Judge Howard C. Nielson, Jr. |

## I.    Introduction

**Note:** This Reply is publicly posted at utahcorruption.com and other community sites to ensure transparency and public awareness.

1.       In this case, the stakes for Utah's elections could not be higher: unless this **Court intervenes promptly**, only the wealthiest candidates will be able to compete for the Utah Republican Party's nomination, and the March 2026 caucus will be starved of ordinary Utahns willing to participate in the State's caucus and primary convention process. COMES NOW Plaintiffs, Tracie Halvorsen et al., and submit this response to the Motion to Dismiss (ECF 83) filed by Defendants Curtis Bramble, Daniel McCay, Mike Schultz, and J. Stuart Adams (collectively, the "Legislative Defendants"). The challenged "second chance primary" regime imposes an **urgent and unconstitutional barrier to ballot access** by deterring ordinary Utahns

from declaring candidacy for the Utah Republican Party nomination unless they can first raise roughly a million dollars to finance a forced, "second chance" primary election. This harm is exacerbated by the fast-approaching January 2026 deadline for candidates to declare—a deadline that is rapidly collapsing—and by Legislative Defendants' delay tactics in the form of an inappropriate Motion to Dismiss that consumes precious days while the filing window narrows. Under this scheme, even candidates who prevail at the state primary convention are automatically compelled into an expensive "second chance" direct primary at the whim of wealthier rivals, chilling political participation and suppressing competitive candidacies across the state at the very moment when Plaintiffs and similarly situated candidates must decide whether to enter the race. If this Court does not **act now**, the damage will be irreversible: candidates will abandon their candidacies rather than face the million-dollar burden, the March caucus will proceed with a depleted field of only well-funded contenders, and Utah's republican nomination process will have been fundamentally corrupted by a pay-to-play barrier that ordinary Utahns cannot surmount.

### A. Procedural Posture and Nature of Dispute

2.      Plaintiffs Tracie Halvorsen et al. filed this civil action on October 14, 2025, challenging the constitutionality and application of Utah's "second chance primary" regime and related election practices under federal and state law. The Complaint names as defendants various state executive officials, legislative officials, judicial officers, and party officials, and seeks declaratory and injunctive relief, as well as other appropriate remedies, to remove unconstitutional barriers to ballot access and protect Plaintiffs' rights as candidates, delegates, and voters.

3.      On November 25, 2025, Legislative Defendants Curtis Bramble, Daniel McCay, Mike Schultz, and J. Stuart Adams filed their Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6), asserting legislative immunity, lack of redressability, and alleged failure to state a claim as to them. Legislative Defendants do not dispute Plaintiffs' well-pleaded factual Complaint; instead, they effectively concede to their actions but contend it does not matter because they are immune, relying solely on legal immunity arguments that fail as a matter of law. Plaintiffs now submit this Memorandum in Opposition to Legislative Defendants' Motion to Dismiss, asking the Court to deny the motion and allow Plaintiffs' claims against these Defendants to proceed.

**B. Defendants' Defenses Fail**

4.      This Memorandum proceeds in three parts. First, Plaintiffs explain that Legislative Defendants' Motion to Dismiss rests on an overbroad view of legislative immunity that is incompatible with binding precedent and the Legislative Defendants' admit to their actions presented in the Complaint. Legislative immunity does not provide a blanket shield from suit where Plaintiffs challenge the ongoing maintenance and exploitation of an unconstitutional ballot-access regime rather than a single past legislative vote or speech.

5.      Second, Plaintiffs show that the Legislative Defendants' Motion's redressability and separation-of-powers arguments mischaracterize the relief Plaintiffs seek. Plaintiffs do not ask this Court to compel the passage of particular legislation but instead seek declaratory and injunctive relief invalidating the unconstitutional "second chance primary" scheme and preventing its continued use to exclude ordinary candidates from the Utah Republican Party nomination process—relief well within this Court's Article III power.

6.      Third, Plaintiffs demonstrate that, applying the familiar Rule 12(b)(6) standard, the Complaint easily states plausible claims for relief. Taking the detailed allegations as true and

drawing all reasonable inferences in Plaintiffs' favor, the pleading more than satisfies the *Twombly/Iqbal* standard, and any remaining objections Legislative Defendants may have to the facts or evidence must be addressed at summary judgment or trial, not at the motion-to-dismiss stage.

## II.    Standard of Review

7.    Under Tenth Circuit law, a Rule 12(b)(6) motion tests only the legal sufficiency of the complaint, compelling the Court to accept as true all well-pleaded factual allegations and view them in the light most favorable to the plaintiff. Typically, this standard protects plaintiffs from early dismissal when facts are in dispute. But here, the analysis is even simpler: **Legislative Defendants do not dispute the facts**. By filing a motion based purely on immunity and redressability—and by making explicit concessions in their opposition to the Preliminary Injunction—Defendants have effectively admitted to the conduct provided in the Complaint. They do not deny sponsoring the scheme, coordinating with the Executive to maintain it, or using it for political gain.

8.    Because Defendants concede the factual record, this Motion to Dismiss is not a genuine challenge to the sufficiency of the pleadings; it is a tactical "Hail Mary." Defendants know they cannot defend their actions on the merits or under the Constitution. Instead, they are gambling that the Court will provide them with a blanket shield of immunity to escape accountability for conduct they practically admit to committing. They are asking this Court to ignore the detailed record of their participation in a racketeering enterprise and grant them a "get out of jail free" card based on a warped application of legislative privilege.

9.    Dismissal is a "drastic step" reserved for cases where no legal theory could possibly succeed. It was never intended to serve as an escape hatch for officials who admit to

unconstitutional conduct but hope to avoid liability through procedural maneuvering. Because Plaintiffs have pled a detailed, undisputed account of how Defendants designed and exploited the "second chance" regime to strip Plaintiffs of their rights—and because Defendants' only response is to hide behind immunity—the standard for dismissal is plainly not met. The Court should reject this attempt to delay justice and allow the case to proceed on the admitted facts.

### III.    Legislative Defendants' Admissions Confirm the Pleaded Facts

10.    Legislative Defendants' own Motion to Dismiss confirms that there is no genuine dispute at this stage about the core factual conduct pleaded in the Complaint. They admit that Senator Bramble and Senator McCay sponsored S.B. 54, debated it in committee and on the floor, and that later bills (including H.B. 338 and S.B. 205) addressing the nomination process were introduced and then blocked or allowed to fail, including a 2021 proposal that would have removed the ability to fraud the people into believing the signature-gathering process could be forced upon a qualified political party.

11.    They further acknowledge that they met with the Governor to discuss S.B. 205, that leadership did not move impeachment or reform measures, and that Senator Bramble used the signature-gathering path and campaign donations as a political candidate while Legislative Defendants promoted the regime through social-media activity. Those are precisely the kinds of operational, political, and financial acts Plaintiffs describe: coordinating with the Executive and consultants, leveraging the "second chance" structure in campaigns, and reinforcing a narrative of legitimacy.

12.    By choosing to move under Rules 12(b)(1) and 12(b)(6) on pure legal grounds—legislative immunity, redressability, and Rule 65 vagueness—without contesting a single concrete factual claim about how the "second chance primary" operates in practice, Legislative

5

Defendants have effectively conceded the factual predicate for Plaintiffs' claims at this stage. Under *Safe Streets* and *Iqbal*, the Court must accept those well-pleaded facts as true and reject this Motion, which brazenly asks for dismissal because Defendants believe they have immunity even if they violate the law.

## IV.    Argument

### A.  Legislative Immunity Does Not Apply

13.    Legislative immunity does not extend to the conduct Plaintiffs challenge because Plaintiffs are not suing Legislative Defendants for how they debated or voted on S.B. 54, but for their ongoing participation in, and profiteering from, a racketeering scheme that implements and legitimizes an unconstitutional "second chance" primary and effects unconstitutional takings. Legislative immunity is limited to acts that are "quintessentially legislative" in nature—such as introducing bills, voting on them, or engaging in formal debate—and does not protect non-legislative conduct undertaken to carry out or benefit from an unlawful enterprise. See *Kamplain v. Curry County Bd. of Comm'rs*, 159 F.3d 1248, 1253 (10th Cir. 1998) (holding that legislative immunity does not apply to administrative or enforcement acts, even if performed by a legislative body). Coordinating with the Executive to "preserve and legitimize" a specific election scheme is an operational, non-legislative act similar to the decision under *Kamplain*.

14.    Legislative Defendants' own Motion confirms that Plaintiffs are not suing them "because they passed a bill," but because they stepped outside the protected legislative sphere and into operational, political, and financial activities that maintain and legitimize the "second chance" signature-path regime. They admit sponsoring S.B. 54, participating in later reform efforts, meeting privately with the Governor to shape and ultimately defeat convention-only legislation, and engaging in social-media and campaign conduct around the very regime at issue.

Those activities—coordination with the Executive, use of the signature path as candidates, and public messaging to validate the process—fit squarely within the non-legislative conduct that *Kamplain, Gravel*, and *Bogan* hold is not shielded by absolute legislative immunity.

15.     Here, the Plaintiffs claim that Legislative Defendants have gone well beyond the protected sphere of lawmaking by participating in, amplifying, and benefiting from a coordinated scheme to present the "second chance" process as lawful while it strips Plaintiffs of their convention-earned nominations and forces candidates into a duplicative, pay-to-play primary. Those are the sorts of operational, political, and financial acts—coordinating with consultants, leveraging the scheme in campaigns, reinforcing a false narrative of legitimacy—not the core legislative activities the immunity doctrine was crafted to protect. Plaintiffs therefore seek RICO and damages relief not "because they passed a bill," but because they joined and advanced an enterprise that uses that signature-gathering framework to perpetrate ongoing constitutional injuries and unconstitutional takings of associational rights and electoral opportunities. Those are the sorts of operational, political, and financial acts... not the core legislative activities the immunity doctrine was crafted to protect. *See id.* (noting that immunity is reserved for acts that are "integral steps in the legislative process," not peripheral political conduct).

16.     Legislative Defendants stand in the same position as any other RICO participant: when they step outside formal legislative functions and into implementing and profiting from an unlawful scheme, they act as enterprise members, not as immune legislators. The doctrine of legislative immunity cannot be stretched to cloak participation in racketeering or to bar damages for unconstitutional takings simply because some parts of the scheme trace back to legislation. To hold otherwise would allow state legislators to launder any private or political misconduct through a statute and then claim absolute immunity, a result squarely at odds with the limited,

function-based nature of the immunity recognized by the courts. See *Bogan v. Scott-Harris*, 523

U.S. 44, 54 (1998) (immunity attaches only to acts within the "sphere of legitimate legislative

activity").

17.    Moreover, Plaintiffs do not seek to punish Legislative Defendants for a single,

past vote; they seek prospective relief and damages for Defendants' continuing participation in

and maintenance of an unconstitutional system that is actively injuring Plaintiffs as the January

2026 filing deadline approaches. As with other state officials who enforce or maintain

unconstitutional schemes, the "ongoing violation" principle permits claims to proceed against

officials who are presently giving effect to an unlawful regime, even if some of that regime's

tools originated in legislation. As with other state officials who enforce or maintain

unconstitutional schemes, the "ongoing violation" principle permits claims to proceed... *Verizon*

*Maryland Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (holding that under *Ex*

*parte Young*, a court need only determine whether the complaint claims an ongoing violation of

federal law and seeks prospective relief).

## B. Legislative Immunity Does not Protect Defendants' Participation in a RICO Enterprise and Unconstitutional Takings

18.    Plaintiffs' claims against the Legislative Defendants are not limited to their role as

lawmakers in 2014; they also sound in RICO and unconstitutional takings based on Defendants'

participation in, and ongoing maintenance of, an enterprise that exploits the "second chance

primary."  As the Supreme Court held in *United States v. Brewster*, 408 U.S. 501 (1972),

legislative immunity is not a blanket shield for all conduct by a legislator; it does not protect

criminal or corrupt acts simply because they are performed by an official. Just as taking a bribe is

not a "legislative act," coordinating with consultants and donors to rig a nomination scheme is

not "legislative." The Complaint demonstrates that Legislative Defendants coordinated with consultants, donors, and other officials to design, preserve, and legitimize a pay-to-play path to the Utah Republican Party nomination, conduct that falls far outside the "deliberative" sphere and has prostituted the legislative process.

19.     That conduct is qualitatively different from casting a vote on S.B. 54. It is operational, political, and financial activity undertaken to carry out and benefit from an unlawful enterprise See *Gravel v. United States*, 408 U.S. 606, 625 (1972) (holding that "political" activities, such as campaigning or communicating with the public, are not protected legislative acts). When legislators step outside the hall and into implementing, promoting, and profiting from a RICO scheme through social media posts and private executive meetings, they act as enterprise participants, not as immune legislators. Legislative immunity cannot be stretched so far as to cloak racketeering or shield damages claims for ongoing unconstitutional takings merely because the enterprise uses a statute as one of its tools.

20.     To the extent Legislative Defendants argue that legislative immunity bars Plaintiffs' RICO and takings claims, that argument fails under *Chappell v. Robbins*, 73 F.3d 918 (9th Cir. 1996). While *Chappell* recognized immunity for legitimate legislative acts, it affirmed that immunity does not apply when legislators act outside their legislative capacity. Here, Plaintiffs challenge Defendants' ongoing participation in, and benefit from, a racketeering enterprise that uses the "second chance primary" to effect unconstitutional takings—conduct that is "political" and "operational," not "legislative."

21.     To the extent Legislative Defendants argue that legislative immunity bars Plaintiffs' RICO and takings claims, that argument fails for the same reasons discussed above: Plaintiffs challenge Defendants' ongoing participation in, and benefit from, a racketeering

enterprise that uses the "second chance primary" to effect unconstitutional takings, not merely their votes on past legislation.

### C.  Plaintiffs' Claims Are Redressable (The Court's Can Fix This)

22.  The claims are redressable because the Court has clear power to eliminate the concrete, present-tense harms Plaintiffs claim, without ordering the Legislature to enact any particular law or intruding on core legislative functions. Plaintiffs do not ask this Court to micromanage future debates or force any legislator to vote a certain way; they seek declaratory and injunctive relief that would invalidate the unconstitutional "second chance primary" scheme and prevent its continued use to block convention-nominated candidates and price ordinary Utahns out of the nomination process.

23.  First, a declaration that the "second chance" regime and its application are unconstitutional, together with an injunction against using that regime to determine the Utah Republican Party's nominees, would directly redress Plaintiffs' injuries by removing the pay-to-play barrier and restoring a lawful nomination path before the January 2026 deadline. That is classic Article III redressability: the requested judgment would change the governing legal framework in a way that makes it possible for Plaintiffs to run, be considered, and compete on constitutional terms.

24.  Second, as to the Legislative Defendants specifically, Plaintiffs' requested relief does not require the Court to command them to pass new statutes; instead, it asks the Court to declare unlawful and enjoin the current, unconstitutional scheme that those Defendants helped design and continue to maintain and legitimize. Federal courts routinely hold that such relief is redressable where state officials—whether executive or legislative in role—are claimed to be

participating in or maintaining an ongoing constitutional violation, because a judgment against them would remove their ability to continue giving that scheme legal force and political effect.

25.    Third, Plaintiffs' damages claims (including RICO and unconstitutional takings theories) are independently redressable: monetary relief would compensate Plaintiffs for concrete past injuries, including the loss of nomination rights and expenditures forced by the unlawful "second chance" regime. Redressability does not require that a single order cure every systemic problem; it requires only that the Court's judgment be likely to alleviate the particular injuries Plaintiffs have claimed, and here both prospective relief and damages plainly meet that standard.

26.    State and Legislative Defendants' opposition (ECF 96) to Plaintiffs' Motion for Preliminary Injunction further underscores that the challenged scheme is a single, discrete mechanism—certification of signature-path candidates and maintenance of a "second chance" primary structure—that has been applied "for nearly a decade" in "every election since" 2015 and again in the 2024 gubernatorial cycle. By their own account, the status quo is that the Lt. Governor routinely certifies disqualified candidate—who used the unpermitted signature-gathering process—to a closed Republican primary ballot, and that this practice will continue unless enjoined. That admission confirms that the Court can fashion narrow, concrete relief directed to that specific mechanism without "ordering the Legislature to legislate," and that such relief will directly redress Plaintiffs' injuries before the January 2026 deadline.

**D.  Defendants' Redressability Argument Fails as a Matter of Law**

27.    The Legislative Defendants' redressability argument badly mischaracterizes what Plaintiffs are asking this Court to do. Plaintiffs are not seeking an order commanding the Utah Legislature to draft, debate, or pass any particular statute; they are asking the Court to exercise its core judicial function by declaring the forcing of a "second chance primary" regime

unconstitutional and enjoining its continued use as a barrier to ballot access. A ruling that the "second chance" scheme violates the Constitution would immediately remove the unlawful legal obstacle that now prevents Plaintiffs and similarly situated candidates from running without first securing extraordinary sums to finance a duplicative primary, thereby directly redressing the injury claimed.

28.    Once the Court strikes down the unconstitutional regime, Plaintiffs no longer face the coerced choice between staying out of the race or submitting to an expensive, second, pay-to-play primary at the whim of wealthier rivals. The State remains free to legislate prospectively within constitutional bounds, but Article III does not require this Court to supervise future policy choices; it requires only that the Court be able to alleviate the concrete harm before it by invalidating the specific unconstitutional mechanism that causes that harm. By removing that mechanism, a declaratory judgment and corresponding injunction restore a lawful path to candidacy in time for the January 2026 deadline and thus fully satisfy the redressability requirement without any need to intrude into the legislative role.

**E. Defendants' Own Authorities Confirm Redressability.**

29.    Defendants' reliance on *Spallone v. United States*, 493 U.S. 265 (1990) and *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 436 U.S. 719 (1980) backfires. *Spallone* explicitly affirms the power of federal courts to enforce compliance with the Constitution against government entities, distinguishing only the narrow issue of coercing individual legislative votes. Plaintiffs here seek exactly what Spallone permits: relief against the unconstitutional regime itself. Further, *Consumers Union* held that even officials with legislative functions are proper defendants when they also possess enforcement authority. Legislative Defendants have stepped outside their legislative role to actively coordinate the enforcement of the "second chance"

scheme with the Executive. Under *Consumers Union*, they are therefore subject to suit for declaratory and injunctive relief. Finally, the very existence of *Utah Republican Party v. Herbert*, 144 F.3d 1263, 1270 (D. Utah 2015), confirms that federal courts have the power to adjudicate the constitutionality of this specific election regime. If the Court has the jurisdiction to determine that the State cannot force unaffiliated voters on a party, it certainly has the authority to determine that the State cannot force a "second chance" primary for the losers of a convention.

30.     As the court held in *Herbert*, while a state may regulate elections, "a state may not force a political party to allow unaffiliated voters in its primary election. Such a requirement is a severe burden on the political party's First Amendment rights because it dilutes the party's ability to determine its candidates, and will only be upheld if it is narrowly tailored to a compelling state interest. No case, however, has upheld a forced open primary." *Id*. at 1278.

31.     The same logic applies here. Just as the State cannot forcibly dilute the party's vote by mandating an open primary, it cannot forcibly dilute the party's selection process by mandating a "second chance" signature path that overrides the convention's choice. Since the federal court in Herbert had the power to enjoin the State from forcing an open primary, this Court has the power to enjoin the State from forcing a "second chance" primary.

**F.  The Complaint Plausibly States a Claim**

32.     Defendants' motion also fails because it ignores the level of factual detail pled in the Complaint and treats a richly documented set of allegations as if it were a bare, conclusory pleading. The Complaint does not simply assert that Utah's "second chance primary" is unfair or unconstitutional in the abstract; it sets out specific, concrete facts showing that the challenged regime operates as a pay-to-play barrier that prices ordinary candidates out of the race and strips convention-nominated candidates of the value of their nominations. Among other things,

Plaintiffs demonstrated that pursuing the forced, duplicative "second chance" primary requires roughly a million dollars in campaign resources, that this cost structure is determinative of who may realistically seek the Utah Republican Party nomination, and that Plaintiffs themselves face an imminent choice between forgoing candidacy or submitting to that unconstitutional financial hurdle in light of the January 2026 deadline. These are precisely the kind of well-pleaded factual allegations that, when accepted as true and viewed in Plaintiffs' favor, render their constitutional claims not only conceivable but eminently plausible.

33.    Under the governing standard, Plaintiffs are not required at the Rule 12 stage to prove they will ultimately prevail—yet here, they have effectively done so. Because Legislative Defendants have conceded the factual narrative of the Complaint, Plaintiffs have already established that the "second chance" regime, as applied, imposes severe and unjustified burdens on ballot access and political participation. The Complaint ties the extraordinary financial requirement, the forced second primary, and the displacement of convention results directly to Plaintiffs' own participation decisions and to the broader chilling effect on competitive races across the state.

34.    These are not mere allegations; they are now undisputed facts. Plaintiffs have identified the statutory mechanisms, the financial thresholds, the timeline, and the concrete constitutional injuries, and Defendants have offered no factual rebuttal. This level of detail does more than satisfy the plausibility threshold—it establishes a clear, uncontested record of constitutional violation. Any attempt by Defendants to now dispute the weight or impact of these facts must be reserved for summary judgment; it cannot support dismissal at the pleading stage where the Plaintiffs' facts stands uncontradicted.

35.      Defendants' "vagueness" objection misdescribes the relief Plaintiffs actually seek. Plaintiffs are not asking for a generic injunction commanding Defendants to "follow the law." Rather, the Complaint identifies a discrete mechanism—the unconstitutional "second chance" primary path—and asks this Court to enjoin its forced application as a method for determining the Utah Republican Party's nominees. That requested relief is narrow, concrete, and easily administrable: it prohibits Defendants from employing a specific, identified process that has been claimed to violate Plaintiffs' constitutional rights, while leaving them free to administer elections through constitutionally permissible procedures.

36.      Because the requested injunction targets a clearly defined practice—the forced, duplicative, million-dollar "second chance" primary that overrides convention results—it provides far more guidance than the sort of "obey all election laws." It tells Defendants exactly what they must stop doing (using the "second chance" path to place their preferred candidates on the ballot) and, by implication, restores the lawful nomination routes already described in the statutory and party framework. An order of that kind is not impermissibly vague; it is the classic form of equitable relief federal courts issue when a particular statutory or regulatory mechanism is found unconstitutional.

### G. Defendants' Own Authorities Support Plaintiffs' Claims

37.      Defendants' reliance on Bronson and Shook is misplaced. *Bronson v. Swensen* confirms that redressability turns on a defendant's connection to the enforcement of the challenged act. Unlike the bystander clerk in Bronson, Legislative Defendants here—by their own admission—actively coordinated with the Executive to maintain the "second chance" regime. Similarly, *Shook v. Bd. of Cnty. Comm'rs of Cnty. Of El Paso,* 543 F.3d 597 (10th Cri. 2008) warns only against vague "obey the law" decrees. It effectively validates Plaintiffs'

approach here: seeking a narrow, specific injunction against a defined statutory mechanism (the unconstitutional forced signature path), which provides the precise guidance *Shook* requires. Thus, the very cases Defendants cite demonstrate that Plaintiffs' claims are justiciable and their requested relief is proper.

38.    Legislative Defendants' own Motion also acknowledges their active participation in promoting the "second chance" scheme through social media—a quintessentially non-legislative act. They admit that they made social media posts regarding the election and candidates, yet they attempt to dismiss these as "irrelevant" or protected. But under *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), legislative immunity does not reach such political or public-relations conduct; it covers only acts integral to the deliberative legislative process, like voting or debating in committee. When Legislative Defendants took to social media to validate the "second chance" process, endorse candidates benefiting from it, participated in the signature-gathering process themselves as candidates, or amplify the narrative of its legitimacy, they were acting as political operatives and enterprise participants, not as legislators. By admitting these acts occurred, their Motion confirms they engaged in conduct outside the sphere of legislative immunity, further supporting Plaintiffs' claims that they are liable for their role in the RICO enterprise and the ongoing constitutional violation.

**H. Legislative Defendants' Motion Confirms No Genuine Dispute**

39.    Legislative Defendants' own Motion to Dismiss confirms that there is no genuine dispute at this stage about the core factual statement set out in the Complaint. In moving under Rules 12(b)(1) and 12(b)(6), they expressly invoke the standard that requires the Court to accept Plaintiffs' well-pleaded factual allegations as true and to disregard only legal conclusions. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("When there are well-pleaded factual allegations, a

16

court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief"). Notably, Defendants do not challenge a single fact provided in the Complaint. They do not dispute that the "second chance" is forced upon the Utah Republican Party. They do not dispute that convention-nominated candidates are forced into a "second chance" primary. They do not dispute that they coordinated privately with Governor Cox and former Governor Leavitt to block convention-only reform legislation. Instead, by structuring their entire motion around purely legal defenses—legislative immunity, redressability, and the scope of available relief—Defendants concede all material facts and proceed on the explicit premise that the "second chance" primary regime operates exactly as Plaintiffs describe, and they did exactly what the Plaintiffs claim, but they are "immune". This concession is fatal to their motion and dismissal is inappropriate.

40.    Legislative Defendants' tactical choice to avoid any factual dispute is dispositive at this stage. By relying solely on legal defenses—legislative immunity, lack of redressability, vagueness—while accepting the truth of Plaintiffs' detailed allegations about the "second chance" primary scheme, its operation, and Plaintiffs' concrete injuries, Legislative Defendants have effectively conceded the factual predicate for Plaintiffs' claims. The Tenth Circuit in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 889 (10th Cir. 2017), made clear that a district court is "not at liberty to disbelieve" well-pleaded factual allegations or to credit defendants' alternative explanations at the motion to dismiss stage. Here, Legislative Defendants have not asked this Court to disbelieve Plaintiffs' facts; they have implicitly conceded them by mounting only legal arguments. That concession forecloses dismissal. The Court cannot adopt the extraordinary remedy of dismissal when the defendant has not even challenged the factual basis

17

of the RICO enterprise, unconstitutional takings, and ongoing constitutional violations that form the foundation of Plaintiffs' claims

## I.    Legislative Defendants Own Motion Corroborates the RICO Conspiracy with Executive Officials

41.    The Utah Constitution deliberately separates the legislative and executive functions: the Legislature declares policy through statutes, while the Governor and executive branch enforce those statutes within constitutional bounds. Article V, section 1 expressly bars officials charged with one department's powers from exercising the core functions of another. In *In re Young*, 976 P.2d 581, 585 (Utah 1999), the Utah Supreme Court held that Article V, section 1 "very specifically prohibits the exercise of certain functions of one branch by one charged with the exercise of certain powers of another branch," and invalidated a statute that gave the Legislature appointment powers that properly belonged to the Executive. Yet Legislative Defendants' own Motion to Dismiss admits that Defendant McCay, Adams and others met privately with Governor Cox and former Governor Leavitt to shape, and ultimately kill, legislation that would have eliminated the Executive Department's ability to force the signature-gathering process. In context, that private coordination was not a neutral policy discussion but part of a joint effort between the legislative and executive branches to preserve an enforcement scheme—the "second chance" signature path—that the Executive was already using, and planned to continue using, in a manner that violates Plaintiffs' constitutional rights.

42.    This is not how separation of powers is supposed to work. Ironically, Legislative Defendants themselves cite *Snow v. Office of Legislative Research & General Counsel*, 2007 UT 63, ¶ 12, 167 P.3d 1051, 1054, which establishes the very principle they have violated: "The Utah Legislature is charged with the **declaration of policy**, in response to the expressed wishes

18

of citizens shown by the selection of their representatives and senators... On the other hand, the **executive branch is charged with implementation of that policy**." Yet by their own admission in this Motion, Legislative Defendants blurred precisely this line by meeting privately with Governor Cox and former Governor Leavitt to design enforcement policy—specifically, to preserve the Executive Department's ability to force signature-gathering on the Utah Republican Party and to block legislative reforms that would have constrained that power.

43.    The Governor's constitutional role in legislation is limited: to recommend measures, to participate through the public veto process, and then to faithfully execute whatever laws survive that process. The Executive is not entitled to treat the Legislature as a partner in designing and entrenching a specific enforcement mechanism. Yet that is precisely what occurred here: rather than the Legislature enacting policy and the Executive implementing it, Legislative Defendants and executive officials jointly engineered a scheme to preserve an enforcement path—the "second chance" signature process—that allows the Executive to override convention results and force duplicative, expensive primaries on candidates and its citizens. When legislators and executive officials privately align to construct and preserve an unconstitutional election regime, they are not checking each other through the normal legislative and veto processes; they are collapsing the constitutional separation that protects the People and enables democratic accountability. Article V forbids that fusion of lawmaking and enforcement power.

44.    In fact, Legislative Defendants' reliance on *Snow* backfires: it admits the constitutional principle they have transgressed and demonstrates that their private coordination with executive officials to block convention-only reforms was itself a violation of that principle.

## V.    Conclusion

45. For the foregoing reasons, Legislative Defendants' Motion to Dismiss must be denied. Defendants have not challenged the detailed factual statements that describe an ongoing, unconstitutional scheme to restrict ballot access, strip convention-nominated candidates of their rights, disenfranchise caucus and delegate votes, and price ordinary Utahns out of the Republican nomination process. Instead, they rely on overbroad immunity claims and misstatements of redressability law that are contradicted by binding precedent and their own admissions.

46. Because Plaintiffs have shown that Legislative Defendants stepped outside their protected legislative roles to actively participate in, maintain, and profit from a RICO enterprise and an unconstitutional election regime—conduct that is actively injuring Plaintiffs today—this case must proceed. The Court should deny the Motion to Dismiss in its entirety and allow Plaintiffs to vindicate their constitutional rights on the merits before the fast-approaching 2026 election cycle renders those rights illusory.

## VI.    REPRESENTATIONS TO THE COURT (Rule 11)

47. WE HEREBY CERTIFY that, under Federal Rule of Civil Procedure 11 and applicable local rules, the foregoing PLAINTIFFS' REPLY IN OPPOSITION TO [83] LEGISLATIVE DEFENDANTS' MOTION TO DISMISS is presented in good faith, for proper purposes, and based on existing law and factual support, and that to the best of our knowledge, information, and belief, formed after reasonable inquiry, the statements contained herein are true and correct.

Dated: December 22, 2025

/s/ Tracie Halvorsen                              /s/ NANCY INMAN

TRACIE HALVORSEN                           NANCY INMAN
138 East 12300 South                            138 East 12300 South
C275                                                      C275
Draper, Utah 84020                               Draper, Utah 84020

801-688-3594
traciehalvorsen@outlook.com
Plaintiff Pro Se

916-396-4395
Nancyjinman@gmail.com
Plaintiff Pro Se


/s/ STEVEN HUBER

STEVEN HUBER
138 East 12300 South
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com
Plaintiff Pro Se

/s/ DANIEL NEWBY

DANIEL NEWBY
138 East 12300 South
C275
Draper, Utah 84020
801-949-3360
danieltrouble@protonmail.com
Plaintiff Pro Se

/s/ WAYNE WICKIZER

WAYNE WICKIZER
138 East 12300 South
C275
Draper, Utah 84020
385-239-8326
justice@utahwtp.com
Plaintiff Pro Se

## Certificate of Service

We hereby certify that on this 22nd day of December, 2025, we electronically filed the

PLAINTIFFS' REPLY IN OPPOSITION TO [83] LEGISLATIVE DEFENDANTS' MOTION

TO DISMISS with the Clerk of the Court under the filing and electronic notification procedures

outlined under DUCivR 5-1, which will send notification of such filings to all registered

participants in this case.

Jason Dupree
Office of the Utah Attorney General
PO Box 140856
Salt Lake City, Utah 84114-0856
(385) 977-8940
jndupree@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

Scott *Cheney*
*Office of the Utah Attorney General*
*PO Box 140856*
*Salt Lake City, Utah 84114-0856*
*(385) 977-4858*
scheney@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

David Wolf
Office of the Utah Attorney General
PO Box 140856
Salt Lake City, Utah 84114-0856
(385) 441-5084
dnwolf@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

Anikka Hoidal
Office of the Utah Attorney General
PO Box 140856
Salt Lake City, Utah 84114-0856
(385) 272-3951
ahoidal@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

Stacy R. Haacke
Office of General Counsel
Administrative Office of the Courts
PO Box 140241
Salt Lake City, Utah 84114-0241
(801) 214-5805
stacyh@utcourts.gov
*Attorney for Chief Justice Matthew Durrant*

John R. Richardson
111 S. Main Street, Suite 2400
Salt Lake City, Utah 84111
Johnny.richardson@dentons.com
*Attorney for Brian McKenzie*

R. Blake Hamilton
111 S. Main Street, Suite 2400
Salt Lake City, Utah 84111
Blake.hamilton@detons.com
*Attorney for Brian McKenzie*

Janise K. Macanas
111 S. Main Street, Suite 2400
Salt Lake City, Utah 84111
Janise.macanas@dentons.com
*Attorney for Brian McKenzie*

Alan R. Houston
Office of Legislative Research and General
Counsel
Utah State Capitol Complex
House Building, Suite W210
Salt Lake City, Utah 84114-5210
ahouston@le.utah.gov
*Attorney Bramble, McCay, Durrant, Schultz,
and Adams*

Victoria S. Ashby
Office of Legislative Research and General
Counsel
Utah State Capitol Complex
House Building, Suite W210
Salt Lake City, Utah 84114-5210
vashby@le.utah.gov
*Attorney Bramble, McCay, Durrant, Schultz,
and Adams*

Cliff Parkinson
2750 Rasmussen Rd.
Suite H-107
Park City,. Utah 84098
cliff@pbp.law
*Attorney for Axson, Coleman, and Null*

Christine R. Gilbert
Office of Legislative Research and General
Counsel
Utah State Capitol Complex
House Building, Suite W210
Salt Lake City, Utah 84114-5210
cgilbert@le.utah.gov
*Attorney Bramble, McCay, Durrant, Schultz,
and Adams*

D. Loren Washburn
2750 Rasmussen Rd., Suite H-107
Park city, Utah 84098
loren@pbp.law
*Attorney for Axson, Coleman, and Null.*

Executed on this 22nd day of December 2025.

/s/ Tracie Halvorsen
TRACIE HALVORSEN
138 East 12300 South
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com
Plaintiff Pro Se

/s/ STEVEN HUBER
STEVEN HUBER
138 East 12300 South
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com

/s/ NANCY INMAN
NANCY INMAN
138 East 12300 South
C275
Draper, Utah 84020
916-396-4395
Nancyjinman@gmail.com
Plaintiff Pro Se

/s/ DANIEL NEWBY
DANIEL NEWBY
138 East 12300 South
C275
Draper, Utah 84020
801-949-3360
danieltrouble@protonmail.com

Plaintiff Pro Se                                    Plaintiff Pro Se


/s/ WAYNE WICKIZER
WAYNE WICKIZER
138 East 12300 South
C275
Draper, Utah 84020
385-239-8326
justice@utahwtp.com
Plaintiff Pro Se