FILED
2025 DEC 22 AM 11:34
CLERK
U.S. DISTRICT COURT

Tracie Halvorsen
Petitioner Pro Se
138 E 12300 S
C275
Draper, Utah 84020
801-688-3594
traciehalvorsen@outlook.com

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF UTAH

| | |
|---|---|
| TRACIE HALVORSEN, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>SPENCER COX, et. al,<br><br>Defendants | **PLAINTIFFS' REPLY IN OPPOSITION TO [84] JUDICIAL DEFENDANTS' MOTION TO DISMISS**<br>**(Durrant)**<br><br>Case No. 2:25-cv-00909-HCN-JCB<br><br>Judge Howard C. Nielson, Jr. |

### I.     Introduction

**Note:** This Reply is publicly posted at utahcorruption.com and other community sites to ensure transparency and public awareness.

1.      Each new threshold motion—by the Legislative Defendants, by Executive officials, and now by Chief Justice Durrant—forces Plaintiffs to divert scarce time and resources into parallel briefing at the very moment when potential candidates must decide whether to declare by January 2026 and whether to invest in organizing for the March caucus and convention. The practical effect is to slow this case to a crawl while the election calendar moves inexorably forward. Defendants' strategy speaks for itself: officials who genuinely cared about free and fair elections, and about resolving serious constitutional challenges before ballots are fixed, would welcome a timely merits determination rather than multiplying procedural obstacles

such as these multiple Motions to Dismiss. By choosing delay instead, Defendants signal that they are indifferent to how quickly this case is resolved and to how much additional harm their "second chance" regime inflicts on Plaintiffs and similarly situated individuals in the meantime. If these tactics succeed in pushing meaningful review past the declaration deadline and into or beyond the March caucus, the harm will be done: candidates will have stayed out of the race, ordinary delegates will have been denied genuine choices, and the very election cycle Plaintiffs seek to protect will have been irretrievably skewed in favor of the wealthiest contenders.

### A. Procedural Posture and Nature of Dispute

2. Defendant Chief Justice Matthew Durrant ("Defendant Durrant") moves to dismiss Plaintiffs' Complaint by invoking absolute judicial immunity and technical defenses under the Federal Courts Improvement Act ("FCIA"). His motion, however, fundamentally mischaracterizes the nature of this suit. Plaintiffs do not sue Defendant Durrant merely because he issued an adverse ruling in a vacuum. Rather, Plaintiffs' sue Defendant Durrant because he stepped outside his protected judicial role to actively participate in, aid, and abet a racketeering enterprise that has corrupted Utah's election system.

3. Specifically, Defendant Durrant joined a coordinated scheme with Executive Branch officials and political operatives to preserve an unconstitutional "second chance" primary regime. In furtherance of this enterprise, he not only issued a ruling without jurisdiction or due process to block legitimate challenges, but also performed non-judicial, ministerial acts—such as administering oaths of office to candidates he knew were fraudulently nominated—to lend a veneer of legitimacy to an unlawful election. When a judge joins a conspiracy to rig elections and obstruct justice, he is not performing a "judicial act"; he is acting as a member of a criminal enterprise.

4. Because Defendant Durrant is sued for his non-judicial conduct and his participation in a RICO conspiracy, and because Plaintiffs seek prospective relief to halt an ongoing violation of federal law, neither judicial immunity nor the FCIA warrants dismissal. The Motion to Dismiss should be denied.

## II.    Standard of Review

5. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint, not the merits of Plaintiffs' claims or the strength of their evidence. In resolving such a motion, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiffs' favor, while disregarding only bare legal conclusions. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (a claim is plausible when the factual content allows the court to draw a reasonable inference of liability); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (complaint must contain enough factual matter to "raise a right to relief above the speculative level"). The question at this stage is not whether Plaintiffs will ultimately prevail, but whether, assuming the truth of their detailed factual Complaint, they have stated a claim to relief that is plausible on its face.

6. This standard applies with full force even where a defendant invokes immunity or other affirmative defenses. Dismissal on immunity grounds at the pleading stage is appropriate only where the defense is apparent on the face of the complaint and no set of additional facts consistent with the pleadings could overcome it. Courts in this Circuit therefore treat dismissal as a "harsh remedy" that should be granted sparingly, particularly where Plaintiffs have ongoing constitutional injuries and a continuing scheme affecting the integrity of elections and the right to vote. In evaluating Defendant Durrant's motion, the Court must accept as true Plaintiffs' allegations that he acted under color of law, outside his legitimate judicial capacity, and in

concert with other officials to further a racketeering enterprise and unconstitutional election regime, and may not weigh competing factual narratives or infer in his favor at this preliminary stage.

### III.    ARGUMENT

#### A. Defendant Durrant's Motion Admits to His Unlawful Actions

7.      Defendant Durrant's own Motion to Dismiss confirms that there is no genuine dispute at this stage about the key factual Complaint pled against him; it simply attempts to relabel those facts as immune "judicial acts." In his Motion, Defendant Durrant expressly acknowledges that Phil Lyman was elected as the Utah Republican Party's nominee for governor at the April 27, 2024 convention and treats Lyman as the central challenger to the signature-gathering path, thereby implicitly admitting the core premise of Plaintiffs' claim: that convention delegates selected Lyman as the party's nominee while other disqualified candidates—including Cox and Henderson—proceeded solely by virtue of the "second chance" signature-gathering process. By focusing exclusively on Lyman as the convention-chosen nominee and never disputing the disqualification of other convention candidates (Cox, Henderson, Curtis, and Brown) under party rules, Durrant necessarily accepts that those other individuals were likewise displaced by the signature path and that the very conflict Plaintiffs describe between convention results and the signature-gathering mechanism existed.

8.      Durrant also does not deny that he personally issued the order summarily denying any challenge to the signature-gathering process in the Lyman extraordinary-writ proceeding, nor does he deny that he subsequently administered the oath of office to Cox and Henderson as "Governor" and "Lieutenant Governor" notwithstanding their reliance forced unlawful signature-gathering process that caused injury to the Plaintiffs. He concedes these actions occurred and

4

argues only that they are shielded by judicial immunity. In doing so, he effectively admits every operative step: that the convention made Phil Lyman and Trent Staggs the UPR nominees to the general ballot, and Frank Mylar and Rachel Terry URP nominees to the final primary ballot, that he used an unlawful one-justice order to block review of the signature-gathering scheme, and that he then officiated the installation of disqualified candidates whose nominations depended on that scheme. His Motion thus reads less like a factual denial and more like a confession wrapped in an immunity defense. A defendant who acknowledges the conduct—refusing to allow any judicial test of the signature path, then swearing in the beneficiaries of that path—while insisting that the Court may not examine it because he wore a robe when he did it, only underscores the that he acted under color of law, outside his legitimate judicial capacity, to further a racketeering enterprise and entrench an unconstitutional election regime.

9. Defendants' strategy reveals the weakness of their immunity defense. In opposing preliminary relief, Defendants argue that because they have been applying the either or both provision the same way for nearly a decade, Plaintiffs' delay undermines their claims. (ECF 96 at 7-8.) In substance, Defendants contend that they have been violating the Constitution for years; because Plaintiffs did not catch them sooner, they should now be immune. A defendant cannot simultaneously claim (1) his conduct has been lawful and constitutional for years, and (2) even if unlawful, he is immune from accountability. Defendants' own framing confirms they are defending a long-running scheme, not isolated acts deserving of immunity. This pattern-based admission—that Defendant Durrant's actions were part of a consistent, multi-year unconstitutional application of the forced signature-gathering process—directly supports Plaintiffs' RICO claim of an ongoing enterprise rather than a single erroneous judicial ruling.

**B. Judicial Immunity Does Not Shield Defendant Durrant's Non-Judicial Acts and Participation in a RICO Enterprise**

10. Judicial immunity is strong, but it is not absolute. It does not protect judges who act outside their judicial capacity or who engage in non-judicial conduct to further a criminal enterprise. See *Stump v. Sparkman*, 435 U.S. 349, 360 (1978) (immunity applies only to "judicial acts"); *Forrester v. White*, 484 U.S. 219, 227–29 (1988) (no immunity for administrative or executive decisions). Defendant Durrant's argument fails because the conduct challenged here falls outside the "judicial" sphere.

11. Defendant Durrant, acting under color of law, purported to resolve Plaintiff Lyman's extraordinary-writ petition by issuing a one-justice order on August 13, 2024. (Compl. Ex. 62.) Under the Utah Constitution, however, the Supreme Court's authority is vested in the court as a multi-member tribunal, not in a single justice acting alone. Article VIII, section 2 provides that "[t]he Supreme Court by rule may sit and render final judgment either en banc or in divisions," confirming that it is the court—sitting as a body—that exercises the judicial power to "render final judgment," not an individual justice acting unilaterally. (Compl. ¶ 17.) The Utah Supreme Court consists of five justices; Chief Justice Durrant's status as chief does not confer a roving license to disregard the court's constitutional structure and rules and to dispose of an election contest by personal fiat. Yet his August 13 order, later filed on August 15, 2024 as a "per curiam" decision, bears precisely that hallmark: a lone justice making a dispositive, merits-based determination in a context where the Constitution contemplates a collegial court acting en banc or in an authorized division.

12. "En banc" refers to the full court (all justices) sitting together to decide a case, while "per curiam" refers to an unsigned opinion issued in the name of the court as an institution,

6

rather than a single identified author. Used properly, a per curiam decision reflects the collective judgment of the court; it is not a vehicle for a single justice to act alone outside the court's prescribed procedures and then retroactively cloak that solo act with the appearance of institutional authority. Here, the sequence of events in the Complaint—an order issued by Chief Justice Durrant alone and later styled "per curiam"—underscores that Defendant Durrant stepped outside the legitimate exercise of judicial power, and thus outside the protection of judicial immunity, when he intervened to shield the "second chance" scheme from review at a critical moment in the election cycle.

13. Because Defendant Durrant's solo action cut off review at the very moment Phil Lyman sought to challenge the unlawful primary, his conduct was not only ultra vires but outcome-determinative. Had the Utah Supreme Court, sitting properly en banc or in a lawfully constituted division, been allowed to consider Plaintiff Lyman's petition on the merits, the court could have enjoined the use of the unlawful "second chance" primary results and prevented the issuance of a second round of counterfeit ballots falsely identifying disqualified candidates as the URP's nominees. (Compl. ¶¶ 129–167.) Instead, Defendant Durrant's unlawful dismissal cleared the way for those counterfeit general-election ballots to be prepared, certified, and mailed, locking in the enterprise's scheme to supplant the convention-chosen nominee with candidates who had been eliminated under the party's own rules. (Compl. ¶¶ 150–166.) In this way, his extra-nonjudicial intervention—acting without jurisdiction—did not merely misapply law; it was an essential step in the chain of racketeering acts that carried the fraudulent "second chance" regime from contested primary to mailed general-election ballots and ultimately to the installation of illegitimate officeholders.

14. The timing underscores that Defendant Durrant's intervention was outcome-determinative. Lyman filed his writ on August 1, 2024. On August 6, 2024, Lyman filed a motion to expedite. Within days—before any response from defendants, before any briefing schedule, and before the full court could convene—Durrant issued his solo denial on August 13, 2024. Defendants do not dispute this sequence. The speed and unilateral nature, occurring precisely when judicial review would have threatened the enterprise's timeline for certifying fraudulent nominees, supports the inference that Durrant acted not as a neutral arbiter but as a participant ensuring the scheme's success.

### C. Administering Oaths to Fraudulent Candidates is a Ministerial, Not Judicial, Act

15. Judicial immunity is function-based. It attaches only to acts that are truly adjudicative—resolving disputes between parties, applying law to facts—not to every task a judge happens to perform. *Forrester v. White* draws this line explicitly, explaining that judges sometimes perform administrative or ministerial functions that are not protected by absolute immunity because they do not involve the exercise of judicial judgment. Administering an oath of office is such a function: it is a ceremonial, ministerial task that does not require adjudication, issue-finding, or the resolution of a case or controversy. See *Clinton v. Jones*, 520 U.S. 681, 695 (1997) (immunity follows "the nature of the function performed, not the identity of the actor").

16. In this case, the act was not only ministerial; it was also illegitimate. Defendant Durrant did not simply administer an oath in a neutral, routine context. Defendant Durrant swore in candidates he knew had been "nominated" through an unconstitutional and fraudulent "second chance" scheme, for the specific purpose of cementing that fraud and advancing the RICO enterprise. (Compl. ¶ 166.) Instead of neutrally formalizing a lawful election outcome, he used a ministerial ceremony to install into office individuals whose nomination was the product of the

very scheme under challenge. That is not an adjudication of rights; it is an operational step in implementing the enterprise's objective of displacing the convention-chosen nominee. Under *Forrester*, such operational or administrative conduct falls outside the core of "judicial acts" and is not entitled to absolute immunity.

17. Defendant Durrant's contention that administering the oath of office is a "judicial act" because a judge performed it fails on the merits of Utah law. Utah law expressly grants the power to administer oaths to a broad class of non-judicial officers: "Every court, every judge, clerk and deputy clerk of any court, every justice, every notary public, and every officer or person authorized to take testimony in any action or proceeding, or to decide upon evidence, has the power to administer oaths or affirmations." Utah Code § 78B-1-142. If the bare act of administering an oath automatically qualified as a "judicial act" for immunity purposes, then notaries public, clerks, and other ministerial officers would all enjoy the same absolute immunity as judges whenever they performed this routine function—an outcome squarely at odds with the Supreme Court's function-based approach to immunity.

18. Section 78B-1-142 itself demonstrates that administering oaths is a shared, ministerial power, not an inherently adjudicative one, and Defendant Durrant's effort to recast this routine function as a "judicial act" for immunity purposes only underscores how far he must stretch to avoid scrutiny. Utah law places the authority to administer oaths not only in "every judge" but also in "every … clerk and deputy clerk of any court, every justice, every notary public, and every officer or person authorized to take testimony," confirming that the function is common to a broad class of non-judicial officers and is not uniquely judicial in character. Utah Code § 78B-1-142. What makes an act "judicial" is the nature of the function—hearing parties, weighing evidence, resolving legal questions—not the title of the person holding the pen or

9

speaking the words, and the Supreme Court has repeatedly held that immunity turns on function rather than office. *See Forrester v. White*, 484 U.S. 219, 227–29 (1988). Here, Chief Justice Durrant's administration of the oath of office to candidates who were disqualified and unlawfully deemed to be nominated was a ceremonial act of the same type any notary or clerk could perform under § 78B-1-142, and, as pled, it was done in furtherance of a racketeering scheme rather than in the course of deciding any case or controversy. Because the act was ministerial in character, widely shared among non-judicial officers, and illegitimate in purpose, it cannot be retroactively cloaked with absolute judicial immunity.

19. Utah Code § 78B-1-142 definitively refutes Defendant Durrant's characterization. The statute grants oath-administration power to 'every judge, clerk and deputy clerk, every notary public, and every officer authorized to take testimony.' If administering an oath were inherently judicial, this broad grant would be nonsensical—notaries public and deputy clerks do not exercise judicial power, yet they share identical statutory authority. Because Utah law places oath administration among routine ministerial functions shared across judicial and non-judicial officers, and because Defendant Durrant performed this act to install candidates whose nominations were products of an ongoing scheme, the act falls outside the core of judicial immunity.

### D. Participation in a RICO Conspiracy is Not a "Judicial Act"

20. Defendant Durrant's bid for absolute immunity mirrors an argument the law has already rejected in practice: judges are not untouchable when they step into criminal schemes. The federal prosecution of former Texas state judge Rodolfo "Rudy" Delgado makes this plain. Delgado was a sitting state district judge (and later a justice on the Thirteenth Court of Appeals) who was indicted and convicted in federal court for conspiracy, multiple counts of federal

10

program bribery, Travel Act bribery, and obstruction of justice, all arising from a long-running scheme in which he accepted cash bribes in exchange for favorable judicial treatment of criminal defendants. A jury found beyond a reasonable doubt that Delgado had used his judicial office as a tool of a criminal enterprise, and the Fifth Circuit affirmed his convictions and sentence. At no point did judicial status or "judicial immunity" prevent investigation, indictment, trial, conviction, or imprisonment; the Department of Justice correctly emphasized that "no one – especially not a judge – is above the law."

21. The same principle applies here. Plaintiffs do not contend that any adverse ruling, standing alone, creates civil liability; Defendant Durrant joined and advanced a racketeering enterprise that corrupted Utah's nomination process, obstructed meaningful review of the fraudulent "second chance" scheme, by unlawfully (acting under color of law) dismissing Phil Lyman's contest of the Utah primary results, and then ceremonially installed the scheme's beneficiaries into office. (Compl. ¶¶ 133, 166, 197–199.) Just as Delgado's decisions in bribery-tainted cases could be treated as criminal acts notwithstanding the robe he wore when he signed them, Defendant Durrant's use of his office, acting under color of law, to shield an unconstitutional election regime and to legitimize candidates whom the scheme had unlawfully elevated is not insulated from accountability simply because some steps occurred in or around a courtroom. The Delgado prosecution confirms that when a judge's conduct crosses the line from adjudication into participation in a criminal enterprise, the law treats him like any other conspirator; he is not immune from RICO theory or from consequences.

22. Defendant Durrant conspired with Executive Department to obstruct investigations and rig the election process, which does not constitute a "judicial act". (Compl. ¶¶ 133–136, 197–199). Plaintiffs' Complaint makes this concrete: the docket entry for the

extraordinary-writ proceeding reflects that an "attorney called" chambers in connection with the petition (Comp. Exhibit 39 at Image 036). Plaintiff Lyman was self-represented and had no attorney of record but Defendant Deidre Henderson was a party to the action as she was acting as Chief Election Officer. That unexplained entry is consistent than an attorney for an opposing official or insider—communicated ex parte with Defendant Durrant or his staff about how the case should be handled. The fact that the call is memorialized on the court's own docket, yet no appearance or filing by counsel for Lyman exists to match it, strongly supports a reasonable inference of off-the-record coordination between the Judicial-branch and Executive-branch interests whose political fortunes depended on preserving the "second chance" scheme. Defendant Durrant does not deny the "attorney call" docket entry, nor does he explain which attorney called or why that communication occurred when Plaintiff Lyman was self-represented and had no attorney of record. Under Federal Rule of Civil Procedure 8(b)(6), a party that does not deny an allegation is deemed to admit it. By failing to deny or explain the ex parte contact reflected in their own court's docket, Defendants have effectively conceded that coordination between judicial and executive branch actors occurred outside the adversarial process.

  23. A judicial act under Utah law requires that a judge sit en banc or in divisions to hear from the parties through noticed filings, oral argument, and other proceedings open to both sides. Here, by contrast, the record reflects the opposite: a one-sided "attorney call" followed immediately by Chief Justice Durrant's summary denial of relief—issued without briefing, without a hearing, and without any input from the petitioner or response from the respondents. (Compl. ¶ 133). This procedural deficiency alone strips the action of its judicial character. But the complaint alleges far more: taken together with the broader pattern of private coordination among government officials (Compl. ¶ 202), the ex parte attorney call (Compl. ¶ 131), the

conspicuous timing of the denial immediately following Lyman's motion to expedite (Compl. ¶¶ 132, 133), and the subsequent administration of oaths to candidates whose continued eligibility depended on preserving the scheme (Compl. ¶ 150), this docket entry evidences deliberate coordination rather than neutral adjudication." Chief Justice Durrant did not exercise judicial discretion; he coordinated with co-conspirators through ex parte communications to predetermine an outcome. Such collusive, extra-judicial orchestration—conducted behind closed doors and designed to ensure a predetermined political result—is operational and conspiratorial in nature, not judicial. Accordingly, it falls outside the protection of absolute judicial immunity.

### E. Plaintiffs' are Entitled to Injunctive Relief

24. The FCIA provision on injunctive relief applies only to "a judicial officer for an act or omission taken in such officer's judicial capacity." 42 U.S.C. § 1983. Defendant Durrant's reliance on that protection fails at the threshold, because Plaintiffs do not sue him for acts taken in a legitimate judicial capacity, but for conduct undertaken under color of law and outside the bounds of any proper judicial function. Durrant did not neutrally adjudicate a case; he used the trappings of his office to coordinate with other officials, summarily dispose of an election challenge without regular process, and ceremonially install candidates whose nominations were the product of a racketeering scheme. (Compl. ¶¶ 133–136, 166, 197–199). Those are not "acts or omissions taken in [a] judicial capacity"; they are extra-judicial, conspiratorial uses of state power, and the FCIA's narrow limitation on injunctive relief does not extend that far.

25. Because this action is brought against Durrant precisely on the theory that he acted under color of law but outside his judicial role, the FCIA does not bar the remedies Plaintiffs seek. Plaintiffs request a declaration that Durrant's extra-nonjudicial conduct violated the Constitution and RICO, together with appropriate prospective relief to prevent further

participation in or enforcement of the unlawful scheme. (Compl. Prayer for Relief). Nothing in § 1983 strips federal courts of their traditional equitable authority to enjoin ongoing constitutional violations by state officials acting under color of law when those officials are not performing bona fide judicial acts. In these circumstances, Durrant stands in the same position as any other state official that is a part of an ongoing enterprise: he may not invoke judicial-capacity language to shield conduct that, as pled, was never properly judicial in the first place.

### F. The "Ongoing Violation" Doctrine Permits Suit

26. Under *Ex parte Young*, 209 U.S. 123 (1908), and *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), judicial immunity does not bar a suit seeking prospective relief to end an ongoing violation of federal law. Defendant Durrant is actively participating in a continuing scheme to deny ballot access and obstruct justice. (Compl. ¶¶ 133–36). Because the violation is ongoing, the FCIA and immunity doctrines do not shield him from equitable intervention. See *Verizon Md.*, 535 U.S. at 645 (inquiry is whether complaint alleges an ongoing violation of federal law and seeks prospective relief).

### G. Utah Criminal Statutes Support the RICO Predicate Acts

27. Defendant Durrant argues that Utah Code §§ 76-8-201 (Official Misconduct) and 76-8-504 (Written False Statement) do not create a private right of action. (ECF 84 Mot. at 9). This misses the point. Plaintiffs do not seek to "prosecute" Defendant Durrant under these statutes; they cite these violations to demonstrate he acted outside of his authority and engaged in the obstruction of justice as predicate acts of racketeering under the federal RICO statute, 18 U.S.C. § 1961(1).

28. RICO defines "racketeering activity" to include any act which is indictable under specific state laws. Violations of official duty and falsification of records in furtherance of a

fraud scheme are classic RICO predicates. See *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (state law violations can serve as unlawful acts in a RICO conspiracy context). Plaintiffs need not show a private right of action under the state statute itself, only that the conduct is "indictable" or "unlawful" and forms part of the pattern of racketeering activity. *Id*.

### H. Plaintiffs' RICO Claim Against Defendant Durrant

29. Defendant Durrant claims Plaintiffs failed to allege he "controlled" the enterprise or "participated" in its affairs. (ECF 83 Mot. at 10). This ignores the Supreme Court's "operation or management" test in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), as interpreted by the Tenth Circuit.

30. <u>Participation Under § 1962(c)</u>. Liability under § 1962(c) extends to "any person employed by or associated with any enterprise" who participates in the conduct of its affairs. This does not require being the "leader" or "boss." It requires only playing "some part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179. Defendant Durrant played a crucial, directive role: he used his judicial office to summarily dismiss any election contest that dissented the unlawful forced "second chance" primary—specifically to insulate the enterprise's fraudulent candidates from disqualification—and then swore those candidates into office. (Compl. ¶¶ 133, 166). This is "participation" in the enterprise's goal of seizing political power. See *Tal v. Hogan*, 453 F.3d 1244, 1269 (10th Cir. 2006) (conduct element met where defendant implements enterprise's decisions).

31. <u>Conspiracy Under § 1962(d)</u>. Even if Defendant Durrant did not personally "operate" the enterprise, he is liable under § 1962(d) for conspiring to violate RICO. A RICO conspiracy defendant need not personally commit the predicate acts; he need only agree to agree

to pursue the same criminal objective—getting their preferred candidates sworn into office. *Salinas v. United States*, 522 U.S. 52, 64 (1997). The Complaint demonstrates tacit or explicit agreement between Durrant, Executive officials, and Legislative Defendants to preserve the "second chance" scheme at all costs. His unlawful issuance of the Lyman order and administration of oaths were overt acts in furtherance of that conspiracy. This is sufficient to state a claim. *Id.*

### IV. CONCLUSION

32.     Defendant Durrant seeks to hide behind his robe to avoid accountability for his role in a political and criminal enterprise. But judicial immunity protects "judicial acts," not election-rigging conspiracies. Because Plaintiffs have provided a well detailed Complaint with 92 exhibits that Defendant Durrant acted outside his judicial capacity to further a RICO enterprise, and because the relief sought is prospective and necessary to cure an ongoing constitutional violation, the Motion to Dismiss must be denied.

### V. REPRESENATIONS TO THE COURT (Rule 11)

33.     WE HEREBY CERTIFY that, under Federal Rule of Civil Procedure 11 and applicable local rules, the foregoing PLAINTIFFS' REPLY IN OPPOSITION TO [84] JUDICIAL DEFENDANTS' MOTION TO DISMISS is presented in good faith, for proper purposes, and based on existing law and factual support, and that to the best of our knowledge, information, and belief, formed after reasonable inquiry, the statements contained herein are true and correct.

Dated: December 22, 2025

/s/ Tracie Halvorsen                                        /s/ NANCY INMAN

TRACIE HALVORSEN                                   NANCY INMAN
138 East 12300 South                                     138 East 12300 South

C275  
Draper, Utah 84020  
801-688-3594  
traciehalvorsen@outlook.com  
Plaintiff Pro Se

C275  
Draper, Utah 84020  
916-396-4395  
Nancyjinman@gmail.com  
Plaintiff Pro Se

/s/ STEVEN HUBER

STEVEN HUBER  
138 East 12300 South  
C275  
Draper, Utah 84020  
801-688-3594  
traciehalvorsen@outlook.com  
Plaintiff Pro Se

/s/ DANIEL NEWBY

DANIEL NEWBY  
138 East 12300 South  
C275  
Draper, Utah 84020  
801-949-3360  
danieltrouble@protonmail.com  
Plaintiff Pro Se

/s/ WAYNE WICKIZER

WAYNE WICKIZER  
138 East 12300 South  
C275  
Draper, Utah 84020  
385-239-8326  
justice@utahwtp.com  
Plaintiff Pro Se

**Certificate of Service**

We hereby certify that on this 22nd day of December, 2025, we electronically filed the PLAINTIFFS' REPLY IN OPPOSITION TO [84] JUDICIAL DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court under the filing and electronic notification procedures outlined under DUCivR 5-1, which will send notification of such filings to all registered participants in this case.

Jason Dupree
Office of the Utah Attorney General
PO Box 140856
Salt Lake City, Utah 84114-0856
(385) 977-8940
jndupree@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

Scott *Cheney*
*Office of the Utah Attorney General*
*PO Box 140856*
*Salt Lake City, Utah 84114-0856*
*(385) 977-4858*
scheney@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

David Wolf
Office of the Utah Attorney General
PO Box 140856
Salt Lake City, Utah 84114-0856
(385) 441-5084
dnwolf@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

Anikka Hoidal
Office of the Utah Attorney General
PO Box 140856
Salt Lake City, Utah 84114-0856
(385) 272-3951
ahoidal@agutah.gov
*Attorney for the State of Utah, Cox, Henderson, Bramble, McCay, Durrant, Schultz, and Adams*

Stacy R. Haacke
Office of General Counsel
Administrative Office of the Courts
PO Box 140241
Salt Lake City, Utah 84114-0241
(801) 214-5805
stacyh@utcourts.gov
*Attorney for Chief Justice Matthew Durrant*

John R. Richardson
111 S. Main Street, Suite 2400
Salt Lake City, Utah 84111
Johnny.richardson@dentons.com
*Attorney for Brian McKenzie*

R. Blake Hamilton
111 S. Main Street, Suite 2400
Salt Lake City, Utah 84111
Blake.hamilton@detons.com
*Attorney for Brian McKenzie*

Janise K. Macanas
111 S. Main Street, Suite 2400
Salt Lake City, Utah 84111
Janise.macanas@dentons.com
*Attorney for Brian McKenzie*

| | |
|---|---|
| Alan R. Houston<br>Office of Legislative Research and General Counsel<br>Utah State Capitol Complex<br>House Building, Suite W210<br>Salt Lake City, Utah 84114-5210<br>ahouston@le.utah.gov<br>*Attorney Bramble, McCay, Durrant, Schultz, and Adams* | Christine R. Gilbert<br>Office of Legislative Research and General Counsel<br>Utah State Capitol Complex<br>House Building, Suite W210<br>Salt Lake City, Utah 84114-5210<br>cgilbert@le.utah.gov<br>*Attorney Bramble, McCay, Durrant, Schultz, and Adams* |
| Victoria S. Ashby<br>Office of Legislative Research and General Counsel<br>Utah State Capitol Complex<br>House Building, Suite W210<br>Salt Lake City, Utah 84114-5210<br>vashby@le.utah.gov<br>*Attorney Bramble, McCay, Durrant, Schultz, and Adams* | D. Loren Washburn<br>2750 Rasmussen Rd., Suite H-107<br>Park city, Utah 84098<br>loren@pbp.law<br>*Attorney for Axson, Coleman, and Null.* |
| Cliff Parkinson<br>2750 Rasmussen Rd.<br>Suite H-107<br>Park City,. Utah 84098<br>cliff@pbp.law<br>*Attorney for Axson, Coleman, and Null* | |

Executed on this 22nd day of December 2025.

| | |
|---|---|
| /s/ Tracie Halvorsen<br>TRACIE HALVORSEN<br>138 East 12300 South<br>C275<br>Draper, Utah 84020<br>801-688-3594<br>traciehalvorsen@outlook.com<br>Plaintiff Pro Se | /s/ NANCY INMAN<br>NANCY INMAN<br>138 East 12300 South<br>C275<br>Draper, Utah 84020<br>916-396-4395<br>Nancyjinman@gmail.com<br>Plaintiff Pro Se |
| /s/ STEVEN HUBER<br>STEVEN HUBER<br>138 East 12300 South<br>C275<br>Draper, Utah 84020<br>801-688-3594<br>traciehalvorsen@outlook.com | /s/ DANIEL NEWBY<br>DANIEL NEWBY<br>138 East 12300 South<br>C275<br>Draper, Utah 84020<br>801-949-3360<br>danieltrouble@protonmail.com |

Plaintiff Pro Se                                    Plaintiff Pro Se

/s/ WAYNE WICKIZER
WAYNE WICKIZER
138 East 12300 South
C275
Draper, Utah 84020
385-239-8326
justice@utahwtp.com
Plaintiff Pro Se