D. Loren Washburn (10993)
Brennan H. Moss (10267)
Clifford B. Parkinson (13327)
**PARKINSON BENSON POTTER**
2750 Rasmussen Road, Ste. H-107
Park City, Utah 84098
Telephone: (415) 534-7970
Email:  loren@pbp.law
         brennan@pbp.law
         cliff@pbp.law

*Attorneys for Defendants Kim Coleman,*
*Robert Axson, and Chris Null*

---

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TRACEY HALVORSEN, an individual; SOPHIE ANDERSON, an individual; NANCY INMAN, an individual; STEVEN HUBER, an individual; WAYNE WICKIZER, an individual; and DANIEL NEWBY, an individual,<br><br>     Plaintiffs,<br><br>v.<br><br>SPENCER COX, as an individual and in official capacity; DEIDRE HENDERSON, as an individual and in official capacity, STATE OF UTAH, et al.,<br><br>     Defendants. | **DEFENDANTS' MOTION FOR ATTORNEY FEES UNDER 42 U.S.C. § 1988 AND FOR SANCTIONS**<br><br>Case No. 2:25-cv-00909-HCN-JCB<br><br>Judge Howard C. Nielson, Jr.<br>Magistrate Judge Jared C. Bennett |

Come now Defendants Chris Null, Robert Axson and Kim Coleman (the "**URP**

**Defendants**") through undersigned counsel and file this Motion For Attorney Fees Under 42

U.S.C. § 1988 And For Sanctions.

## INTRODUCTION

Robert Axson, Kim Coleman and Chris Null are unpaid volunteers who serve as leaders of the Utah Republican Party ("URP") because they care about Utah and about the wellbeing of the URP. The Plaintiffs brought entirely meritless claims against the Defendants because Plaintiffs believe their personal grievances justify the harassment of public servants. Specifically, Plaintiffs do not like SB 54. Even though they know it has been upheld by the Courts, they are trying to nullify the law by recruiting key government and party officials to defy it. When those efforts failed, this lawsuit was filed to retaliate against those who would not go along with Plaintiffs efforts.

The law Plaintiffs putatively challenged in this case is not new, in dispute, or unsettled: as this Court explained in its order dismissing Plaintiffs' claims, "[t]he key contention underlying Plaintiffs' claims is . . . plainly controlled by the decisions of the Utah Supreme Court in *Utah Republican Party v. Cox*, 373 P.3d 1286 (Utah 2016), and the Tenth Circuit in *Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018)."[1] And the Court had, "little difficulty concluding that the different procedural posture here does not provide a sound basis for disregarding the plain import of those decisions."[2]

Unfortunately, this is not the first time Plaintiffs have burdened the courts with frivolous litigation. Plaintiff Huber, assisted by his daughter, Plaintiff Tracie Halvorsen, is currently pursuing two frivolous suits in the District of Utah.[3] Those complaints are similar in structure to

---

[1] ECF 132.

[2] *Id*.

[3] *Steven Huber v. Romero, et al*. 2:25-cv-01098-DBB (while Ms. Halvorsen's name does not appear on the pleadings, her email, traciehalvorsen@outlook.com, is the email address Mr. Huber used in filing the case. Also throughout the Complaint Mr. Huber complains that his

this case – primarily alleging RICO and civil rights violations against government employees simply trying to do their jobs – and in the way plaintiffs use vexatious litigation tactics – refusing to stipulate to routine extensions, filing pointless objections to magistrates' involvement, and filing frivolous motions seeking sanctions. Also, those cases are similarly meritless as Judge Barlow recently found when he denied a motion seeking a preliminary injunction.[4]

If Plaintiffs' public statements are believed, three frivolous lawsuits will not be the end of it. Plaintiff Halvorsen recently posted on x.com (formerly Twitter) touting her latest "Notice of Intent" threatening to bring an action "in federal court for declaratory and injunctive relief, as well as damages under 42 U.S.C. § 1983," against Utah state legislators who are sponsoring a bill further defining and criminalizing the unauthorized practice of law in Utah.[5]

All told, Plaintiffs Huber and Halvorsen[6] have sued the following entities and people:

1.  United States Government (twice),

2.  The State of Utah,

---

daughter was not allowed to sit with him at counsel table and otherwise act as counsel for him because she is not a licensed attorney (*see, e.g.* 2:25-cv-01098-DBB ECF 1 at ¶¶ 33, 39, 106(b), 113(d)); *Steven Huber v. United States Government, et al*. 2:25-cv-00592-TS-CMR (again, Ms. Halvorsen is not listed as a Plaintiff, but her email is listed on the court docket and during a hearing Huber refers to as the "reset" hearing, Huber complains that Judge Romero refused to let Ms. Halvorsen sit next to him at counsel table (ECF No. 48 at ¶ 53).

[4] *Huber v. Romero, et al.* 2:25-cv-01098-DBB, ECF No. 39.

[5] See Exhibit 1 to this motion. It is perhaps not a coincidence that the object of Plaintiff Halvorsen's ire are restrictions on the ability to practice law without a license. As explained in further detail below, one of Plaintiff Huber's frequent complaints in his lawsuits and his petition for an extraordinary writ to the Tenth Circuit was that he wanted his "trusted daughter" (Plaintiff Halvorsen) to be able to sit at counsel table with him and act like his lawyer. *See Huber v. United States*, 2:25-cv-00592-TS-CMR, ECF 48 at ¶ 14.

[6] Although Plaintiff Halvorsen is not a party in the Huber lawsuits, her email address is used for his email and one of Mr. Huber's consistent complaints is that he wants his "trusted daughter," who is Plaintiff Halvorsen, to be able to act as his unlicensed lawyer, sitting at counsel table and advising him in his lawsuits.

3.  The United States Department of the Interior,

4.  The United States Bureau of Land Management,

5.  The Office of the United States Attorney for the District of Utah,

6.  The Tenth Circuit Court of Appeals,

7.  The United States District Court for the District of Utah,

8.  United States District Court Chief Judge Jill Parrish,

9.  United States Magistrate Judge Cecilia Romero,

10. Utah Supreme Court Chief Justice Matthew Durrant,

11. Utah Governor Spencer Cox,

12. Utah Lieutenant Governor Dierdre Hendersen,

13. The Utah State Senate President, Stuart Adams,

14. Two Utah State Senators, Daniel McKay and Curtis Bramble

15. The Speaker of the Utah House of Representatives, Mike Schulz

16. A Tenth Circuit clerk,

17. Two clerks of this Court,

18. Four BLM employees,

19. The Davis County Clerk, and

20. The URP Defendants.

And absent intervention, at least two more elected officials will face a frivolous suit despite there being no factual basis supporting it and regardless of the absolute legislative immunity[7] that will make the lawsuit truly pointless.

---

[7] *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) ("we have held that state and regional legislators

Mr. Axson, Ms. Coleman, and Mr. Null are unique among those sued by Plaintiffs to date because they are not government employees and have had to personally bear the costs of their legal representation, to date a total of $92,843.00. But the costs of Plaintiffs' procedural vandalism should not be borne by the URP Defendants. Federal law provides an avenue for defendants named in frivolous civil rights suits to obtain attorney fees and the URP Defendants request that the Court order the Plaintiffs to pay the attorney's fees they so gleefully intended to impose on the Defendants.[8] The URP Defendants also move the Court to enter an injunction to protect the public and public servants from further abuses by Plaintiffs Huber and Halvorsen.

## APPLICABLE LAW

In pertinent part, 42 U.S.C. § 1988(b) provides that "[i]n any action or proceeding to enforce [Section 1983] . . . the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee as part of the costs…." Attorney's fee awards under Section 1988 are not limited to prevailing plaintiffs and can be awarded to prevailing defendants when "the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."[9] "In enacting § 1988 . . . Congress sought 'to protect defendants from burdensome litigation having no legal or factual basis.'"[10] A frivolous suit is one "based on an indisputably meritless legal theory, ... [or] whose factual contentions are clearly baseless."[11]

---

are entitled to absolute immunity from liability under § 1983 for their legislative activities.")

[8] *See* Dkt. No. 87-2 (wherein Plaintiff Halvorsen accompanies a picture of 12 large, wrapped boxes in an x.com post with the caption, "Can you imagine the amount of money each Defendant will have to spend in order to defend themselves. How much will an attorney cost to read a 20 pound complaint?").

[9] *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (adopting and quoting the standard from Title VII claims established in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)).

[10] *Fox v. Vice*, 563 U.S. 826, 833 (2011) (citing *Christiansburg* 434 U.S. at 420).

[11] *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

The fact that Plaintiffs are proceeding *pro se* is not a bar to an attorney fee award. "An unrepresented litigant should not be punished for his failure to recognize subtle factual or legal deficiencies in his claims."[12] "However, Plaintiffs' claim did not suffer from a 'subtle' deficiency."[13]

## ARGUMENT

### I.    The URP Defendants Are Prevailing Parties

Under § 1988 the Moving Defendants may be entitled to attorney's fees if they are prevailing parties. There can be no dispute that Moving Defendants are prevailing parties.

The Court granted the URP Defendants' Motion to Dismiss in a brief docket order that adopted the Magistrate's Report and Recommendation and overruled Plaintiffs' objections to the Report and Recommendation.[14] Magistrate Judge Bennett's Report and Recommendation, meanwhile, analyzed each of Plaintiffs' claims against the URP Defendants and found them all deficient for reasons in addition to the failure of Plaintiffs' "key contention" identified by the Court in its docket order.[15] Plaintiffs did not object to the portions of the Report and Recommendation that specifically related to the Plaintiffs' claims against the URP Defendants, meaning they have waived further review of those claims. Therefore, URP Defendants obtained "enduring relief on the merits that alters the legal relationship between the parties."[16]

### II.    Plaintiffs' Claims Against The URP Defendants Were Frivolous, Lacked Foundation And Were Unreasonable.

---

[12] *Hughes,* 449 U.S. at 15.
[13] *Blackburn v. Webb*, No. CIV-23-379-R, 2024 WL 4607718, at *3 (W.D. Okla. Oct. 29, 2024).
[14] ECF No. 132.
[15] ECF No. 120 at pp. 34-42
[16] *Lackey v. Stinnie*, 604 U.S. 192, 207 (2025)

The second thing the Court must find to award attorney's fees to the URP Defendants is that Plaintiffs' claims were frivolous, unreasonable, or without foundation.

### A. Plaintiffs' SB 54 Theory Contradicted Controlling Precedent

The Court did not need to undertake a complicated legal analysis to dispose of all Plaintiffs' claims. The dismissal came in a docket text order without need for an extensive opinion, stating in part:

> The key contention underlying Plaintiffs' claims is that the State's requiring the placement of candidates who have submitted the specified number of signatures on the ballot for the Republican primary even when those candidates have been rejected by the Republican nominating convention contravenes Utah law and is unconstitutional. But however the undersigned might resolve these issues if they were presented as a matter of first impression, they are plainly controlled by the decisions of the Utah Supreme Court in *Utah Republican Party v. Cox*, 373 P.3d 1286 (Utah 2016), and the Tenth Circuit in *Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018). The court has little difficulty concluding that the different procedural posture here does not provide a sound basis for disregarding the plain import of those decisions.[17]

The entire legal basis for Plaintiffs' 92 page lawsuit with its more than 90 exhibits was eradicated with three simple sentences. It is easy to conclude that the Plaintiffs' entire suit was "based on an indisputably meritless legal theory"[18] since all Plaintiffs' claims were predicated on this "key contention," and the entire complaint was "plainly controlled" by two decisions that Plaintiffs were aware of and cited[19] when they initiated this litigation.

### B. Plaintiffs' Specific Claims Against the URP Defendants Lacked A Legal Basis

Even if this key contention had not been so clearly baseless, Plaintiffs claims against the

---

[17] ECF 132.

[18] *Neitzke*, 490 U.S. at 327.

[19] *See e.g.* ECF 7 at ¶ 5 (citing Judge Tymkovich's dissent in *Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018)).

URP Defendants would still be frivolous for additional independent reasons.

The only conduct Plaintiffs allege the URP Defendants engaged in that supposedly caused them harm was: (1) Robert Axson wrote an email that, among other things, said that Plaintiff Halvorsen's Notice of Intent was "meritless"; and, (2) the URP Defendants called the police to have Plaintiff Halvorsen removed from a Utah Republican Party Central Committee meeting when she would not leave after being directed to do so by the chair of the Committee, Mr. Axson.

1. *Plaintiffs Sophie Anderson, Nancy Inman, Steven Huber, Wayne Wickizer, and Daniel Newby Suffered No Deprivation of Their Rights.*

For all the Plaintiffs other than Plaintiff Halvorsen, there is no plausible theory that their rights or interests were affected by either of the two alleged incidents. Consequently, Nancy Inman, Steven Huber, Wayne Wickizer, and Daniel Newby lack standing because they suffered no harm, and they cannot make a claim based on alleged infringement of Plaintiff Halvorsen's rights.[20] Their claims against the URP Defendants were all indisputably meritless and frivolous.

2. *Plaintiff Halvorsen Had No Federally Protected Right That Was Infringed By Any Text Or Email Of Robert Axson.*

Plaintiff Halvorsen's claims fared no better. Plaintiffs did not articulate any coherent legal theory under which Mr. Axson violated Plaintiff Halvorsen's Constitutionally protected

---

[20] It is well established that "a section 1983 claim must be based upon the violation of [the] plaintiff's rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir.1990). Moreover, to the extent they claim that the harm to Plaintiff Halvorsen somehow affected their rights, that claim also fails because the Complaint contains no allegation that the URP Defendants specifically intended to harm their rights when they responded to Plaintiff Halvorsen's email or removed Plaintiff Halvorsen from the URP committee meeting. *See Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1190 (10th Cir.1985) (even though complaint alleged "intent with respect to" harmed victim's rights, "this intent may not be transferred to establish intent to deprive" others of their constitutionally protected rights.)

rights by sending his email in response to her Notice of Intent. As the Report and Recommendation concluded, "[a]lthough Ms. Halvorsen had a First Amendment right to send the Notice of Intent, she did not have a federally protected right to have her views in the Notice of Intent heard or met with approval."[21] Besides, Mr. Axson's assessment that Plaintiff Halvorsen's theory was "meritless" was vindicated by this Court's order summarily dismissing all Plaintiffs' claims.

3. *Removing Plaintiff Halvorsen From A Private URP Committee Meeting Did Not Infringe Her Constitutionally Protected Rights Because She Had No Constitutionally Protected Right To Attend The Committee Meeting.*

Plaintiff Halvorsen also failed to articulate a theory under which her Constitutionally protected rights were infringed by the URP Defendants' efforts to remove her from the September 7, 2024 meeting. As the Report and Recommendation concluded:

> a private body like a political party has neither a constitutional obligation to open its meetings to the public nor an obligation to allow Ms. Halvorsen to speak at its meetings. Because Ms. Halvorsen did not have a federally protected right to attend or speak at the Committee Meeting, Plaintiffs' section 1983 claim based on the URP Defendants' alleged attempts to exclude her from the Committee Meeting should be dismissed with prejudice.[22]

4. *Plaintiffs Did Not Articulate A Coherent Theory That the URP Defendants Were State Actors.*

---

[21] ECF 120 at 35, citing *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984) (stating that individuals "have no constitutional right to force the government to listen to their views"). Plaintiffs did not object to this finding in the Report and Recommendation and have therefore waived further review of it.

[22] ECF 120 at 36.  In the Complaint Plaintiffs identified three sources of authority that they claimed gave Plaintiff Halvorsen a right to attend the meeting – the URP bylaws, Roberts Rules of Order, and Utah's Open and Public Meetings Act – but in the Report and Recommendation Judge Bennet clearly explained why those sources of authority did not support and indeed undermined Plaintiffs' argument that Plaintiff Halvorsen was allowed to attend the meeting. *See id.*, at 37-39. Again, Plaintiffs did not object to this section of the Report and Recommendation.

The Report and Recommendation found that the URP Defendants were not state actors and Plaintiffs did not object to those findings.[23] Plaintiffs argument that the party leadership are state actors flies in the face of the allegations in their Complaint. Plaintiffs' overarching theory is that the URP is a totally independent private entity and must be insulated from state regulation or influence. For Plaintiffs § 1983 claim to be viable, however, the leadership of this entirely independent private political party must be *the state*.[24] Of course, there is no legal basis for contradictory and incoherent theories like this.

5. *Plaintiffs RICO Claims Lack A Legal Or Factual Basis*

Finally, Plaintiffs' RICO claims require a showing that the URP Defendants were part of an enterprise and joined a conspiracy. Plaintiffs do not even bother to allege that the URP Defendants conducted[25] the affairs of an enterprise or that the enterprise had the necessary structure[26] for a viable RICO claim. And when Plaintiffs' conspiratorial musings lead them to allege a "secret" meeting of the conspirators,[27] the URP Defendants were not there. Simply put, it appears Plaintiffs did not really try to connect the URP Defendants to any of their RICO claims. The RICO claims against the URP Defendants are indisputably meritless in both their

---

[23] ECF 120 at p. 39.

[24] *See e.g*. ECF 1 at ¶ 147 stating "On August 31, 2024, Robert Axson, **acting under color of law as a party official** . . . sent an email to Central Committee Members dismissing concerns about election fraud raised by Plaintiff Halvorsen." (emphasis added).

[25] *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (Liability under the RICO statutes requires a showing that the "the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs.") (internal quotation marks omitted).

[26] *Boyle v. United States*, 556 U.S. 938, 946 (2009) ("an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.")

[27] See ECF 1 at ¶¶ 67-69.

legal theories and their factual contentions.

Plaintiffs' entire lawsuit rests on an indisputably meritless legal foundation. The factual contentions for Plaintiffs' claims – an email and removal from a meeting – are plainly baseless.

### III.    The URP Defendants' Attorneys Fees Are Reasonable And Were A Result Of Plaintiffs' Frivolous Claims and Steps to Multiply Litigation

The URP Defendants' attorney's fees are reasonable. Plaintiffs filed a 92-page complaint with more than 90 exhibits. Simultaneously with the filing of the Complaint, Plaintiffs filed a motion for a preliminary injunction. Later, Plaintiffs filed a frivolous motion for sanctions[28], that the URP Defendants were forced to respond to. Plaintiffs filed numerous additional motions that URP Defendants could have responded to but did not because they were patently ridiculous, such as Plaintiffs' Motion to Join the United States as a Plaintiff.[29] Making the decision not to respond to all Plaintiffs' baseless motions reduced URP Defendants' fees.

The URP Defendants filed their Motion to Dismiss[30] and a reply in support;[31] the Court granted this motion. URP Defendants also filed an opposition to Plaintiffs Motion for Preliminary Injunction,[32] which was also successful. Additionally, URP Defendants filed a motion for an extension of time, which was granted, when Plaintiffs unreasonably refused to stipulate to an extension after a similar extension had already been granted to the other Defendants.[33] And, URP Defendants filed responses to Plaintiffs' frivolous Motion for

---

[28] ECF 100 (Pls' Mot. for Sanctions Pursuant to FED. R.CIV. P. 11 AND 28 U.S.C. § 1927), 110 (URP Defs' Mot. to Strike Sanctions and Mem. in Support Thereof), 117 (URP Defs' Mem. in Opp. Re Mot. for Sanctions).

[29] ECF 48.

[30] ECF 87.

[31] ECF 108.

[32] ECF 93.

[33] See Exhibit 2; *See e.g.*, ECF 64 (Order granting Def. Brian McKensie's Mot. to Extend

Sanctions. The URP Defendants filed a response to Plaintiffs Objections to the Report and Recommendation, largely for the purpose of noting that Plaintiffs' failure to file specific objections to the portions of the Report and Recommendation relating to Plaintiffs' claims against the URP Defendants waived those objections.[34] Finally, the URP Defendants prepared and filed this motion.

URP Defendants' counsel are experienced attorneys who have litigated dozens of federal trials including taking Section 1983 claims to trial in this Court.[35] To date URP Defendants' counsel has billed a total of 151.6 hours totaling $92,843.00.[36] These hours were incurred because of Plaintiffs' frivolous and factually unfounded claims. And in the opinion of an experienced and respected attorney in the community, D. Craig Parry, who has himself defended a Section 1983 matter through trial in this Court, and who has extensive experience as opposing counsel to URP Defendants' counsel, the hours expended and rates charged by URP Defendants' counsel are reasonable for the needs of this case and the prevailing rates in the community.[37]

Plaintiffs knew the URP Defendants would incur costs; indeed, it appears that at least part of Plaintiffs' objective was to force the URP Defendants to incur costs. At the time Plaintiffs filed their Complaint, Plaintiff Halvorsen asked on x.com, "Can you imagine the amount of money each Defendant will have to spend in order to defend themselves. How much will an

---

Deadline), 66 (Order Granting Defs. Spencer Cox, Diedre Henderson, et al.'s Mot. to Extend Deadline), 73 (URP Defs.' Mot. to Extend Deadline), and 74 (Order Granting URP Defs.' Mot to Extend Deadline).

[34] ECF No. 130.

[35] *See* Exhibit 3

[36] *Id.*

[37] *See*, Exhibit 4.

attorney cost to read a 20 pound complaint?"[38] And in their Motion for Preliminary Injunction, Plaintiffs requested that the Court order the URP not to pay the URP Defendants' attorney's fees, attempting to force the URP Defendants to personally bear the costs.[39] The Court should order Plaintiffs to pay the fees Plaintiff Halvorsen so glibly dreamed of inflicting on the URP Defendants.

Plaintiffs also cannot feign surprise at the amount of the URP Defendants' fees. To support their lawsuit, even though they were proceeding *pro se*, Plaintiff Halvorsen launched a crowd-funding campaign on the website GiveSendGo with a goal of raising $30,000 (to date she has raised more than $20,000) claiming that amount was necessary merely to pay for copies and filing fees.[40] If Plaintiffs believed $30,000 was a reasonable fundraising target for copies and filing fees, they knew the fees for attorneys would be much higher.

## IV.    The Court Should Impose Filing Restrictions Against Plaintiffs Halvorsen And Huber

As a sanction the Court may also impose limitations on Plaintiffs' ability to file future frivolous claims. "The right of access to the courts is neither absolute nor unconditional, and there is no constitutional right of access to the courts to prosecute an action that is frivolous or malicious."[41] Courts have the inherent power to regulate and curtail vexatious and groundless litigation by "imposing carefully tailored restrictions under the appropriate circumstances."[42] While filing restrictions may not deny a litigant "meaningful access to the courts," the

---

[38] ECF 87-2.
[39] ECF 7 at ¶ 20.
[40] https://www.givesendgo.com/utahcorruption.
[41] *Tripati v. Beaman*, 878 F.2d 351, 353 (10th Cir.1989) (internal citation omitted).
[42] *Cotner v. Hopkins*, 795 F.2d 900, 902 (10th Cir. 1986).

restrictions may nevertheless be as onerous as necessary "to assist the district court in curbing the particular abusive behavior involved." *Id.* When imposing filing restrictions upon litigants, the court must: (1) set forth the history of abusive litigation; (2) specify the guidelines as to what the litigants may do to obtain permission to file an action; and (3) provide the litigants with notice and an opportunity to oppose the restrictions before implementation.[43]

### A. Plaintiffs Huber and Halvorsen Have Worked Together To File Vexatious And Frivolous Litigation Against The United States Bureau of Land Management

For Plaintiffs Huber and Halvorsen this is not the only case they have pending before this Court. In July, 2025, Plaintiff Huber filed a lawsuit against the United States, the Department of the Interior, the Bureau of Land Management, and four BLM employees ("**Huber I**").[44] The gist of the claims in Huber I was that the defendants had violated Mr. Huber's rights because they did not grant access across BLM land for him to reach his property.[45] Mr. Huber acknowledged that he could have filed an application to obtain an easement, but it would have entailed an application fee and annual rental payments, which he refused to pay.[46] Rather than file an application and pay associated fees of a few thousand dollars, Mr. Huber filed a lawsuit alleging that the United States, the BLM and four BLM employees were engaged in robbery and extortion (for requesting the application fees), couching the government employee's actions as a RICO enterprise. The email address used by Mr. Huber in Huber I is traciehalvorsen@outlook.com, the same email address Plaintiff Tracie Halvorsen uses in this case.

---

[43] *Andrews v. Heaton*, 483 F.3d 1070, 1077 (10th Cir. 2007); *Tripati*, 878 F.2d at 353-54; *see, e.g.* Utah Rule of Civil Procedure 83; *see also, e.g.* Utah Rules of Appellate Procedure 40A.
[44] *See Huber v. United States*, 2:25-cv-00592-TS-CMR.
[45] *See id,* ECF 1 at ¶¶ 24-28, 34-43.
[46] *Id* at ¶¶ 40, 43.

Huber I was initially assigned to Magistrate Judge Cecilia Romero, which Plaintiff Huber did not like because he and Plaintiff Halvorsen do not like magistrates.[47] So apparently as a tactic to get the case assigned to a District Court Judge,[48] Plaintiff Huber filed a motion for a preliminary injunction. He was upset when, after the case was reassigned to Judge Stewart, the motions were referred to Judge Romero, who entered orders granting extensions of time for the United States to respond to Huber's lawsuit and motions. After a status conference where, among other things, Judge Romero would not let Plaintiff Halvorsen sit at counsel table and act like Mr. Huber's lawyer, Mr. Huber filed a petition to the Tenth Circuit seeking an extraordinary writ of mandamus.[49]

In his brief to the Tenth Circuit in Huber I, Huber sought various relief, primarily focused on not having a magistrate involved in his case and specifically having Judge Romero disqualified, as well as disqualifying government lawyers from representing the individual defendants.[50] Also he asked the Tenth Circuit to enter an order allowing him to have whomever he chose "including, but not limited to, his trusted daughter – sit beside him during any court proceedings."[51] The Tenth Circuit quickly dismissed Huber's petition in a simple docket order, which led to the clerk who had the misfortune of performing the ministerial act of entering the

---

[47] See, e.g. Plaintiff Halvorsen's posts on x.com using artificial intelligence videos to mock Magistrate Judge Jared Bennet in this matter:
https://x.com/TracieHalvorsen/status/2017083917052883074 ;
https://x.com/TracieHalvorsen/status/2014932304624501148
[48] Plaintiff Halvorsen has posted on x.com explaining her disdain for magistrate judges and noted the fact that once she files a motion for preliminary injunction the case must be assigned to a district court judge. https://x.com/TracieHalvorsen/status/2014932304624501148
[49] See 2:25-cv-00592-TS-CMR, ECF 48.
[50] Id. at ECF 48 at ¶¶ 4-15.
[51] Id at ¶ 14.

order at the direction of the three-judge panel being named in Huber's second complaint. The case was then stayed pursuant to a general order entered by Chief Judge Jill Parrish because of a lapse in appropriations.[52] Shortly after the stay was lifted Mr. Huber filed a Motion for Summary Judgement, then he filed a second lawsuit.

In the second lawsuit Huber filed on December 3, 2025 ("**Huber II**"), he again used Plaintiff Halvorsen's email address as his own.[53] The general theory of Huber II was that the Tenth Circuit Court of Appeals, the United States District Court for the District of Utah, Judge Romero, the Assistant United States Attorneys handling Huber I, Judge Parrish, a U.S. District Court committee and three court clerks, formed a RICO enterprise to deny him his rights. Specifically, they violated his rights by allowing a magistrate to be involved in the adjudication of Huber I, entering orders granting routine extensions in Huber I, staying Huber I due to the lapse in appropriations, allowing AUSAs to represent the individuals he had sued, having clerks enter docket orders and communicate with counsel for the government, and prohibiting Plaintiff Halvorsen from acting like a lawyer in his case.[54] The object of the improbably composed RICO enterprise was "extortion, obstruction of justice, and wire fraud, committed with the common purpose of depriving Plaintiff of his constitutional and property rights and shielding Government actors from accountability."[55] In addition to the RICO claims, Huber brought multiple civil rights claims alleging his rights were violated for all the reasons described above.[56]

---

[52] *Id.* at ECF 55
[53] *Huber v. Romero*, 2:25-cv-01098-DBB.
[54] See *Id*. at ECF 1 ¶¶ 100, 106, 113.
[55] *Id.* at ¶ 68.
[56] *Id.* at ¶¶ 100, 106. Because all the defendants were federal employees the civil rights claims were fashioned as *Bivens* claims, rather than Section 1983 violations. *See, Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 (1971).

Judge Barlow, who was assigned to Huber II, denied Mr. Huber's motion for a temporary restraining order and preliminary injunction finding he had no likelihood of success on the merits because: (1) his RICO claims "involve government officials acting in their official capacities. . . . [and therefore] are barred by immunity;"[57] (2) the claims against the defendants "in their personal capacities are not likely to succeed because they lack a factual basis"[58] and, (3) Huber II was a collateral attack on and an attempt to revisit rulings he did not like in Huber I.[59] Ultimately Judge Barlow found that "Mr. Huber's motion is without merit."[60] Mr. Huber immediately appealed the ruling to the Tenth Circuit, where it is currently pending.

Huber I and Huber II share many things in common with this case:

1.  Plaintiffs Huber and Halvorsen are personally involved in all three cases;

2.  Plaintiffs alleged RICO violations against government employees who were simply trying to do their jobs;

3.  Plaintiffs Huber and Halvorsen unreasonably refused to engage in typical professional courtesies by refusing to grant routine extensions and making objections to virtually every court order;

4.  Plaintiffs Huber and Halvorsen filed spurious motions attempting to avoid the involvement of magistrates and objecting to rulings by magistrates without any legal basis;

5.  Plaintiffs Huber and Halvorsen attempted to preclude the individual government

---

[57] *Id*. ECF 39 at p. 6.
[58] *Id*. at p. 9.
[59] *Id*. at p. 12-13.
[60] *Id*. at p. 13.

employees from having government counsel represent them;

6.  Plaintiffs Huber and Halvorsen sought sanctions against opposing counsel without any factual or legal basis (and sued opposing counsel from Huber I as defendants in Huber II);

7.  Plaintiffs Huber and Halvorsen sued government employees despite the fact they have immunity for the actions forming the basis of Plaintiffs' claims; and,

8.  Plaintiff Halvorsen is trying to act as a lawyer in all three cases even though she lacks a license or the basic competence necessary to effectively prosecute a lawsuit.

To date Plaintiffs Halvorsen and Huber have filed three lawsuits suing 3 judges, 7 elected officials, 9 federal government employees, the United States, the State of Utah, this Court, the Tenth Circuit, three federal agencies, and the URP Defendants. One might think that lawsuits against such a distinguished collection of defendants would be based on serious violations and that the claims would not be brought without significant proof. Not so. The core issues in the more than 170 pages of complaints Plaintiffs Huber and Halvorsen have filed can be distilled to: Huber I – Plaintiff Huber wants an easement but doesn't want to fill out an application or pay standard application fees; Huber II – Plaintiff Huber (and/or Halvorsen) does not understand or want to abide by ordinary procedural rules of the federal courts; and, this case – Plaintiffs Huber and Halvorsen do not like SB 54 and are upset that other people are unwilling to go along on their attempts to nullify it by defying the law. By all appearances, not a single claim filed by Plaintiffs Huber or Halvorsen in these three lawsuits has even an ounce of merit.

And now Plaintiff Halvorsen is at it again, threatening to sue Utah legislators in federal court alleging civil rights violations if they pass legislation that would further regulate and

criminalize the unauthorized practice of law by people like her. This fourth lawsuit, if filed, will once again inevitably be dismissed because of absolute legislative immunity,[61] but it will be an expensive nuisance to the individuals Plaintiff Halvorsen sues, and to the state of Utah.

Plaintiffs Halvorsen and Huber have an extensive history and established pattern of filing frivolous and abusive lawsuits against public servants and they are actively threatening to do it again. In cases like this where *pro se* plaintiffs have an established pattern and history of filing frivolous lawsuits, the Tenth Circuit has approved of courts imposing limitations on the plaintiffs' future filings. Conditions the Tenth Circuit has approved include requiring the *pro se* plaintiffs, before filing any additional lawsuits: (1) to file a petition with the clerk requesting leave to file a pro se action; (2) to inform the clerk of court in writing of all previously filed or currently pending actions, including all details of the case such as disposition and any sanctions or attorneys fees awarded; (3) to provide a list of any other injunctions or orders limiting access to state or federal courts; (4) to file an affidavit which briefly summarizes the factual basis for the proposed claims and the legal basis for the idea that the claims are warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law.[62] The Chief Judge can then review the petition and associated documents and approve any lawsuits before they are allowed to be filed; if the chief judge does not approve the matter would be dismissed immediately.[63]

Conditions such as those approved the by Tenth Circuit in the *Werner* case would protect the public from future frivolous litigation by Plaintiffs Huber and Halvorsen. For example, had

---

[61] *Bogan* 523 U.S. at 49.
[62] *Werner v. State of Utah*, 32 F.3d 1446, 1449 (10th Cir. 1994)
[63] *Id.*

these restrictions been in place when Plaintiffs Huber and Halvorsen filed Huber II, the Court could have easily identified that the claims against the court, the Tenth Circuit, judges, court clerks and the AUSAs all fell within the scope of their duties and therefore were subject to absolute immunity. The Court then could have disallowed the filing of these frivolous claims before they were filed, saving the judges, clerks and government attorneys from the stress of being sued and saving government attorneys from spending hours of work to address the clearly baseless allegations of the Complaint.

Plaintiffs' access to courts to engage in meritorious litigation would not be meaningfully curtailed. To the extent Plaintiffs Huber and Halvorsen have legitimate lawsuits or claims the Court can easily identify those and allow them to be filed. Also, Plaintiffs could avoid the filing restrictions by simply hiring a licensed attorney to pursue their claims. But under this set of restrictions, people like the URP Defendants, whose actions were entirely in conformity with the law, will not face frivolous and baseless lawsuits or incur the tens of thousands of dollars in fees that defending even patently frivolous claims costs. While imposing an attorney's fee order after the fact goes some distance to protecting "defendants from burdensome litigation having no legal or factual basis,"[64] Plaintiffs Halvorsen and Huber have demonstrated that, in their case, only a prospective filing restriction that avoid the expenses from ever being incurred will truly protect the public (and this Court) from their bad behavior.

The Court can and should impose filing restrictions on Plaintiffs Halvorsen and Huber to protect the public, elected officials, the State of Utah, federal employees, and the federal courts from further frivolous and baseless lawsuits.

---

[64] *Fox*, 563 U.S. at 833.

## CONCLUSION

For the reasons stated above, the URP Defendants request that the Court enter an order requiring the Plaintiffs to pay URP Defendants attorney's fees as set forth in the Declaration attached as Exhibit 3 in the amount of $92,843.00 for which Plaintiffs should be jointly and severally liable. The URP Defendants also ask the Court to impose filing restrictions on Plaintiffs Huber and Halvorsen to protect the public and public servants from further abusive and frivolous litigation.

DATED the 2nd day of March, 2026.

**PARKINSON BENSON POTTER**

*/s/ D. Loren Washburn*
D. Loren Washburn
Brennan H. Moss
Clifford B. Parkinson

*Attorneys for Defendants Kim Coleman,*
*Robert Axson, and Chris Null*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2026, the foregoing DEFENDANTS' MOTION FOR

ATTORNEY FEES UNDER 42 U.S.C. § 1988 AND FOR SANCTIONS, was filed using the

Court's electronic filing system, which gave notice to all counsel of record and to the pro se

plaintiffs.

*/s/ D. Loren Washburn*
D. Loren Washburn